JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THE FORM.)*

## I. (a) PLAINTIFFS

PPT Research, Inc.

## DEFENDANTS

Solvay USA, Inc., d/b/a /Solvay-Rhodia, Solvay, and Solvay USA; and Rhodia Operations S.A.S. d/b/a Rhodia-Solvay, Solvay-Rhodia, Rhodia, Rodia S.A., Rhodia-France, Rhodia, Inc., and Rhodia Group

**(b)** County of Residence of First Listed Plaintiff ___Lehigh___
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant ___Mercer (New Jersey)___
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorney's *(Firm Name, Address, and Telephone Number)*

(see attachment)

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1.  U.S. Government Plaintiff
- ☒ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 2.  U.S. Government Defendant
- ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane    ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability    ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander    Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability    ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine    **PERSONAL PROPERTY** | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability    ☐ 370 Other Fraud | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle    ☐ 371 Truth in Lending | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability    ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury    ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights    **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting    ☐ 463 Alien Detainee | | ☐ 871 IRS-Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment    ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations    ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment    ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other    **Other:**    ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education    ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdiction statutes unless diversity)*:
18 U.S.C. § 1836, et seq.

Brief description of cause:
Misappropriation of trade secrets

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ In excess of $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____  DOCKET NUMBER _____

DATE
June 5, 2020

SIGNATURE OF ATTORNEY OF RECORD
/s/ Justin E. Proper

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

1685278v.2

**<u>Attorneys for Plaintiff</u>:**

Justin E. Proper
White and Williams LLP, 1650 Market Street, Suite 1800, Philadelphia, PA 19103
(215) 864-7165

Thomas B. Fiddler
White and Williams LLP, 1650 Market Street, Suite 1800, Philadelphia, PA 19103
(215) 864-7081

William H. Fedullo
White and Williams LLP, 1650 Market Street, Suite 1800, Philadelphia, PA 19103
(215) 864-7185

Sanford J. Piltch
1132 Hamilton Street, Suite 201, Allentown, PA 18101-1024
(610) 433-6266

UNITED STATES DISTRICT COURT
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 515 Business Park Lane, Allentown, PA 18109 _____

Address of Defendant: _____ 504 Carnegie Center, Princeton, NJ 08540 _____

Place of Accident, Incident or Transaction: _____ Princeton, NJ _____

---

**RELATED CASE, IF ANY:**

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes ☐  No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes ☐  No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: June 5, 2020    *Justin Proper*    202701
  *Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.**  *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☑ 11. All other Federal Question Cases
  *(Please specify):* _____ 18 U.S.C. § 1836 et seq. _____

**B.**  *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Justin E. Proper _____, counsel of record *or* pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: June 5, 2020    *Justin Proper*    202701
  *Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## <u>CASE MANAGEMENT TRACK DESIGNATION FORM</u>

| | | |
|---|---|---|
| PPT Research, Inc. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| Solvay USA, Inc., d/b/a Solvay-Rhodia, | : | |
| Solvay, and Solvay USA; and Rhodia | : | NO. |
| Operations S.A.S. d/b/a Rhodia-Solvay, | : | |
| Solvay-Rhodia, Rhodia, Rodia S.A., Rhodia- | | |
| France, Rhodia, Inc., and Rhodia Group | | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. §2241 through §2255.    (  )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health    (  )
and Human Services denying plaintiff Social Security Benefits.

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.    (  )

(d) Asbestos – Cases involving claims for personal injury or property damage from    (  )
exposure to asbestos.

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are    (  )
commonly referred to as complex and that need special or intense management by
the court. (See reverse side of this form for a detailed explanation of special
management cases.)

(f) Standard Management -- Cases that do not fall into any one of the other tracks.    (x)

| | | |
|---|---|---|
| June 5, 2020 | Justin E. Proper | PPT Research, Inc. |
| **Date** | **Attorney-at-law** | **Attorney for Plaintiff** |
| | | |
| 215-864-7165 | 215-399-9620 | properj@whiteandwilliams.com |
| **Telephone** | **Fax Number** | **E-mail Address** |

(Civ. 660) 10/02

1324430v.2

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PPT RESEARCH, INC., | CIVIL ACTION |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| SOLVAY USA, INC., d/b/a SOLVAY-RHODIA, SOLVAY, AND SOLVAY USA; and RHODIA OPERATIONS S.A.S. d/b/a RHODIA-SOLVAY, SOLVAY-RHODIA, RHODIA, RODIA S.A., RHODIA-FRANCE, RHODIA, INC., AND RHODIA GROUP., | |
| Defendants | |

Plaintiff PPT Research, Inc. ("PPT"), by and through its undersigned counsel, hereby alleges and complains as follows:

**INTRODUCTION**

1.     This action involves Solvay USA, Inc. and Rhodia Operations S.A.S.'s (collectively, "Solvay") scheme to steal a groundbreaking and patented technology that PPT spent years and millions of dollars developing.

2.     The technology is known as the LVS micro-gel particle slurry suspension system ("MGP Technology"), which consists of a water-based formula used in the process of cutting solar wafers, which, in turn, are used to manufacture the solar cells for solar panels.

3.     Solvay gained access to PPT's confidential, proprietary and patented technology by entering into a sham Technology Licensing Agreement ("TLA") with PPT, which it never intended to perform.

4.      Under the TLA, PPT licensed the MGP Technology to Solvay for use in China and South Korea in exchange for a modest royalty fee of 7%.

5.      PPT accepted this small royalty fee to gain access to the lucrative China solar market with which Solvay purported to have extensive ties.

6.      PPT (and Solvay) knew that PPT's MGP Technology would be worth hundreds of millions of dollars once it was successfully commercialized in China.

7.      Prior to entering into the sham contract, Solvay had expressed an interest in acquiring the MGP Technology outright, but PPT refused to accept what it perceived to be a low ball offer.

8.      At the time PPT entered into the sham contract with Solvay, PPT knew its technology worked and it further knew that the enormous value this technology would have after it was commercialized in China and Asia.

9.      While the contract gave Solvay a right of first refusal to purchase this lucrative technology, Solvay had no intention of ever paying market value for MGP Technology.

10.      Solvay had a dilemma: it desperately wanted PPT's technology, but it did not want to pay for it.

11.      Solvay's solution to this problem was to devise a plan to usurp PPT's intellectual property and disrupt t its existing patents and patent applications through the misappropriation of PPT's trade secrets.

12.      Incredibly, Solvay actually laid out its plan in an internal document titled: "PPT Research Commercialization Story Board - Short update" ("CSB").

13.      Solvay inadvertently sent this document to PPT years later when it sought to terminate the relationship.

-2-

14.     The CSB confirms that Solvay had no intent of complying with its contractual

obligations to PPT.

15.     The CSB laid out a multi-step plan to usurp PPT's technology.

16.     The plan hinged on discrediting the technology and secretly filing a fraudulent

patent application to disrupt and de-value PPT's existing intellectual property and patents/active

applications.

17.     The CSB detailed how Solvay would endeavor to coerce PPT into falsely

admitting that the MGP Technology did not work in its present form, and to mislead potential

customers into believing the same

18.     After discrediting the technology, the CSB details how Solvay would develop an

"independent" solution to an existing performance issue of water-based slurries (i.e.; thick – thin

wafer formation or "T/T") that it would then patent in its own name, despite the fact that PPT

had already presented two viable and tested solutions to this issue, which Solvay arbitrarily

rejected for customer introduction.

19.     Solvay excluded PPT from any involvement or knowledge of their development

activities.

20.     This plan, if successful, would have prevented PPT from selling its patented

technology.

21.     If the clandestinely developed Solvay solution did not provide the expected

results to give Solvay the technical basis for their "disrupting patent application", the CSB

detailed how Solvay (still refusing to implement the valid and tested T/T solutions from PPT)

would cancel the project by falsely claiming that PPT breached the agreement by not delivering

the transfer of technology as required in the agreement.

22.     The CSB detailed that, if the solution did not show improvement, Solvay would deceitfully cancel the TLA by falsely claiming that important technology and composition components had not been provided.

23.     Solvay proceeded to execute this plan to perfection.

24.     Rather than market the MGP Technology as required by the contract, Solvay intentionally deviated from PPT's patented technology, training, S.O.P.s, recommendations and directions in tests with China based solar wafer manufacturers to ensure that the tests would fail.

25.     Solvay simultaneously worked to develop an "independent" solution to the very problems to which it had ready-made solutions from PPT.

26.     Solvay was adamant about developing its own additive/process solution to the T/T issue, which it was determined to patent in the Solvay name only.

27.     This was the linchpin to its plan of usurping PPT's MGP Technology.

28.     In November 2015, and in furtherance of the scheme laid out in the CSB, Solvay met with PPT at the PPT facilities in Allentown, PA and claimed to have developed an "independent" T/T solution.

29.     At the Allentown meeting, Solvay claimed that the purportedly "independent" nature of this T/T solution was patentable, and that Solvay had the sole right to file a patent application based on this "new" solution.

30.     The culmination of the plan involved coercing PPT into agreeing to allow Solvay to patent the Solvay solution in Solvay's own name.

31.     Rather than focusing its efforts on commercializing PPT's technology, Solvay spent the next five months lying to PPT in an effort to co-opt PPT's valuable technology.

32.     Solvay needed to convince PPT that it came up with an "independent" solution.

33.    Solvay accomplished this objective in two ways.

34.    First, Solvay refused to tell PPT anything about its "independent" solution unless and until PPT signed an amended TLA allowing Solvay to patent the solution in its own name.

35.    Second, in response to a memo from PPT, Olivier Touret, Solvay Senior. Vice President, falsely represented to PPT in January 2016 that the proposed patent application that Solvay was planning to file did not involve any new additive or change in LVS composition, but only clarified the wire saw operating conditions needed to use the LVS slurry system properly in China.

36.    PPT relied upon Solvay's false representations about having developing an "independent" solution and its false statements about problems with PPT's technology in agreeing to an amended agreement in April 2016.

37.    Unbeknownst to PPT, Solvay had already filed a patent application some five months earlier in November 2015, and thus, the entire premise of the amended TLA was a lie.

38.    _No language_ in the Amendment granted any permission for retroactive filing of any patent application.

39.    Solvay also lied about the solution being "independent".

40.    PPT later learned when it saw the Solvay PCT filed patent application, for the first time, in April 2018 that the solution was anything but "independent".

41.    Solvay's solution was derived from PPT work product shared with Solvay and was a derivative of PPT's patented technology and confidential intellectual property.

42.    The entire amended TLA was secured by fraud and in furtherance of the CSB.

43.    Although Solvay was successful in misappropriating PPT's MGP technology, it ultimately failed in its efforts to commercialize the technology in China.

-5-

44.     During the two years Solvay spent trying to fulfill its plan to usurp PPT's technology, another new technology, diamond wire slicing (DWS), was on a parallel path to solar wafer slicing qualification assuming they could eliminate their own system problems and failures.

45.     PPT and Solvay knew before ever entering into an agreement that this new technology was being developed and would be going through testing at the same time as PPT's technology was being tested and qualified.

46.     PPT had a huge advantage over this competing technology because the latter required manufacturers to incur large equipment conversion costs whereas PPT's technology had none.

47.     But everyone also knew that if this competing technology was adopted before PPT's technology, then PPT's window to enter this lucrative market would be effectively closed.

48.     No manufacturer would change to PPT's technology after incurring these large equipment conversion costs to accommodate the DWS method.

49.     There was a race to market and there would only be one winner.

50.     For this reason, the original licensing agreement had a "time is of the essence" clause.

51.     Solvay's willful and intentional plans to usurp PPT's technology, and control or own as many aspects of the technology, market and customer base as possible ended in such an extensive qualification time delay, that it ultimately prevented PPT from beating this competing technology to market.

52.     Had Solvay properly and compliantly marketed PPT's technology in full cooperation with PPT, honored its contractual obligations, and not introduced purposeful and

extensive time delays which delayed the project by over a year, PPT would have easily beat this competing technology to market.

53.     But for Solvay's breaches of contract and scheme to steal PPT's trade secrets, PPT's technology would have been the prominent technology in the Asian market, not the competing technology that now exists.

54.     Solvay's conduct was and is a substantial factor in PPT losing out on a lucrative business opportunity with production revenue that easily would have exceeded $100 million annually.

## PARTIES

55.     Plaintiff PPT Research, Inc. (PPT) is a Pennsylvania corporation with its principal place of business located at 575 Business Park Lane, Allentown, PA 18109.  PPT is a citizen of the Commonwealth of Pennsylvania.

56.     Defendant Solvay USA, Inc. (aka Solvay-Rhodia, Solvay, Solvay USA, Novecare, et.al.) is a Delaware corporation having its principal place of business at 504 Carnegie Center, Princeton, NJ 08540, which corporation does business in Pennsylvania through its own satellite offices and those of related, subsidiary, branches, divisions, business units, facilities and/or affiliated companies and /or locations in over fifty locations throughout the U.S.A. Solvay USA is a citizen of the State of Delaware and the State of New Jersey.

57.     Defendant Rhodia Operations S.A.S. (aka Rhodia–Solvay, Solvay-Rhodia, Solvay SA, Rhodia, Rhodia S.A., Rhodia-France, Rhodia Inc., Rhodia Group, et.al.) is a foreign corporation, believed to be originally organized in France, acquired by Solvay in 2011, and having approximately eighteen U.S. offices, sites, manufacturing facilities, research facilities and

other places of business in the U.S. including offices in New Jersey at the same location as the

principal offices of its parent company, Solvay and/or Solvay USA, Inc.

## JURISDICTION AND VENUE

58.     This Court has jurisdiction over PPT's claims under the Defend Trade Secret Act,

18 U.S.C. § 1836(b)(1) and (c) pursuant to 28 U.S.C. §1331 and supplemental jurisdiction over

PPT's state law claims pursuant to 18 U.S.C.§1367, because the federal and state law claims

arise from a common nucleus of operative fact.  This Court also has subject matter jurisdiction

over this action pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship

between plaintiff and all defendants and the amount in controversy exceeds $75,000.

59.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) because a

substantial part of the events or omissions giving rise to PPT's claims occurred in this district.

## STATEMENT OF FACTS

### PPT AND THE RELEVANT MARKET

60.     PPT is a small research and development company more recently specializing in

low or non-toxic chemicals and compositions for use in the silicon ingot solar wafer slicing

industry worldwide.

61.     Solar energy is one of the most popular renewable energy sources. In recent years,

more solar energy capacity has been deployed than traditional energy source capacity.

62.     The global solar energy market is expected to reach $422 billion in 2022, in

comparison to $86 billion in 2015.

63.     The solar wafer manufacturing process includes melting elemental silicon in a

crucible to form an ingot.

64.     The ingot is sliced in a wire saw to make silicon wafers.

-8-

65.     Prior to 2016, wire saws for poly-silicon wafer production used a slurry of abrasive grain (powder) and glycol, which was poured over a web of steel wire.

66.     The wire, which can be hundreds of kilometers long, is wound over wire guides rolls to form a web of parallel slicing wires.

67.     These wire guide rolls have thousands of grooves, which direct the web of parallel wires, all moving at high speeds.

68.     The web of parallel wires moving at high speed carrying the abrasive slurry poured onto the wire web initiates a synchronous series of precision cuts across the silicon brick or ingot.

69.     The abrasive slurry, carried by the wires, performs the actual cutting, at speeds of 300 – 450μm/min.

70.     The finished cut, rinsed and separated wafers are then processed in a "fab" either into solar cells or integrated circuits for computer chips depending on the type and purity of silicon ingots used, the configuration of the wire saw, the shape of the silicon ingot, and other slicing parameters.

71.     The solar wafer market is split between mono- and poly-silicon wafer productions, with poly-wafers consisting of approximately 75% of a nearly 60 gigawatt market in 2015.

72.     The majority of mono wafer producers had already switched to a new wire with embedded diamonds, removing the logistics of slurry management and permitting faster cutting speeds.

73.     This placed a strong market pressure on poly wafer producers as growth concentrated around the mono wafer, resulting in price softness for poly wafers.

74.     Diamond wire was less suited for poly-wafer producer.  Additional trials, tests and performance issue resolutions for the diamond wire technology, including "thick–thin" wafer formation (T/T), were necessary for commercialization.

75.     PPT and Solvay were acutely aware of these efforts to commercialize diamond wire for poly-wafers.

76.     This created a proverbial race to market between PPT's patented micro gel particle or MGP technology and diamond wire.

### PPT's PATENTED MGP TECHNOLOGY

77.     In 2003 and 2004, PPT began developing a water based slurry stabilization system using its newly developed MGP Technology.

78.     In approximately 2010 to 2011, PPT began focusing commercial development of its water based slurry system in the areas of ingot slicing and wafer lapping applications beginning in the 2010 – 2011 time frame.

79.     The MGP technology was, and continues to be, marketed by PPT under the product name LVS.

80.     The LVS permits replacing the glycol, a petroleum derivative, with water.

81.     The application of PPT's LVS technology leads to cost reduction in wafer manufacturing, specifically the slicing of ingots into solar wafers on wire saws.

82.     LVS functions to stabilize the abrasive slurry system by prevention of abrasive solids agglomeration and coagulation for better, more even and homogeneous cutting action at higher speeds and reduced byproduct processing, all with environmentally friendly materials as a drop-in system.

83.     Unlike diamond wire, the LVS system enabled cost savings that could be rapidly implemented by the remaining slurry producers without the need for investment in saw equipment modification, thus satisfying their critical and acute need for reduced costs.

84.     Upon information and belief, the conversion costs to use diamond wire are approximately $100,000 per saw which could result in a capital investment of over $100 million for a large poly-wafer manufacturer.

85.     The cost of the diamond wire itself also is significantly more expensive than wires used with a slurry formulation.

86.     With optimization and the selection of high-performance "structured" wire, LVS could match the same savings as diamond wire, and possibly exceed it without the substantial costs associated with using diamond wire.

## PPT'S RELATIONSHIP WITH SOLVAY

87.     Beginning in late 2013 and continuing into early 2014 PPT was proceeding to demonstrate commercialization capability of its MGP technology with a number of its customers in Europe, the United States, and Taiwan.

88.     In late March of 2014, Solvay-Rhodia contacted PPT to discuss a potential joint venture or partnership in PPT's proprietary MGP technology.

89.     In June 2014, PPT and Rhodia, an acquired company and subsidiary of Solvay/ Solvay U.S.A., entered into a Reciprocal Confidentiality Agreement ("RCA") for the purpose of exchanging confidential information pertaining to the MGP Technology and their respective businesses.

90.     In August 2014, the RCA was amended to include Solvay USA ("First Amended RCA").

-11-

91.     In August 2014, PPT and Rhodia/Solvay USA entered into a Memorandum of Understanding permitting Rhodia/Solvay USA to conduct due diligence of the MGP Technology and allowing either or both of them to offer a business relationship with PPT to expand commercialization opportunities for the MGP Technology within an extendible ninety (90) day term.

92.     Beginning in the latter half of 2014 and continuing through March 2015, PPT provided to Solvay virtually unrestricted access to trade secrets and technical know-how under the covenants and restrictions of the Reciprocal Confidentiality Agreement and the First Amended RCA, and permitted Solvay to actively observe and/or participate in LVS customer demonstrations and qualification trials at selected locations.

93.     For instance, in late 2014, Rhodia/Solvay sent its LVS project manager, Matthias ("Matt") Braem, to visit a PPT LVS trial customer, PV Crystalox, located in Germany.

94.     As told to PPT by Solvay, Mr. Braem was hired specifically to be the Project Manager for the LVS project due to his background at Bekaert Wire – the OEM of the multi-axis structured wire ("MASW").

95.     At PV Crystalox, the Head of Technology for Crystalox conducted extensive discussions, observations and reviews of the wire saw system used for LVS trials, and Q&A talks over a period of 2 days with Mr. Braem about LVS performance including the production process and wire saw set up used for LVS production level trials compared to that of standard glycol slurry.

96.     In January 2015, PPT Research provided further extensive training to Mr. Braem at its research facilities about the LVS water-based suspension system, wire saw operating

parameters and processes as well as trouble-shooting potential issues that may arise at various customer sites on different wire saws.

97.     In order to provide additional proofs of the efficacy of the LVS product, Solvay conducted its own due diligence on various aspects of the LVS system.  For example, in addition to customer visits and discussions, Solvay submitted an LVS sample to the renowned Fraunhofer Institute in Germany for analysis of PPT Research's technical claims and performance likelihood.

98.     On December 1, 2014 Fraunhofer reported that the LVS technology performed as claimed, agreeing with the commercial concept for the solar wafer cutting slurry, *i.e.,* the MGP Technology.

99.     After receiving technical training and the Fraunhofer report, Rhodia/Solvay informed PPT that it wanted to move forward with a business relationship.

100.    Rhodia/Solvay proposed three separate business relationships, each of which would have resulted in it receiving a significant and entrenched stake and ultimate ownership of PPT's LVS business and technology.  PPT rejected each of Rhodia/Solvay's proposals because they were not in line with PPT's business plan to increase the value of its MGP technology for sale to a third party or alternatively to a few large customers in China and/or Asia.

101.    Rhodia/Solvay had the connections to a region where approximately 75% of the solar market customers are located.

102.    Solvay, in violation of the TLA and the RCA, did not have Sunnywell, Solvay's agent in China, sign any confidentiality agreements required of a "sub-contractor" to the project that directly involved PPT.

-13-

103.    In January 2015 and consistent with PPT's stated business plan, Rhodia/Solvay and PPT began negotiating a license agreement to provide for an exclusive sales and marketing territory in Asia for Rhodia/Solvay.

104.    On April 27, 2015, Solvay USA, Inc. and Novecare (acting on behalf of itself and its affiliates that include Rhodia/Solvay) and PPT Research executed a Technology License Agreement "(TLA)".

105.    The effective date of the TLA was February 20, 2015.

106.    The key terms of the TLA included:

- Parties agree to a limited geographic territory for Solvay USA, Inc. to market the LVS and ancillary products for commercialization, *i.e.,* China and S. Korea.

- Time is of the Essence.  Both parties are keenly aware of widespread industry efforts to qualify diamond wire sawing (DWS), a competing technology and equipment system that could disrupt the LVS-solar ingot cutting market opportunity if qualified beforehand.

- Parties agree to good faith partnership of cooperative spirit, with regular and continuing communication sharing; a major impetus for cooperative efforts as the competitive threat imposed by DWS increases.

- Parties agree that PPT is the sole and exclusive owner of all "Technology", "Technology Package", "Products" and "Know-How" as described in the TLA agreement, including, but not limited to, all trade secrets, transmitted to Rhodia/Solvay for the purpose of LVS commercialization within the "Scope of Use" as defined in the TLA, and any alterations or issue resolutions – regardless

-14-

of which party makes a subsequent discovery or improvement.  The definition of the term "Technology" in TLA is as follows:

> "Technology shall mean the Patents, Patent Rights, technology developed, compositions, formulations, designs and Know-How of Licensor as they directly relate to the Scope of Use.  Technology also shall include all process methods, Q.C. equipment, processes, use know-how, training information, further technology and product development, *whether made by Licensor or not*, and technical applications information, disseminated process, operations or wire saw knowledge, *process issue resolutions* involving use or application of Licensor's technology and Products, or *Product composition alterations* for the Scope of Use." [Emphasis added.]

- In return for access to Solvay resources, its global footprint – particularly the Chinese market, brand recognition, and respect for and compliance with PPT's Intellectual Property ownership, PPT agreed to a 7% royalty based on Rhodia/Solvay's net revenue.

## THE THICK/THIN ISSUE

107.    Prior to signing the TLA, Solvay began LVS trials with solar wafer fabricators in China with the MGP Technology branded as Supersol AR-100.

108.    An LVS trial consists of replacing glycol slurry with LVS water slurry, making any needed LVS system modifications with respect to component proportions, adjusting wire saw set-up and ingot slicing parameter settings, and testing its performance in a wire saw.

109.    During the June through November 2015 time period, Solvay reported that it was experiencing a performance issue involving the formation of alternating thick and thin wafers when using the LVS (*i.e.;* "T/T") at an undisclosed potential customer location.

110.    The T/T issue occurs in standard glycol slurry, but is more prevalent in water slurry.

111.    Solvay requested that PPT resolve this issue with little or no description of the precise operating parameters, or quality control issues with the trials or the name of the potential customer(s) where the trial was/were being performed at that time.

112.    However, PPT was aware of the possibility of a thick-thin (T/T) wafer formation caused by uneven wire spacing (or adjoining wire pairing), which results in successive 'thick' and 'thin' wafers.

113.    PPT had previously developed two tested and proven solutions to this wafer production issue and had transparently advised and disclosed the T/T performance issue and the solutions to Solvay USA, et.al. in 2014 into mid-2015 through continued and frequent testing and performance data.

114.    One of the T/T solutions was to add a limited amount of polyethylene glycol (PEG) to the slurry and the other involved the use of multi-axis structured wire (MASW), often with specific wire saw parameter settings.

115.    Solvay rejected both tested and proven solutions.

116.    PPT had no knowledge or reason to believe that Solvay was working on a solution to the T/T issue.

117.    To the contrary, Solvay tasked PPT with this responsibility.

-16-

118.     Because of Solvay's refusal to accept PPT's T/T solutions, PPT embarked on further research and development efforts to solve the T/T issue minimizing the use of additives or multi-axis structured wire (MASW) which were part of the prior, successfully tested resolutions for this performance issue.

## SOLVAY IMPOSES A "BLACKOUT" AS IT PURSUES ITS CLANDESTINE R&D EFFORTS TO SOLVE THE T/T ISSUE

119.     As PPT worked on alternative solutions, Rhodia/Solvay did not provide PPT with any technical information or updates whatsoever from June 2015 through November 2015, and further did not even advise PPT whether any trials were taking place.

120.     However, Solvay did continue to ask PPT to provide information on technical questions including PPT's progress on solving T/T.

121.     It was not until October, 2015 that the PPT Project Director from Solvay contacted PPT to advise that Solvay had good news, which he would not reveal except in person.

122.     PPT was surprised to hear that there was important news because it was unaware that Solvay was working on any important technical issue of which PPT had not been informed.

123.     PPT was nevertheless anxious to hear of this "news" and asked for the meeting ASAP to which Solvay's project Director (Eric Aubay) responded that the meeting would have to be in late November because they wanted to be completely finished with the work.

124.     A full six weeks later, on November 30, 2015, Mr. Eric Aubay, Solvay Director for the PPT project, gave a superficial presentation to PPT Research about Solvay's development of an "independent" T/T solution.

125.     PPT was shocked to hear of this news, especially since it, under pressure from Solvay, had spent months working on another alternate solution to the T/T issue, believing Solvay to be working in other areas of the project.

126.    Mr. Aubay's presentation was devoid of descriptive data, materials, test results and/or processes used by Solvay to purportedly solve the T/T issue, other than to state that the solution was a combination of an additive and a process.

127.    At the November 30, 2015 meeting, Mr. Aubay also stated that Solvay wanted to patent the "independent" T/T solution in its own name.

128.    This too shocked PPT because under the clear terms of the TLA, PPT owned all improvements or modification to the Technology, regardless of which party derived or developed the improvement or modification, and that PPT did not consent to the filing of any patent application by Solvay or any affiliate.

129.    PPT informed Mr. Aubay about the clear language in the TLA to which he responded that he had never read the TLA, even though he was the PPT Project Director.

130.    He, however, insisted that Solvay had the right to file a patent application because their work was independent and was not derived from PPT's technology.

131.    At the conclusion of the meeting, Mr. Aubay placed a document face-down on the table and requested that PPT review and consider the document, whereupon he left the building. The document was titled "Amendment to Technology Licensing Agreement ("Amended TLA").

**SOLVAY FRAUDULENTLY INDUCES PPT TO EXECUTE AN AMENDED TLA**

132.    The Amended TLA expanded Solvay's exclusive Asian territory by 9 countries, increased the TLA term to six years, and gave it the right to file one or more patent applications in Solvay's name only; an activity expressly prohibited by the signed, executed TLA and the RCA (*i.e.;* Reciprocal Confidentiality Agreement).

133.    Beginning from the November 2015 meeting and continuing into April 2016 (*i.e.;* an additional 4+ months of wasted time), Solvay imposed a continuing total blackout on all LVS

project updates to PPT, including failing to timely provide customer reports and product-technology updates.

134.    Solvay also steadfastly refused to provide PPT Research with any information about its supposed "independent" solution to the T/T issue unless and until PPT agreed to sign the Amended TLA.

135.    In fact, under the terms of the Amended TLA, Solvay was required to provide additive composition information about the solution within 10 days of the Amendment execution and full disclosure report of the "Additive/Process" resolution within 30 days of the agreement execution, as well as provide any copies of patent applications directed to said resolution.

136.    PPT Research received written assurances from Olivier Touret in January 2016 that the patent application Solvay was planning to file did not involve any new additive or change in LVS composition.

137.    Mr. Touret further represented in writing that the patent application would only clarify the wire saw operating conditions needed to use the LVS slurry system properly in China.

138.    Notwithstanding these assurances, PPT refused to sign the Amended TLA because it contradicted material provisions in the TLA, which give exclusive ownership of any formula, composition or process development/improvement and/or modification exclusively and solely to PPT.

139.    Solvay's campaign of extensive and continuing material withholding of important technical, project and customer information from PPT continued as did efforts to commercialize the competing diamond wire technology.

140.    Solvay, by these pre-meditated activities and time delays, seriously jeopardized the otherwise certain adoption of the LVS system at large and crucial China customers.

-19-

141.    Solvay also refused to provide status reports to PPT as required by the TLA until and unless PPT agreed to sign Solvay's proposed Amendment to the TLA.

142.    PPT Research was left with the Hobson's choice of accepting the terms of the Amended TLA or losing out on any possibility of winning the race to market against diamond wire.

143.    In April 2016, PPT signed the Amended TLA based on Rhodia/Solvay's representations that PPT's T/T solutions did not work and that Solvay's T/T solution was "independently" developed.

144.    PPT never would have agreed to execute the Amended TLA but for these representations.

145.    Subsequent to the signing of the Amendment to the TLA, Solvay was required to send to PPT all reports and any patent applications, providing only the many previously withheld documents pertaining to customer trials, including in-house R&D reports, and qualification reports, but failed to provide any patent application document and/or filing particulars.

146.    It took PPT Research valuable extra time to fully review and analyze the content, compliance with PPT standard operating procedure methods and veracity of these documents. This time distraction would have been unnecessary if Solvay had provided the documents in real time as required by the TLA.

147.    However, the documents clearly showed that Solvay had embarked on a clandestine mission from the moment the TLA was executed to develop a solution to the T/T issue on its own, without PPT involvement, knowledge or notification. This was in spite of the fact that PPT had recommended and made available to Solvay tried and tested solutions to the T/T issue.

148.     These efforts included trials at GCL-Poly beginning in or around May 2015.

149.     GCL-Poly is the world's largest poly-wafer manufacturer for solar applications.

150.     PPT did not know these trials were taking place for nearly six months (from June through November), much less that Rhodia/Solvay conducted the trials during or directly after October, 2015 at GCL using an unauthorized and modified form of the LVS formulation employing Solvay's secretly developed T/T solution.

151.     PPT was deprived of any opportunity to attend, contribute, expedite or shorten the time of these trials and/or confer about any issues and/or problems as required by the TLA.

152.     From May 2015 through the execution of the Amended TLA in April, 2016 (after a full year of illicit and unnecessary time delays), Rhodia/Solvay devoted substantial time and resources to developing a solution to a problem for which PPT already had developed two proven solutions.  These two solutions could also be combined for an even more robust resolution.

153.     Despite the time delays associated with Solvay developing its solution and the coercion of PPT, GCL-Poly was very close to approving the LVS system for commercialization.

154.     Solvay's solution was successful in resolving the T/T issue, but no more successful than the solutions recommended by PPT. PPT's solutions could have been implemented at GCL nearly a year earlier than Solvay's solutions.

155.     The only issue that remained to pass the GCL-Poly trial was correcting a wafer cleaning issue.

156.     The small wafer cleaning issue resulted from some wet caking caused by improper slurry composition compliance, which resulted from abrasive overloading in the LVS slurry allowed by Solvay.

157.    Solvay consistently overloaded the slurry with abrasive in contravention to PPT directives, past customer trial results observed by Solvay, and extensive Solvay training.

158.    Solvay did not advise PPT about the wafer cleaning issue at GCL until mid-April 2016.  Very soon after PPT received the GCL slicing report, Solvay desperately sought PPT's assistance to overcome the wafer cleaning issue.  Solvay's report for this series of major production trials still does not acknowledge the significantly over-loaded abrasive level of the LVS slurry as a primary cause.

159.    PPT informed Solvay the cleaning issues were a function of overloaded non-compliant LVS slurry (44% abrasive vs. 36-40% for the simple structured wire) and could be resolved by reducing the abrasive level.

160.    Solvay would not entertain slurry recipe alterations to achieve qualification and insisted that PPT focus solely on an adequate cleaning method alone.

161.    PPT immediately sent to Solvay technical information regarding two different wafer cleaning solutions.

162.    Unfortunately, GCL-Poly made the decision to adopt diamond wire and convert its wire saws to accommodate this technology.

## SOLVAY SEEKS TO TERMINATE THE RELATIONSHIP

163.    Thereafter in January 2017, Solvay notified PPT that it was terminating its involvement in the LVS project effective immediately.

164.    When informed about the six-month mandatory wind down period in the TLA, Solvay modified its position to state that Solvay will not contribute further human resources, R&D work, customer contact or engagement efforts, facilities or laboratory efforts, sales and marketing efforts, personnel, or any further capital toward furtherance of the LVS project.

-22-

165.    Solvay's only caveat was that if PPT were somehow able to commercially qualify LVS on its own, Solvay <u>might</u> consider re-establishing involvement.

166.    Solvay also stated that it now had no continuing interest in the LVS technology, competing against PPT or LVS, or in pursuing the developed additive/process solution that was central to the discussion of Solvay patent application and its demand for the TLA Amendment. This was in spite of the fact that Solvay forced PPT to accept a full year of time delays to achieve these illegitimate goals.

167.    Most crucially, Solvay's abandonment of the project completely destroyed the imminent opportunity for the adoption of the LVS slurry system by the world's largest poly-silicon solar wafer producer, GCL.

168.    Solvay then proposed the drafting of a Termination Agreement separate from the covenants of the TLA, as amended, which covers such action in detail, requesting a full legal dissolution of TLA partnership.

169.    Because there was no partnership created by the TLA or its Amendment, and because all detailed responsibilities and obligations for agreement termination were fully set forth in the TLA, PPT objected to a separate Termination Agreement as unnecessary and redundant.

170.    However, Solvay insisted a separate Termination Agreement be negotiated, and then refused to produce or deliver any documents, reports, information or the crucial "Customer List", which would have allowed PPT to continue the marketing of the LVS system in China, unless and until the separate termination agreement has been negotiated and signed.

171.    Essentially, Solvay used extortionate tactics to force PPT to sign the separate termination agreement, by conditioning PPT's right to access certain crucial document on its

assent to the agreement. This was in spite of the fact that PPT had a legal right to access those documents.

172.    PPT agreed to cooperate with the draft exercise but warned that no "separate" termination agreement shall violate, contravene or add new covenants to those already in force within the TLA, and that **all** documents due to PPT by Solvay in accordance with the TLA covenants of termination, especially the crucial "Customer List", must be provided when a good faith effort by PPT has been made to produce a separate termination agreement.

173.    Solvay verbally agreed.

174.    After successive drafts to reconcile and compromise proposed terms of a Termination Agreement extending over multiple months, no mutually acceptable terms could be achieved.

175.    Solvay continued withholding the required reports, and other documents, including the crucial customer contact data and LVS trial reports and data and would provide these documents only after "the termination agreement is signed," purposefully obstructing any continuing commercial efforts by PPT.

176.    No separate Termination Agreement beyond the covenants defining termination in the TLA was ever signed.

177.    Subsequent to Solvay's termination of the TLA and the failure of the parties to reach a separate termination agreement, PPT requested its corporate attorney send Solvay a notice of material breach of the TLA due to Solvay's continued refusal to deliver documents owed to PPT under the terms of the TLA.

178.    Ultimately a box of documents was received by PPT's attorney in early 2018 from Solvay containing mostly trial data reports and presentations of project updates to Solvay management.

## SOLVAY'S SCHEME TO MISAPPROPRIATE PPT'S TECHNOLOGY IS REVEALED

179.    A detailed inspection of these materials uncovered a Solvay PowerPoint presentation titled: "PPT Research:  Commercialization Story Board – Short Update by M. Braem - June 2015".

180.    Solvay did not produce the original CSB.

181.    The short update to the CSB details the very pattern of deceit Solvay practiced to hide their real intentions to illegitimately acquire PPT's micro-gel particle technology, I.P. and subordinate PPT patents to a plagiarized and illegally filed patent of their own contrivance.

182.    Solvay's illicit scheme is as follows:



183.   Solvay did exactly what it planned to do; it defrauded PPT and intentionally breached the terms of the TLA and the Reciprocal Confidentiality Agreement.

184.   The TLA required and Solvay tasked PPT with resolving the T/T issue yet it was secretly performing trials from May through November of 2015 to develop a redundant T/T solution that it could patent in its own name.

185.   The TLA gave ownership of any product developments to PPT yet Solvay informs PPT on November 30, 2015 that it resolved the T/T issue and demanded an amended TLA allowing it to patent the solution for its own benefit and at the complete expense of PPT.

186.   The TLA requires cooperation and the sharing of information yet Solvay refuses to provide any technical information about the T/T solution or its unilateral efforts to commercialize the LVS technology unless and until PPT agreed to sign the Amended TLA giving ownership of the solution to Solvay.

187.   Solvay knew time was of the essence, yet it wasted months developing a solution to a problem for which PPT Research previously developed two proven solutions and then wasted another five months to coerce PPT Research into signing the Amended TLA.

188.   Even after the Amended TLA was executed in April, 2016, when Solvay was obligated to turn over all documents on their T/T solution, Solvay purposefully failed to provide any patent application document and/or filing particulars.

189.   Solvay represented that the solution it developed was "independent" and did not involve an additive. However, the benchmark used for Solvay's solution was PPT Research's PEG additive solution and Solvay's solution did, in fact, involve an additive.

190.    It took Solvay over a year to accomplish its strategy of developing its T/T solution and extorting PPT Research into giving up ownership rights under the guise that the solution was "independent".

191.    This left too little time to resolve the minor wafer cleaning issue that remained and which, in any event, was caused by Solvay's failure to follow PPT Research's standard operating procedures for the LVS slurry composition.

192.    Had Solvay not pursued these illegal tactics to usurp for itself the complete control and ownership of the solar wafer market, customers, controlling I.P., and technology of all that was rightfully owned and developed by PPT Research, Inc., the LVS slurry would have been adopted by GCL-Poly and other Asian customers well before and instead of the diamond wire technology.

193.    PPT's LVS product was designed and already demonstrated to be the cost-reduction lifeline desperately needed by major wafer producers, offering similar or greater cost savings as DWS without the need for costly capital expenditures in saw conversion or lost production during conversion downtime.

194.    Solvay's deceit and breaches of its contractual obligations caused PPT to lose out on this valuable business opportunity.

195.    The window to the poly-wafer market is now closed due to Asian manufacturers' investment in DWS – an investment that never would have been made had Solvay not set out to steal PPT's patented technology and its confidential developments and discoveries shared under confidence with Solvay during the project.

-27-

**SOLVAY'S PATENT APPLICATION IS DISCOVERED ALONG WITH SOLVAY'S MISAPPROPRIATION/DISCLOSURE OF CONFIDENTIAL PPT TRADE SECRETS**

196. Shortly prior to the discovery of the CSB, PPT requested a worldwide review of patent documents to determine whether Solvay had withheld pertinent information about any patent applications that could have been filed by Solvay or any of its affiliated companies.

197. In April 2018, PPT's attorney discovered that Solvay applied for a Patent Cooperation Treaty International Application (filed in Hong Kong, China) that was published as Patent Application Publication No. WO2017/091945(A1) by the World Intellectual Property Organization ("WIPO") on June 8, 2017

198. Publication of the application documents follows an 18-month period from the filing of the application that occurred on November 30, 2015, nearly 5 months prior to the adoption of the TLA Amendment permitting any such filing by Solvay.

199. Stated differently, Solvay was negotiating with PPT for the right to file a patent application for a supposed "independent" solution to the T/T issue in its own name after it had already filed the patent application.

200. A review of the WIPO Publication revealed Solvay's solution contained an additive, contrary to representations that were made to PPT Research as an inducement to execute the Amended TLA.

201. The WIPO Publication further revealed that Solvay had used PPT invention descriptions presented in PPT's earlier patents and patent applications (i.e., patent plagiarism).

202. The WIPO Publication also included confidential and proprietary trade secret information divulged to Solvay pursuant to several Agreements restricting proprietary information to absolute confidentiality and non-disclosure by the receiving party.

-28-

203.    The Applicants identified in the International Application were Rhodia (a signatory of the Reciprocal Confidentiality Agreement) and Solvay-China (an entity that was not a signatory to the TLA or to the Reciprocal Confidentiality Agreement).

204.    Solvay intentionally concealed its filing of the International Application as well as its disclosure of extremely sensitive and proprietary information, trade secrets and confidential technical and customer information to this non-aligned entity, Solvay-China.

205.    Solvay had not sought permission from PPT, nor even notified PPT to present the proprietary trade secret information in the application invention description as forbidden in the Reciprocal Confidentiality Agreement.

206.    Further, Solvay via Olivier Touret, Senior Vice President, and Eric Aubay, PPT Project Director, completely misrepresented the content of the filed PCT application by withholding all information concerning the plagiarism of PPT's existing patent.  Solvay also failed to disclose that crucial PPT trade secrets were revealed within the text and claims of Solvay's secretly filed and fraudulent patent application.

207.    Also, due to the systemic issues with China historically usurping and openly stealing U.S. technology companies I.P. and trade secrets, Solvay purposefully filed their application through their "Solvay-China" affiliate, which had no authorization through any agreement to receive or use such confidential and sensitive information.

208.    Solvay also failed to report to PPT its decision to abandon the application when it suddenly and without warning withdrew from the project and the obligations of the TLA, leaving the information to be publicly disclosed without PPT even being aware that its trade secrets were being divulged and published.

209.     PPT's corporate counsel sent a series of letters during 2017 and its patent counsel again sent a series of letters during January and through February 2020 in an attempt to resolve Solvay's failure to provide potential customer contact data or return trade secret materials provided to Solvay under the TLA and under Reciprocal Confidentiality Agreement before the expiration of the five year tail period.

210.     In 2017, a non-responsive reply from Solvay's in-house counsel was received which denied any obligation by Solvay to provide any documents owed to PPT.

211.     This was responded to by another letter citing the in-force, legal agreements requiring Solvay to provide the requested documents with no further responses from Solvay.

212.     For the letters sent in January-February, 2020, no reply of any kind by responsive letter or otherwise has been received from Solvay, its affiliated companies, or its counsel to date.

## FIRST CAUSE OF ACTION

### MISAPPROPRIATION OF TRADE SECRETS UNDER U.S. DEFEND TRADE SECRETS ACT (2016)

213.     The allegations in the foregoing paragraphs are incorporated in this cause of action as if restated in their entirety herein.

214.     A private party has been afforded the right to initiate a civil action to enforce against the misappropriation of its trade secrets in accordance with 18 U.S.C. 1836(b)(1) when the trade secret is embodied in a product or service that is placed in interstate or foreign commerce.

215.     PPT permitted its LVS product including its proprietary micro-gel technology to be placed in interstate and foreign commerce through its efforts and those efforts of Defendants under license from PPT.

216.    At all times prior to the revelation of the confidential proprietary trade secret information to Defendants and continuing thereafter PPT restricted such information to only a few employees within PPT and has not revealed such information to others except under terms and conditions similar to those in the confidentiality clauses of the Agreements recited herein.

217.    PPT under and in accordance with various agreements with Solvay provided its trade secret information to Solvay under strict confidentiality and non-disclosure restrictions as included in both the Reciprocal Confidentiality Agreement of June 2014 and the Technology Licensing Agreement of April 2015, neither of which restrictions were either modified or circumvented by later amendments to the Agreements.

218.    In derogation of the restrictions in the requirements of confidentiality Defendants used the confidential proprietary trade secret information of PPT to its own benefit in furtherance of an intentional scheme to misappropriate said trade secrets.

219.    Solvay used the PPT Research's trade secrets in a manner not permitted or contemplated by the TLA for the express purpose of stealing said trade secrets by developing a solution to a T/T issue that it intended to patent in its own name, thereby using such mechanism to seize control of the LVS product usage, market penetration and disrupt PPT's openly stated business plan to sell its technology and LVS business to a third party once adopted in the solar market.

220.    Solvay experimented with the technology within Solvay's own facilities in Shanghai, China and potentially other locations, and during LVS product commercialization trials at various silicon ingot slicing companies in Asia.

221.    This was done by Solvay in an effort to create their own intellectual property by co-opting developments and discoveries made by PPT, which were shared with Solvay under

strict confidence, then used by Solvay to contrive other compositional and process solutions to specific performance issues of the LVS, for which solutions to said performance issues had already been tested, proven and shared with Solvay to quickly forward the qualification process at customer sites.

222.    Solvay then attempted to usurp their contrived component and process I.P. by assuming ownership of the technology by causing to be written and published an application for patent under the Patent Cooperation Treaty, and then abandoning the application, all under a cloak of secrecy and failed to advise PPT of its conduct at any time relevant to this action.

223.    This course of conduct by the Defendants has revealed confidential proprietary trade secret information of PPT to the public, diminished the value of said proprietary trade secret information, as well as the value of existing PPT patents and patent applications and other I.P., and caused irreparable harm to PPT.

224.    Solvay's scheme to misappropriate PPT's trade secrets caused further harm by causing PPT to lose out on a lucrative opportunity to commercialize its LVS technology in Asia.

225.    Solvay's misappropriation of PPT's trade secrets was done willfully and/or maliciously, thereby entitling PPT to enhanced damages as permitted by the Defend Trade Secrets Act.

226.    But for Solvay's breaches of contract and scheme to steal PPT's trade secrets, PPT's technology would have been the dominant force in the Asian market, rather than diamond wire saw technology.

227.    PPT seeks damages in accordance with the harm caused, reasonable attorney's fees due to Solvay's bad-faith misappropriation and a permanent injunction against such continuing activities, as well as the immediate return of all copies of the proprietary trade secret

information, and any derivatives thereof, from Defendants and any affiliated company, entity, employee or other representative of the Defendants.

## SECOND CAUSE OF ACTION

### MISAPPROPRIATION OF TRADE SECRETS UNDER PENNSYLVANIA UNIFORM TRADE SECRETS ACT (2004)

228.    The allegations in the foregoing paragraphs are incorporated in this cause of action as if restated in their entirety herein.

229.    At all times prior to the revelation of the confidential proprietary trade secret information to Defendants and continuing thereafter PPT restricted such information to only a few employees within PPT and has not revealed such information to others except under terms and conditions similar to those in the confidentiality clauses of the Agreements recited herein.

230.    PPT permitted its LVS product including its proprietary micro-gel technology to be placed in interstate and foreign commerce through its efforts and those efforts of Defendants under license from PPT.

231.    At all times prior to the revelation of the confidential proprietary trade secret information to Defendants and continuing thereafter PPT restricted such information to only a few employees within PPT and has not revealed such information to others except under terms and conditions similar to those in the confidentiality clauses of the Agreements recited herein.

232.    PPT under and in accordance with various agreements with Solvay provided its trade secret information to Solvay under strict confidentiality and non-disclosure restrictions as included in both the Reciprocal Confidentiality Agreement of June 2014 and the Technology Licensing Agreement of April 2015, neither of which restrictions were either modified or circumvented by later amendments to the Agreements.

233.    In derogation of the restrictions in the requirements of confidentiality Defendants used the confidential proprietary trade secret information of PPT to its own benefit in furtherance of an intentional scheme to misappropriate said trade secrets.

234.    Solvay used PPT's trade secrets in a manner not permitted or contemplated by the TLA for the express purpose of stealing said trade secrets by developing a solution to a T/T issue that it intended to patent in its own name, thereby using such mechanism to seize control of the LVS product usage, market penetration and disrupt PPT's openly stated business plan to sell its technology and LVS business to a third party once adopted in the solar market.

235.    Solvay experimented with the technology within Solvay's own facilities in Shanghai, China and potentially other locations, and during LVS product commercialization trials at various silicon ingot slicing companies in Asia.

236.    This was done by Solvay in an effort to create their own intellectual property by co-opting developments and discoveries made by PPT, which were shared with Solvay under strict confidence, then used by Solvay to contrive other compositional and process solutions to specific performance issues of the LVS, for which solutions to said performance issues had already been tested, proven and shared with Solvay to quickly forward the qualification process at customer sites.

237.    Solvay then attempted to usurp their contrived component and process I.P. by assuming ownership of the technology by causing to be written and published an application for patent under the Patent Cooperation Treaty, and then abandoning the application, all under a cloak of secrecy and failed to advise PPT of its conduct at any time relevant to this action.

238.    This course of conduct by the Defendants has revealed confidential proprietary trade secret information of PPT to the public, diminished the value of said proprietary trade

secret information, as well as the value of existing PPT patents and patent applications and other I.P., and caused irreparable harm to PPT.

239.    Solvay's scheme to misappropriate PPT's trade secrets caused further harm by causing PPT to lose out on a lucrative opportunity to commercialize its LVS technology in Asia.

240.    Solvay's misappropriation of PPT's trade secrets was done willfully and/or maliciously, thereby entitling PPT to enhanced damages as permitted by the Pennsylvania Uniform Trade Secrets Act.

241.    But for Solvay's breaches of contract and scheme to steal PPT's trade secrets, PPT's technology would have been the prominent technology in the Asian market, not the competing technology that now exists.

242.    PPT seeks damages in accordance with the harm caused, reasonable attorney's fees and a permanent injunction against such continuing activities, as well as the immediate return of all copies of the proprietary trade secret information, and derivatives thereof, from Defendants and any affiliated company, entity, employee or other representative of the Defendants.

### THIRD CAUSE OF ACTION

INJUNCTIVE RELIEF UNDER
U.S. DEFEND TRADE SECRETS ACT, 18 U.S.C § 1836 ET SEQ. AND
PENNSYLVANIA UNIFORM TRADE SECRETS ACT, 12 P.S. § 5302 ET SEQ.

243.    The affirmative allegations in the foregoing paragraphs are incorporated in this cause of action as if restated in their entirety herein.

244.    Both the U.S. Defend Trade Secrets Act and the Pennsylvania Uniform Trade Secrets Act provide aggrieved parties with the right to seek an injunction preventing actual or

threatened misappropriation of their trade secrets, and to require the misappropriator to take affirmative actions to protect the trade secret.

245.     Solvay's misappropriation of PPT's trade secrets, as outlined above, has caused and will continue to cause irreparable harm to PPT unless stopped.

246.     Because the Confidentiality Reciprocal Agreement expires in June 2020, and the Technology Licensing Agreement ends in 2021, absent injunctive relief, PPT will have no remedy in contract for Solvay's ongoing use and disclosure of PPT's trade secrets.

247.     The balance of hardships favor PPT, as Solvay is a multi-billion dollar multinational corporation that will be able to continue operating profitably without resort to the use of PPT's trade secrets, while PPT is a small Pennsylvania company whose business model depends on the protection of its trade secrets.

248.     The public interest would be advanced by the issuance of an injunction protecting an Allentown business from the abuses of a massive multinational corporation.

249.     PPT thus seeks both preliminary and permanent injunctions (a) preventing Defendants and any affiliated company, entity, employee or other representative of the Defendants from disseminating or utilizing PPT's trade secrets, and (b) requiring the immediate return of all copies of the proprietary trade secret information from Defendants and any affiliated company, entity, employee or other representative of the Defendants.

## FOURTH CAUSE OF ACTION

### BREACHES OF CONTRACT IN BOTH THE RECIPROCAL CONFIDENTIALITY AGREEMENT AND THE TECHNOLOGY LICENSING AGREEMENT

250.     The allegations in the foregoing paragraphs are incorporated in this cause of action as if restated in their entirety herein.

251.    Defendants breached the Reciprocal Confidentiality Agreement by failing to return all of PPT's confidential proprietary trade secret information upon request of counsel for PPT in 2017 and again in 2020.

252.    Defendants breached the Reciprocal Confidentiality Agreement by divulging PPT's confidential proprietary trade secret information to a patent office, which information was eventually publicly disclosed in an application publication document.

253.    Defendants breached the TLA by divulging PPT's confidential proprietary trade secret information in an application for patent, which information was eventually publicly disclosed in an application publication document.

254.    Defendants breached the TLA by failing to adhere to the covenant requiring the timely efforts in obtaining industry adoption of the LVS technology and product by joint commercialization efforts.

255.    Defendants breached the TLA by failing to abide by the affirmative duty of a good faith partnership of cooperative spirit, with regular and continuing communication sharing and for cooperative efforts toward adoption and commercialization of the LVS product as the competitive threat imposed by diamond wire increased.

256.    Defendants breached the TLA by failing to abide by the agreement that PPT owns all "Technology" and "Know-How", including, but not limited to, all trade secrets, transmitted to Defendants for the purpose of LVS commercialization within the "Scope of Use" as defined in the Technology Licensing Agreement, and any alterations or issue resolutions, regardless of which party makes a subsequent discovery improvement or modification, and co-opting an additive composition derived from PPT's confidential proprietary trade secrets, which was fraudulently claimed to be owned by Defendants.

-37-

257.    Defendants fraudulently induced PPT to execute the Amended TLA by refusing to provide documents that were required under the TLA unless the new agreement was executed and by affirmatively misrepresenting that the solution to the T/T issue was "independent" and did not involve an additive.  Thus, the Amended TLA is unenforceable as a matter of law.

258.    Defendants breached the TLA by failing to remit (or account for) royalties potentially due for LVS product actually sold to silicon ingot slicing customers even though such sales were for commercialization efforts.

259.    Defendants breached the TLA by failing to advise PPT, no later than 30 days after the signing of the Amended TLA, of the scope, content and existence of the application filed for patent, the filing date and jurisdiction of filing, the publication of the application laying open the text to the public, and upon withdrawal the intended abandonment of the application so that PPT could assume prosecution efforts.

260.    Defendants breached the TLA by failing to provide customer lists and contact information to PPT upon Solvay termination of the TLA and their involvement in the overall LVS project covered by the TLA.

261.    Defendants breached the TLA by failing to provide material, critical and relevant technical communications to PPT reviewing customer status in trials and qualification efforts of the LVS product; unilateral alterations in the composition and use methods of the LVS slurry product at customer sites; performance issues and needed resolutions utilizing PPT expert experience and knowledge of the LVS system, when many such needed resolutions were already in place and ready for application at customer sites; engaging in a complete lack of said technical communications by Solvay to PPT for a <u>full year</u>, which is in stark violation of the Technology License Agreement and which resulted in extensive qualification time delays as well as the

complete loss of opportunity for PPT for rapid and major adoption of the LVS by world class solar wafer producers ahead of diamond wire efforts.

262.    Defendants breached the agreement by not acting in accordance with time is of the essence clause.

263.    Defendants breached their duty of good-faith and fair dealing by concocting and executing a scheme to steal PPT's patented LVS technology.

264.    In view of the enumerated breaches of contractual agreements, as well as other breaches that may be uncovered during the course of this action, PPT has been harmed by the loss of opportunity of the adoption of the LVS technology by timely efforts that were not provided by Defendants and the revenue derived therefrom, as well as the loss of opportunity to sell that segment of its business as the LVS product achieved greater adoption in the industry.

265.    But for Solvay's breaches of contract and scheme to steal PPT's trade secrets, PPT's technology would have been the dominant player in the Asian market, not diamond wire saw technology, and thus highly desired by multiple large entities who had immediate and high interest in obtaining / acquiring a high-value added, high-revenue product and technology system for meaningful penetration into the solar wafer industry, for which PPT was ready and willing to have purchased at a consummate price representing the market value of its technology and adoption at one or more world class solar wafer producers as the critical cost reduction enabler.

266.    By abandonment of the illicitly filed Solvay patent application, PPT's crucial trade secrets have been opened to the global public domain, which impinges ongoing harm to PPT's existing I.P., patents and patent applications for the future marketing efforts of PPT for the LVS technology and products in directly or indirectly related industries, or for potential sale of PPT's intellectual property to any third-party buyer for use in other non-related industries.

267.    Such continuing harm and loss of value for PPT's existing intellectual property has produced extensive damage to the value of said intellectual property for any and all commercial marketing or sales efforts.

### PRAYER FOR RELIEF

WHEREFORE, PPT prays that this Court:

a.    Enter a preliminary injunction enjoining Defendants and any affiliated company, entity, employee or other representative of the Defendants from disseminating or utilizing PPT's trade secrets.

b.    Enter a preliminary injunction requiring the immediate return of all copies of the proprietary trade secret information from Defendants and any affiliated company, entity, employee or other representative of the Defendants.

c.    Enter a permanent injunction enjoining Defendants and any affiliated company, entity, employee or other representative of the Defendants from disseminating or utilizing PPT's trade secrets.

d.    Enter a permanent injunction requiring the immediate return of all copies of the proprietary trade secret information from Defendants and any affiliated company, entity, employee or other representative of the Defendants.

e.    Enter judgment requiring Defendants to pay compensatory damages, consequential damages, exemplary damages, and reasonable attorney's fees and costs.

f.    Provide such other relief as this Court deems equitable.

WHITE AND WILLIAMS LLP

BY:   /s/ Justin E. Proper
       Justin E. Proper
       Thomas B. Fiddler
       William H. Fedullo
       1650 Market Street | One Liberty Place,
       Suite 1800 |
       Philadelphia, PA 19103-7395
       Phone: 215.864.7165/7081/7185
       properj@whiteandwilliams.com
       fiddlert@whiteandwilliams.com
       fedullow@whiteandwilliams.com


LAW OFFICES OF SANFORD J. PILTCH, ESQ.

BY:   /s/ Sanford J. Piltch
       Sanford J. Piltch
       1132 Hamilton Street,
       Suite 201
       Allentown, PA 18101-1024
       Phone: 610.433.6266
       spiltch@pennsylawyers.com

       Attorneys for Plaintiff,
       PPT Research, Inc.


Dated:  June 5, 2020