# KAY DECLARATION

# EXHIBIT 1

## INTERNATIONAL CHAMBER OF COMMERCE
## INTERNATIONAL COURT OF ARBITRATION

Solvay USA Inc. and Rhodia Operations S.A.S.,

Claimants,

v.

PPT Research, Inc.,

Respondent.

---

## REQUEST FOR ARBITRATION

---

Randall E. Kay, Esq.
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, California 92121
858.314.1139
rekay@jonesday.com

Andrea W. Jeffries, Esq.
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, California 90071
213.489.3939
ajeffries@jonesday.com

Attorneys for Solvay USA Inc. and
Rhodia Operations S.A.S.

# TABLE OF CONTENTS

REQUEST FOR ARBITRATION ............................................................................................ 1

    I.    Claimants' Statement of Information for Article 4(3)
        of the ICC Arbitration Rules…………………………………………………….. 1

        1.    The Name in Full, Description, Address and Other Contact Details
                of Each of the Parties ................................................................................ 1

        2.    The Name in Full, Address and other Contact Details of Any
                Persons Representing the Claimant in the Arbitration ............................. 2

        3.    Description of the Nature and Circumstances of the Dispute Giving
                Rise to the Claims and of the Basis Upon Which the Claims are
                Made. ........................................................................................................ 2

        4.    Statement of the Relief Sought, Together With the Amounts of
                Any Quantified Claims and, to the Extent Possible, an Estimate of
                the Monetary Value of Any Other Claims. ............................................... 3

        5.    Relevant Agreements With the Arbitration Clauses. ............................... 4

        6.    Where Claims are Made Under More Than One Arbitration
                Agreement, an Indication of the Arbitration Agreement Under
                Which Each Claim is Made. ..................................................................... 5

        7.    All Relevant Particulars and Any Observations or Proposals
                Concerning the Number of Arbitrators and Their Choice in
                Accordance With the Provisions of Articles 12 and 13, and any
                Nomination of an Arbitrator Required Thereby. ...................................... 6

        8.    All Relevant Particulars and Any Observations or Proposals as to
                the Place of the Arbitration, the Applicable Rules of Law and the
                Language of the Arbitration. .................................................................... 6

        9.    Payment of ICC Filing Fee. .................................................................... 6

    II.    Claimants' Detailed Statement of Claims ……………………………………7

FIRST CAUSE OF ACTION, DECLARATORY RELIEF
(28 U.S.C. §§ 2201, 2202 (All DJ Claims); Del. Code Ann. Tit. 10 § 6501 (RCA
Claims), Pennsylvania Declaratory Judgment Act 42 Pa. §§ 7532-34 (TLA
Claims)) ......................................................................................................................... 15

SECOND CAUSE OF ACTION, BREACH OF CONTRACT ……………………….... 16

PRAYER FOR RELIEF ……………………………………………………………… 17

**REQUEST FOR ARBITRATION**

Claimants Solvay USA Inc. and Rhodia Operations S.A.S. (collectively "Claimants") submit this Request for Arbitration against PPT Research, Inc. ("Respondent"). Pursuant to Article 4 of the International Court of Arbitration, International Chamber of Commerce ("ICC") Arbitration Rules, Claimants state as follows.

## I. Claimants' Statement of Information for Article 4(3) of the ICC Arbitration Rules

### 1. The Name in Full, Description, Address and Other Contact Details of Each of the Parties

a. Claimant Solvay USA Inc. ("Solvay") is a Delaware corporation with its principal place of business in Princeton, New Jersey. Solvay's address is 504 Carnegie Center, Princeton, New Jersey, 08540. Solvay operates the Novecare Global Business Unit in the United States which includes chemicals and specialty chemicals, polymers, solutions, and formulation expertise for use in a variety of industrial, coatings, agricultural, home and personal care, and oil and gas markets and applications.

b. Claimant Rhodia Operations S.A.S. ("Rhodia") is a French corporation with its registered office at 52 rue de la Haie Coq, 93300 Aubervilliers, France. Rhodia operates the Novecare Global Business Unit in France which includes chemicals and specialty chemicals, polymers, solutions, and formulation expertise for use in a variety of industrial, coatings, agricultural, home and personal care, and oil and gas markets and applications.

c. Claimants are informed and believe that Respondent PPT Research, Inc. ("PPT") is incorporated in Pennsylvania with its principal place of business in Allentown,

Pennsylvania. PPT's address is believed to be 515 Business Park Lane, Allentown, Pennsylvania 18109-9115. PPT represents itself as being in the business of developing carriers and slurries for various industries, among other things.

**2. The Name in Full, Address and other Contact Details of Any Persons Representing the Claimant in the Arbitration.**

Claimants are represented by:

> Randall E. Kay
> JONES DAY
> 4655 Executive Drive, Suite 1500
> San Diego, California 92121
> 858.314.1139
> rekay@jonesday.com

> Andrea W. Jeffries, Esq.
> JONES DAY
> 555 South Flower Street, Fiftieth Floor
> Los Angeles, California 90071
> 213.489.3939
> ajeffries@jonesday.com

**3. Description of the Nature and Circumstances of the Dispute Giving Rise to the Claims and of the Basis Upon Which the Claims are Made.**

Claimants bring the following claims in arbitration:

> (1) Declaratory Judgment for Freedom to Operate Without Obligation to PPT Under Reciprocal Confidentiality Agreement (as amended) ("RCA") and Under Technology License Agreement (as amended) ("TLA")
>
>> a. Claimants Solvay and Rhodia
>>
>> b. Respondent PPT
>>
>> c. The basis upon which this claim is made is pled in detail in the First Cause of Action for Declaratory Relief below.
>
> (2) Breach of Contract – Technology License Agreement (as amended)
>
>> a. Claimant Solvay
>>
>> b. Respondent PPT

     c. The basis upon which this claim is made is pled in detail in the Second Cause of action for Breach of Contract below.

**4. Statement of the Relief Sought, Together With the Amounts of Any Quantified Claims and, to the Extent Possible, an Estimate of the Monetary Value of Any Other Claims.**

Claimants seek declaratory relief and compensatory damages.

For declaratory relief, Claimants seek arbitral determinations:

     a. That Claimants have freedom to operate their businesses without obligation to PPT: (1) under the RCA or the TLA; (2) for any alleged trade secret misappropriation or other claim of misuse of proprietary information; (3) for any injunction; or (4) to transfer to PPT "customer information, contacts, locations, Product use information test status information, or other customer information for all customers ever contacted by Solvay or its Distributors or other authorized agents, using the Product, testing the Product, customers where presentations about the Product have been made by Solvay, as well as any information concerning customers contacted who have rejected the Products."

     b. That the TLA is terminated.

     c. That Claimants do not owe any further obligation to PPT under the RCA.

     d. That Solvay does not owe any further obligation to PPT under the TLA.

In damages, Solvay seeks: (a) return of $316,000 USD paid by Solvay to PPT under the TLA due to PPT's breach of the TLA; (b) all additional consequential damages resulting from PPT's breach of the TLA and currently estimated to be in excess of $330,000 USD and subject to proof at the hearing in this matter including costs, payments and reimbursements made to PPT

for travel, lodging and other expenses; and (c) attorney fees, litigation expenses, and

prejudgment interest.

## 5.  Relevant Agreements With the Arbitration Clauses.

The relevant agreements to this arbitration are:

(1)  Reciprocal Confidentiality Agreement (as amended) ("RCA")

    a.  <u>Parties</u>.  Claimant Solvay, Claimant Rhodia and Respondent PPT are the parties to the RCA.  Rhodia and PPT entered the original RCA effective June 9, 2014 (<u>See Exhibit 1</u>).  In an amendment to the RCA effective August 12, 2014, Claimants and PPT agreed for Solvay to be added as a party to the RCA (<u>See Exhibit 2</u>).

    b.  <u>Arbitration Clause</u>  The RCA has its arbitration clause on page 1 in "Definitions" and Section 6 "Choice of Law and Dispute Resolution" as follows:

| Governing Law | The law of Delaware (USA), excluding its conflicts of law principles. |
|---|---|
| Arbitration Rules | The Rules of Arbitration of the International Chamber of Commerce. |
| Arbitration Place | Delaware (USA) |

6.2  All disputes arising out of, or in connection with, the validity, interpretation, performance and/or termination of this Agreement, which cannot be amicably settled between the parties, shall be finally settled under the Arbitration Rules by one or more arbitrators appointed in accordance with such Arbitration Rules without recourse to the ordinary courts of law. Arbitration proceedings shall take place in the Arbitration Place, shall be conducted in confidentiality and in the English language. The award rendered therein shall be final, confidential and binding upon the parties. The foregoing is without prejudice to each party's right to seek injunctions, exequatur and other relief in any appropriate court, to the extent the same are not available in arbitration.

(2)  Technology License Agreement (as amended) ("TLA")

    a.  <u>Parties</u>.  Claimant Solvay and Respondent PPT are the parties to the TLA.  Solvay and PPT entered the original TLA effective

February 20, 2015 (<u>See Exhibit 3</u>).  Solvay and PPT amended the TLA effective April 6, 2016 (<u>See Exhibit 4</u>).

b. <u>Arbitration Clause</u>  The TLA has its arbitration clause in Section 11(b) as follows:

All disputes arising in connection with this Agreement and which cannot be settled amicably shall be settled by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce (ICC). The arbitral tribunal shall be composed of a single arbitrator to be appointed in accordance with said ICC Rules. The place of arbitration shall be Pennsylvania, the arbitration shall be conducted in the English language and all documents not in English language submitted by any Party shall be accompanied by an accurate English language translation thereof. The arbitral tribunal shall apply the state laws of the Pennsylvania and the federal laws of the United States of America. The arbitral tribunal shall not have the power to alter, modify, amend, add to or subtract from any term or provision of this Agreement. The Parties expressly waive any right of appeal to the courts of any award, which shall be final and binding on the Parties. Judgment upon the award of the arbitrators may be entered in any court of competent jurisdiction in the Commonwealth of Pennsylvania.

**6.  Where Claims are Made Under More Than One Arbitration Agreement, an Indication of the Arbitration Agreement Under Which Each Claim is Made.**

Claimants and PPT have two agreements with arbitration clauses.  Claimants bring their claims in arbitration as follows:

(1) Claimants Solvay and Rhodia bring their claim for Declaratory Judgment for Freedom to Operate Without Obligation to PPT under the Arbitration Agreements in both the Reciprocal Confidentiality Agreement (as amended) ("RCA") and under the Technology License Agreement (as amended) ("TLA")

(2) Claimant Solvay brings its claim for Declaratory Judgment that the TLA is terminated under the Arbitration Agreement in the TLA.

(3) Claimants bring their claim for Declaratory Judgment that they do not owe any further obligation to PPT under the RCA under the Arbitration Agreement in the RCA.

(4) Solvay brings its claim for Declaratory Judgment that it does not owe any further obligation to PPT under the TLA under the Arbitration Agreement in the TLA.

(5) Claimant Solvay brings its claim for Breach of Contract under the Arbitration Agreement in the TLA.

**7. All Relevant Particulars and Any Observations or Proposals Concerning the Number of Arbitrators and Their Choice in Accordance With the Provisions of Articles 12 and 13, and any Nomination of an Arbitrator Required Thereby.**

Claimants provide the following particulars for arbitration.

(1) <u>Number of Arbitrators</u>. Claimants request that the ICC conduct this arbitration with appointment of a Sole Arbitrator.

(2) <u>Selection of Arbitrators</u>. Claimants will seek to agree with PPT on the nomination of the Sole Arbitrator for confirmation within thirty days from the date that this Request for Arbitration is received by PPT or such additional time as may be allowed by the Secretariat.

**8. All Relevant Particulars and Any Observations or Proposals as to the Place of the Arbitration, the Applicable Rules of Law and the Language of the Arbitration.**

(1) <u>Place of the Arbitration</u>. Claimants Solvay and Rhodia request that the Place of the Arbitration be Delaware. The parties' arbitration clause in the RCA provides for the "Arbitration Place" as "Delaware (USA)" on page 1 in the Definitions. While two arbitration agreements are at issue in this proceeding, the RCA has the only arbitration agreement that binds all three parties (Solvay, Rhodia and PPT).

(2) <u>Applicable Rules of Law</u>. Claimants maintain that Delaware, Pennsylvania and United States law govern this arbitration. The RCA provides for application of Delaware law ("The law of Delaware (USA)" (page 1, Definitions)). The TLA provides for application of Pennsylvania law and United States law ("The arbitral tribunal shall apply the state laws of the Pennsylvania and the federal laws of the United States of America." (Section 11(b))).

(3) <u>Language of the Arbitration</u>. Claimants maintain that the language of the arbitration shall be English.

**9. Payment of ICC Filing Fee.**

(1) Concurrent with the filing of this Request for Arbitration, Claimants are wiring the $5,000 filing fee required by Article 4 and Appendix III of the ICC Arbitration Rules.

## II. Claimants' Detailed Statement of Claims

1.    Claimants are involved in the development, production, and sale of various chemicals and polymers.  Due to Claimants' global footprint, they have relationships with customers in the silicon wafer industry, including customers in Asia.

2.    Respondent represented itself as having developed turnkey technology pertaining to an LVS micro-gel particle slurry suspension system ("LVS technology"), which Respondent claimed was "proven" and ready for commercialization.

3.    In particular, Respondent represented at least as early as March 2014 that its LVS technology "ha[d] been proven to work very well, even in a full production environment" and the "results have shown clearly that the LVS system is ready for full market introduction."

4.    In order to explore the possibility of Claimants' use and marketing of Respondent's LVS "proven" technology, Claimant Rhodia entered into the RCA with PPT on June 9, 2014.  The RCA contained a defined "Secrecy Period" starting on June 9, 2014 and ending on June 8, 2020.  The RCA contained a defined term providing that obligations under the RCA shall be binding for the Secrecy Period—thus, through June 8, 2020 which has now passed. On August 12, 2014, the RCA was amended and added Solvay as a party to the agreement.  The First Amendment to the RCA also added a new § 2.6 identifying that "the results of any analyses or tests on the operational performance of PPT products . . . by Rhodia, directly or indirectly . . . shall be the Confidential Information of both Rhodia and PPT."  It further provided that "the results of any other analyses or studies undertaken by Rhodia, directly or indirectly . . . ("Other Reports"), shall be the sole property of Rhodia" and "Rhodia will have no obligation to disclose the content of any of the Other Reports to PPT."

5.    Soon thereafter, the parties began negotiating a technology license that would permit Claimants to market the LVS technology in China and Korea, with other territories added

in a later amendment.  Claimants brought substantial value to the deal because of their extensive customer contacts and client lists, which are Claimants' confidential and proprietary information.

6.	After many iterations and negotiations, Claimant Solvay and Respondent PPT entered into the TLA on February 20, 2015.[1]

7.	Under the TLA, Respondent granted to Claimant Solvay "and its Affiliates, an exclusive license under the Technology to manufacture, have manufactured, use, sell or distribute the Products in accordance with the Scope of Use within the Exclusive Territories [China and Korea]."  TLA, § 2(a).

8.	In return, Claimant Solvay agreed to pay a one-time royalty fee advance of $100,000 USD (TLA, § 8(a)) and to pay a licensing and technology transfer fee of $216,000 USD in 6 monthly installments of $36,000 USD (TLA, § 8(b)).  Solvay made all of these payments to Respondent totaling $316,000 USD.

9.	Claimant Solvay also agreed to use commercially reasonable efforts to market and sell the licensed Products in the Exclusive Territories.  TLA, § 14(b).  However, in order to enable Claimant Solvay to effectively do so, Respondent agreed to "make the Technology Package available" to Claimant Solvay "[w]ithin thirty (30) days after the execution of this Agreement."  TLA, § 3(a).

10.	The Technology Package was defined as:

> a collection of [PPT's] information regarding the Products, knowledge, process, use, safety, methods, testing, Q.C. and any other technical disclosure from [PPT] necessary for [Solvay] to properly dilute Product concentrate provided to [Solvay], handle and store such Product, including but not limited to Know-How, Patents and Patent Rights, Patent applications and other related product composition, handling, dilution, use, safety and final "ready-to-use" product information that is available to [PPT] as

_____

[1] A related entity to Claimant named Solvay Specialty Chemicals Asia Pacific Pte. Ltd. entered a Supply Agreement with Padarsh Pharmaceuticals Pvt. Ltd. on February 20, 2015.

directly related to the Scope of Use.  [PPT] agrees to provide to [Solvay] all necessary information available to [PPT] to manufacture and dilute the "LVS" and "SCA-2A" Products from supplied raw materials for the Scope of Use in the Exclusive Territories in accordance with the terms of this Agreement.

TLA, § 1.

11.    Technology was defined as:

the Patents, Patent Rights, technology developed, compositions, formulations, designs and Know-How of [PPT] as they directly relate to the Scope of Use.  Technology also shall include all process, methods, Q.C. equipment, processes, use know-how, training information, further technology and product development, whether made by [PPT] or not, and technical applications information, disseminated process, operations or wire saw knowledge, process issue resolutions involving use or applications of [PPT's] technology and Products, or Product composition alterations for the Scope of Use.

TLA, § 1.

12.    Technology was ***not*** defined to include any inventions made by Claimant Solvay or its affiliates.  *See* TLA, § 1.  Nor was there any provision requiring Claimant Solvay to transfer any of its inventions to Respondent.  *See* TLA.

13.    Further, Respondent agreed to:

train and advise [Solvay] with respect to proper manufacture, storage and handling of final Product formulation by demonstrating appropriate and necessary manufacturing methods to create final Product; methods and processes of raw materials handling, plant and equipment operation, product testing and related environmental, health and safety procedures to a reasonable number of [Solvay's] personnel.

TLA, § 3(c).

14.    However, Respondent did not ever provide or otherwise make available the required Technology Package under § 3(a) of the TLA.

15.    Nor did Respondent provide the required training or advice under § 3(c) of the TLA.

16.     As Claimant Solvay attempted to market the LVS technology to its customers, it encountered major obstacles and that indicated the technology was *not* in fact customer ready as Respondent had initially claimed.  In particular, Claimant Solvay experienced major issues of "thick-thin" wafer cutting involving the formation of alternating thick and thin wafers.  Claimant Solvay also experienced technical difficulties with:  wires lifting out of place (later determined to be a result of hydrodynamic pressure); alumina particles that caused wires to jump; foaming; ingot bowing (leading to broken wafers); slurry instability; slurry caking, wire corrosion, and ingot cleaning and deglueing.

17.     Claimant Solvay notified Respondent of these technical issues, but Respondent was unable to provide solutions.  While PPT had ideas to solve the problem, none of PPT's ideas, alone or in combination, provided a solution.

18.     For instance, Claimant Solvay informed Respondent of the thick-thin problem, but Respondent did not provide a solution.  Thus, Claimant Solvay and its affiliates undertook independent work to solve the problem.  Claimant Solvay expended substantial resources, at its own expense, to investigate process conditions and additives that might allow the LVS technology to be accepted in China and other countries.

19.     When Claimant Solvay successfully developed its novel solution to the thick-thin problem (the "Alternative Technology"), Claimant Rhodia and a Chinese affiliate prepared and filed a patent application to protect their intellectual property.

20.     Claimants told Respondent of their Alternative Technology, including that their solution involved use of an additive and changes to process parameters, and Claimants offered to license the improvement to Respondents in a proposed amendment to the TLA.

21.     PPT knew the scope of the solution—that it included additives and process

parameter changes—which PPT acknowledged in correspondence.  For instance, in a January 29, 2016 letter from Respondent to Claimants, Respondent admitted that "Solvay has developed some new additive, process, or procedure for using the LVS Technology."  Respondent also admitted that, as originally presented to Respondent on November 30, 2015, Claimants' new development "included a new additive to the LVS composition and a process change."  Respondent again acknowledged that Claimants' solution involved "additive(s) composition" and "process change" in its March 19, 2016 correspondence.

22.     During that same time, Respondent alleged that it somehow owned Claimants' independently developed Alternative Technology, despite a lack of any such ownership under the parties' agreements.  Claimants, however, would not agree to transfer their invention, but they did agree to license it to Respondent.

23.     On April 6, 2016, Respondent and Claimant Solvay entered into the First Amendment of the TLA.  Under that First Amendment, Respondent agreed that Claimants' Alternative Technology would be licensed to Respondent, and not owned by Respondent.  TLA, Article IV.i of the First Amendment.  Only future Product composition improvements were to be property of Respondent.  TLA, Article IV.iii of the First Amendment.

24.     Claimant Solvay continued to expend substantial time and resources to solve many of the other technical problems with the LVS technology.  But, ultimately it was unable to solve the key issues of slurry caking and related failures of ingot cleaning and deglueing.

25.     Thus, in late 2016 Claimants asked Respondents again to join them at a customer trial to instruct on how to solve the remaining technical issues, but Respondent was unable to solve the problems of slurry caking and ingot cleaning and deglueing, making it impossible to market the LVS technology.

26. In early 2017, the parties discussed a separate and mutually agreeable termination agreement to end the TLA, but could not reach an agreement. Subsequently, Claimant Solvay terminated for cause under the TLA.

27. Either party was permitted to terminate the TLA in the event of default of the other party by written notice, provided that a breaching party was given 45 days to cure a curable default. TLA § 10(a). A material breach was deemed to have occurred "if either party shall fail to perform in any material respect." TLA § 10(a)(ii).

28. In the event that Claimant Solvay terminated *without* cause or if the TLA was terminated by Respondent for a Solvay material breach, then Claimant Solvay was to provide information pertaining to the customers using the product or that had approved the product, tested the product, had the product presented to them, rejected the product, or had otherwise been contacted about the product. §§ 14(c), (e).

29. However, Claimant Solvay was not required to disclose its confidential and proprietary customer information to Respondent in the event of a termination for Respondent's insolvency or material breach. TLA, §§ 10(a), 14(e).

30. On June 8, 2017, Claimant Solvay put Respondent on written notice pursuant to TLA, § 10(a) that Respondent was in material breach of at least §§ 3(a), 3(c) of the TLA, by failing to provide Solvay with the information necessary to use, implement, and/or commercialize the LVS technology and failing to provide the required training, and that Solvay's termination of the TLA for material breach did not obligate Solvay to provide customer information to Respondent, per §§ 10 and 14 of the TLA.

31. From November 2017 until January 2, 2020, Claimants did not hear from Respondent, as their relationship had concluded. Then suddenly, Respondents reached out to

Claimants in 2020 demanding resolution of the "unresolved issues," which they later identified to be: (a) receipt of Claimants' customer information; (b) return or destruction of Respondent's confidential information; and (c) full and complete technical information regarding Claimant Solvay's Alternative Technology.

32.     Then, in breach of the mandatory arbitration provisions under the RCA (§ 6.2) and the TLA (§ 11(b)), Respondent filed a lawsuit in the United States District Court for the Eastern District of Pennsylvania (the "E.D. PA Action") for: (a) misappropriation of Respondent's trade secrets under the Defend Trade Secrets Act and under Pennsylvania law; (b) breach of the RCA and TLA; and (c) injunctive relief. *PPT Research, Inc., v. Solvay USA Inc., et al.*, Case No. 5:20-cv-02645, Dkt. 1, (E.D. PA, June 5, 2020) ("PPT's Compl.").

33.     For example, Respondent has alleged that Claimants have breached the RCA and TLA by filing Claimants' patent application on the Alternative Technology, failing to abide by a duty of good faith partnership for "cooperative efforts toward adoption and commercialization of the LVS product," fraudulently inducing Respondent to enter into the First Amendment to the TLA, and failing to provide Claimants' customer information to Respondent, among other things. PPT's Compl., ¶¶ 213-267.

34.     Accordingly, a case or controversy exists regarding whether Claimants have freedom to operate their businesses without obligation to PPT: (1) under the RCA or the TLA; (2) for any alleged trade secret misappropriation or other claim of misuse of proprietary information; (3) for any injunction; or (4) to transfer to PPT "customer information, contacts, locations, Product use information test status information, or other customer information for all customers ever contacted by Solvay or its Distributors or other authorized agents, using the Product, testing the Product, customers where presentations about the Product have been made

by Solvay, as well as any information concerning customers contacted who have rejected the Products."

35.     All the claims in the E.D. PA Action are subject to mandatory arbitration under the ICC Rules.  RCA, § 6.2; TLA, § 11(b).

36.     The TLA provides that Respondent "shall indemnify and hold [Solvay], its officers, directors, employees, and agents harmless from and against any losses or damages incurred to the extent that they are the result of:  (i) any material failure of [PPT] to perform the duties and obligations provided for herein, (ii) any material breach of a representation or warranty of [PPT], or (iii) any material inaccuracy in the technical data, literature or training materials provided to [Solvay]."  TLA, § 5(a).

37.     Thus, Respondent's numerous material breaches of the TLA require Respondent to reimburse Claimants for all costs and fees (including attorneys' fees and expenses of litigation) including:  (a) return of the $100,000 USD one-time royalty fee advance and the $216,000 USD licensing and technology transfer fee paid to Respondent under the TLA; (b) all damages resulting from PPT's breach of the TLA currently estimated to be in excess of $330,000 USD and subject to proof at the hearing in this matter including costs, payments, and reimbursements made to PPT for travel, lodging and other expenses, and prejudgment interest; and (c) fees and costs incurred in this Arbitration and in the E.D. PA Action, the filing of which was a material failure of Respondent to perform the duties and obligations of the RCA and the TLA.

# FIRST CAUSE OF ACTION

## DECLARATORY RELIEF

### (28 U.S.C. §§ 2201, 2202 (All DJ Claims); Del. Code Ann. tit. 10 § 6501 (RCA Claims), Pennsylvania Declaratory Judgment Act 42 Pa. §§ 7532-34 (TLA Claims))

38.     The allegations of paragraphs 1 through 37 are incorporated herein by reference with the same force and effect as if set forth in full below.

39.     An actual controversy exists warranting declaration of the rights and other legal relations of Claimants and Respondent.  Claimants seek a declaration of rights under the Declaratory Judgment Act which allows for declaration of the rights and other legal relations of Claimants and Respondent as a case of actual controversy has arisen.  A real and substantial controversy exists warranting determination of specific relief through a decree of a conclusive character, and such controversy is ripe for determination as a controversy over legal rights.  A substantial controversy exists between Claimants and Respondent of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

40.     As a consequence of the foregoing, an actual controversy has arisen and now exists between Claimants Solvay and Rhodia, on the one hand, and Respondent PPT, on the other hand, regarding Claimants' request for an arbitral determination:

   a.  That Claimants have freedom to operate their businesses without obligation to PPT:  (1) under the RCA or the TLA; (2) for any alleged trade secret misappropriation or other claim of misuse of proprietary information; (3) for any injunction; or (4) to transfer to PPT "customer information, contacts, locations, Product use information test status information, or other customer information for all customers ever contacted by Solvay or its Distributors or other authorized

agents, using the Product, testing the Product, customers where presentations about the Product have been made by Solvay, as well as any information concerning customers contacted who have rejected the Products."

    b.   That the TLA is terminated.

    c.   That Claimants do not owe any further obligation to PPT under the RCA.

    d.   That Solvay does not owe any further obligation to PPT under the TLA.

**SECOND CAUSE OF ACTION**

**BREACH OF CONTRACT**

41.    The allegations of paragraphs 1 through 40 are incorporated herein by reference with the same force and effect as if set forth in full below.

42.    As set forth above in detail, Claimant Solvay and Respondent PPT entered into the TLA on February 20, 2015, and they entered into the First Amendment of the TLA on April 6, 2016. The essential terms of the TLA are set forth above and incorporated herein.

43.    Respondent PPT breached the TLA and duties imposed by the TLA as set forth above and incorporated herein, including the following: (a) Respondent did not ever provide or otherwise make available the required Technology Package under § 3(a) of the TLA; (b) Respondent did not provide the required training or advice under § 3(c) of the TLA; and (c) Respondent had not developed a commercially ready LVS technology as it had represented to Solvay.

44.    Solvay has suffered damages resulting from Respondent's breach of the TLA including (a) $316,000 USD paid by Solvay to PPT under the TLA; (b) all additional consequential damages resulting from PPT's breach of the TLA and currently estimated to be in excess of $330,000 USD and subject to proof at the hearing in this matter including costs,

payments and reimbursements made to PPT for travel, lodging and other expenses; and (c) attorney fees, litigation expenses, and prejudgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Claimants pray for relief as follows:

A.  For declaratory relief determination:

    a.  That Claimants have freedom to operate their businesses without obligation to PPT: (1) under the RCA or the TLA; (2) for any alleged trade secret misappropriation or other claim of misuse of proprietary information; (3) for any injunction; or (4) to transfer to PPT "customer information, contacts, locations, Product use information test status information, or other customer information for all customers ever contacted by Solvay or its Distributors or other authorized agents, using the Product, testing the Product, customers where presentations about the Product have been made by Solvay, as well as any information concerning customers contacted who have rejected the Products."

    b.  That the TLA is terminated.

    c.  That Claimants do not owe any further obligation to PPT under the RCA.

    d.  That Solvay does not owe any further obligation to PPT under the TLA.

B.  In damages, award to Solvay of: (a) $316,000 USD paid by Solvay to PPT under the TLA; (b) all additional consequential damages resulting from PPT's breach of the TLA and currently estimated to be in excess of $330,000 USD and subject to proof at the hearing in this matter including costs, payments and reimbursements made to PPT for travel, lodging and other expenses; and (c) attorney fees, litigation expenses, and prejudgment interest.

C.      For recoverable costs as allowed by law including attorneys' fees and expenses, including fees and expenses of the Arbitral Tribunal and the ICC administrative expenses, pursuant to the Tribunal's discretion to allocate the costs of arbitration under Article 38 of the 2017 ICC Rules; and

D.      For such other and further relief as the Arbitral Tribunal deems just and proper.

Dated: July 2, 2020

Respectfully submitted:

Jones Day

By:_____

Randall E. Kay, Esq.
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, California 92121
858.314.1139
rekay@jonesday.com

Andrea W. Jeffries, Esq.
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, California 90071
213.489.3939
ajeffries@jonesday.com

Attorneys for Solvay USA Inc. and
Rhodia Operations S.A.S.

# EXHIBIT 1

# RECIPROCAL CONFIDENTIALITY AGREEMENT

## A. Parties:

| | | |
|---|---|---|
| | **RHODIA OPERATIONS,** a company incorporated in France, having its registered office located at 40 rue de la Haie Coq, 93306 Aubervilliers (France), | **PPT RESEARCH, INC.,** a company incorporated in the state of Pennsylvania (USA), having its registered office located at 515 Business Park Lane Allentown, PA 18109 (USA), |
| | hereinafter referred to as "Rhodia", | hereinafter referred to as "PPT", |

## B. Recitals:

| | |
|---|---|
| | Rhodia is active in the development, production and sale of various chemicals and polymers, including, but not limited to, surfactants, polymers, lubricant formulations, and owns valuable know-how in connection therewith, |
| | PPT is active in the development, production and sale of various formulations, including, but not limited to, carriers and slurries for Solar, Semiconductors , and Optical Wafer Manufacturing, and owns valuable know-how in connection therewith, |
| | Rhodia and PPT wish to exchange certain information and samples which they consider as highly valuable and confidential to fulfill the Purpose (as hereinafter defined). |

## C. Definitions:

| | |
|---|---|
| **Purpose** | means the assessment (i) by Rhodia of the suitability to use PPT technologies in silicon wafer applications and (ii) by both parties of their interest to enter into a further agreement related to a collaboration between both companies |
| **Effective Date** | means 9 June 2014. |
| **Exchange Period** | means the period starting on the Effective Date and ending on 8 June 2015, unless earlier terminated by either party through notification thereof to the other party. |
| **Secrecy Period** | means the period starting on the Effective Date and ending on 8 June 2020 i.e. 5 (five) years after the end of the Exchange Period. |
| **Governing Law** | The law of Delaware (USA), excluding its conflicts of law principles. |
| **Arbitration Rules** | The Rules of Arbitration of the International Chamber of Commerce. |
| **Arbitration Place** | Delaware (USA) |

The parties agree to exchange their respective confidential information and samples under the terms and conditions set forth hereabove and in the hereunder General Terms and Conditions.

## GENERAL TERMS AND CONDITIONS

### 1. ADDITIONAL DEFINITIONS:

1.1. "Confidential Information" means (i) the Purpose, (ii) any technical, economic or business information disclosed by either party or its Affiliates ("Discloser") to the other party or its Affiliates ("Recipient") during the Exchange Period in relation with the Purpose, ((iii) any technical, economic or business information obtained by Recipient through the fulfillment of the Purpose from, and to the extent it relates to, any information under (ii)), and (iv) any information acquired visually by Recipient at the occasion of its visits to any of Discloser's facilities.

Confidential Information may include, without limitation, data, know-how, trade secrets, inventions, unpublished patent applications, specifications, product properties, compositions, technical capabilities and research and development programs.

Information shall be Confidential Information when, (i) if disclosed in writing or on any other tangible support, it is marked "confidential" by an appropriate legend or stamp, (ii) if disclosed orally or visually, it is identified as such during its disclosure and confirmed in writing within thirty (30) days after such disclosure, or (iii) acquired visually according to Sub-Clause 1.1 (v) hereabove.

1.2. "Sample" means any sample supplied by either party or its Affiliates ("Discloser") to the other party or its Affiliates ("Recipient") during the Exchange Period in relation with the Purpose.

1.3. "Affiliate" of a party means any entity or person controlling, or controlled by, or under common control with, such party, whether directly or indirectly; "control" (including, with correlative meanings, "controlling", "controlled by", and "under common control with") meaning the direct or indirect beneficial ownership of more than 50% of the voting or equity interest in such company or other entity.

1.4. For avoidance of doubt, Discloser and Recipient mean either Rhodia and its Affiliates or PPT and its Affiliates as the case may be.

### 2. CONFIDENTIALITY, NON DISCLOSURE AND RESTRICTED USE OBLIGATIONS:

2.1. With regard to Confidential Information and Samples, Recipient shall:

(a) hold the same in confidence using the same degree of care as it uses for protecting its own confidential information and samples of a like nature (but in no event less than a reasonable degree of care), including, by keeping in secure storage and reasonably separate from other information and materials (i) Confidential Information in tangible or documented form and (ii) Samples;

(b) not disclose or supply the same to any third party (including patent offices), except, to the extent required to fulfill the Purpose, to its Affiliates, or with Discloser's prior written agreement, or pursuant to Sub-Clause 2.2;

(c) limit access to the same, on a strict need to know basis, to its and its Affiliates' employees, requiring that access to fulfill the Purpose, provided (i) such employees are subject to confidentiality obligations no less stringent than those contained hereunder through appropriate agreements, (ii) such employees have been informed by Recipient of the obligations hereunder, and (iii) Recipient remains responsible for any violation of the obligations hereunder by such employees;

(d) not use, or in any way exploit for its benefit, the same except for the Purpose; and

(e) upon Discloser's written request and option, either return Confidential Information to Discloser, or destroy (or delete permanently in the case of digital or electronic media) the same, all Recipient's copies of the same and all extracts, notes, analyses, compilations, technical drawings, studies and other documents prepared by Recipient and embodying or utilizing any part of the same, except that (i) this obligation shall not apply to routinely created backup copies of electronic data, and (ii) Recipient may retain one (1) copy of Confidential Information in controlled access files in

accordance with the terms of this Agreement for the sole purpose of determining its legal obligations hereunder.

2.2. In the event Recipient is required to disclose Confidential Information or Samples under applicable law, regulation, supervisory authority or other applicable judicial or governmental order, Recipient shall (i) inform Discloser in writing before any disclosure thereof so that Discloser may seek an appropriate protective order, (ii) give upon Discloser's request all necessary information and support to ward off the disclosure thereof, (iii) ask the receiving third party to maintain confidentiality, and (iv) strictly limit the content of such disclosure to that portion of Confidential Information or Sample that it is strictly compelled to disclose. In any event, Recipient shall not oppose action by Discloser to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded to Confidential Information and Samples.

2.3. Recipient agrees that disclosure of any Confidential Information and (re-)export of any Sample, as authorized according to the provisions of Sub-Clause 2.1, shall be subject to all export laws, restrictions and regulations.

2.4. With regard to Samples, in addition to obligations defined in Sub-Clause 2.1, Recipient shall:

(a) not disassemble, analyze, or have others analyze, Samples or any portions thereof to determine their chemical composition, microscopic structure or method of manufacture, except to the extent strictly required for the Purpose;

(b) not disclose to any third party (including patent offices) and/or not publish, the results of Recipient's evaluation of the Samples supplied by Discloser. For the avoidance of doubt, said results shall be considered and treated by both parties as Confidential Information of both parties; and

(c) upon Discloser's written request and option, either return to Discloser any unused or unconsumed portion of the Samples and any materials derived from the Samples produced in performance of the evaluation, or dispose of the same in a manner that does not reveal their identity or method of manufacturing and in compliance with all laws and regulations relating to health, safety, and environment.

### 3. EXCEPTIONS:

The obligations of Article 2 shall not apply to any portion of Confidential Information or Sample that Recipient can prove:

(a) was available to the public prior to receipt or achievement hereunder, or becomes available to the public thereafter through no fault or negligence of Recipient, or

(b) was already in Recipient's possession prior to receipt or achievement hereunder, or

(c) was lawfully obtained from a third party legally entitled to do so after the time of receipt or achievement hereunder, and Recipient is free to disclose without breach of any of its obligations, or

(d) was independently developed by or for Recipient by person(s) not having access to Discloser's Confidential Information or Samples.

For the purpose of this Article, any information which is specific, shall not be deemed to be within any of the foregoing exceptions, merely because it is embraced by more general information which falls within any one or more of the foregoing exceptions. In addition, any combination of features shall not be deemed to be within any of the foregoing exceptions, merely because individual features fall within any one or more of the foregoing exceptions, but only if the combination itself falls within any one of the foregoing exceptions.

### 4. WARRANTIES AND DISCLAIMERS:

4.1 Recipient acknowledges that Confidential Information and Samples are provided by Discloser "as is", without guarantee, warranty or representation of any kind, express or implied, including, but not limited to, as to (i) their accuracy or completeness, (ii) their merchantability, fitness for a

particular purpose and non infringement of third parties' intellectual property rights, and (iii) their use, handling or disposal. Discloser shall incur no liabilities in connection with the foregoing.

4.2 In particular, and without prejudice to the generality of Sub-Clause 4.1, Recipient further acknowledges that (i) any Sample is of a developmental nature, and (ii) Discloser makes no representation, express or implied, that Discloser will supply it on a commercial basis.

4.3 Each party shall remain responsible for consequential damages caused to the other party through the breach of its obligations under Article 2.

## 5. TERM:

5.1 This Agreement shall enter into force as of the Effective Date.

5.2 At the end of the Exchange Period, Recipient shall discontinue its use of Confidential Information and Samples.

5.3 The obligations hereunder shall be binding upon each Recipient for the Secrecy Period.

## 6. CHOICE OF LAW AND DISPUTE RESOLUTION:

6.1 This Agreement shall be governed by and construed in accordance with the Governing Law.

6.2 All disputes arising out of, or in connection with, the validity, interpretation, performance and/or termination of this Agreement, which cannot be amicably settled between the parties, shall be finally settled under the Arbitration Rules by one or more arbitrators appointed in accordance with such Arbitration Rules without recourse to the ordinary courts of law. Arbitration proceedings shall take place in the Arbitration Place, shall be conducted in confidentiality and in the English language. The award rendered therein shall be final, confidential and binding upon the parties. The foregoing is without prejudice to each party's right to seek injunctions, exequatur and other relief in any appropriate court, to the extent the same are not available in arbitration.

## 7. MISCELLANEOUS:

7.1 Each disclosure or supply hereunder shall be at the sole discretion of Discloser.

7.2 Each Discloser shall hold ownership of its Confidential Information and Samples.

7.3 No right other than as set forth hereunder, or license, is granted hereby by Discloser to Recipient, expressly or by implication, with respect to Confidential Information and Samples.

7.4 This Agreement, as may be amended pursuant to the provisions hereof is the entire understanding between the parties concerning the Purpose and supersedes all agreements, communications, understandings, representations, or any other arrangement, whether written or oral, made or existing between the parties prior to or simultaneously with this Agreement in connection with the Purpose.

7.5 This Agreement shall not be deemed to be a commitment of either party to enter into another agreement whether or not in connection with the Purpose and neither party shall incur any obligation of any kind whatsoever other than as set forth in this Agreement.

7.6 No waiver of any provision of this Agreement shall constitute a waiver of any other provision nor shall any waiver constitute a continuing waiver.

7.7 If any provision of this Agreement is declared invalid or unenforceable, all remaining portions of this Agreement shall continue in full force and effect as if this Agreement had been executed without the invalid provision.

7.8 This Agreement may only be superseded, amended or modified by written instrument, properly executed by duly authorized employees of each party.

7.9 Neither party shall assign any of its rights or obligations under this Agreement without the prior written consent of the other party.

7.10 This Agreement may be executed in counterparts, all of which taken together shall be deemed to be one and the same agreement. Execution and delivery of this Agreement by delivery of a facsimile or electronically recorded copy (including a .pdf file) bearing a copy of the signature of a Party shall constitute a valid and binding execution and delivery of this Agreement by such Party.

**IN WITNESS THEREOF**, the parties have caused this Agreement to be executed through their duly authorized officers or representatives in two (2) original copies.


RHODIA OPERATIONS                              PPT RESEARCH INC.




Name: ~~Patrice PINSARD~~ *Laurent THOMAS*     Name: Chip Ward

Title: ~~Deputy President – Solvay-Novecare Europe~~     Title:    President
*VP Strategy Novecare*

# EXHIBIT 2

This **First Amendment to Reciprocal Confidentiality Agreement** ("First Amendment") dated as of August 12, 2014 between Rhodia Operations S.A.S., a French corporation with offices at 40 rue de la Haie Coq, Aubervilliers, 93306, France ("RHODIA FRANCE") and Solvay USA Inc., a Delaware corporation with offices at 8 Cedarbrook Drive, Cranbury, NJ 08512-7500 ("SOLVAY USA" and, together with RHODIA FRANCE, hereinafter referred to as "RHODIA") and PPT Research, Inc., a Pennsylvania corporation, with offices at 515 Business Park Lane, Allentown, PA 18109 ("PPT").

**Whereas**, RHODIA FRANCE and PPT entered into a Reciprocal Confidentiality Agreement dated June 9, 2014 (the "Confidentiality Agreement"); and

**Whereas**, RHODIA FRANCE, SOLVAY USA and PPT desire that SOLVAY USA, an affiliate of RHODIA FRANCE, be added as a party to the Confidentiality Agreement, and that the Confidentiality Agreement be otherwise amended in accordance with the terms set forth below;

**Now, Therefore**, it is hereby agreed that the Confidentiality Agreement shall be amended as follows:

1.      Capitalized terms used herein shall have the meanings ascribed thereto in the Confidentiality Agreement unless they are otherwise defined herein. References in this First Amendment to a paragraph or subparagraph refer to a paragraph or subparagraph of the Confidentiality Agreement.

2.      RHODIA FRANCE, SOLVAY USA and PPT hereby agree that SOLVAY USA is added as a party to the Confidentiality Agreement and that the term "RHODIA", as defined in Section A of the Confidentiality Agreement, is hereby amended to mean RHODIA FRANCE and SOLVAY USA, as such companies are identified in the first paragraph of this First Amendment above.

3.      The text of Section 2.4(b) is hereby deleted in its entirety and is replaced with the following:

"(b) not disclose to any third party (including patent offices) and/or publish, the results of Recipient's evaluation of the Samples supplied by Discloser; and"

4.      A new Section 2.5 is hereby added to the Confidentiality Agreement, following Section 2.4, having the following text:

"2.5 Notwithstanding anything to the contrary herein contained, Rhodia will have the right to disclose to any third party that is not an Affiliate of Rhodia (a "Rhodia Partner") the Confidential Information of PPT and its Affiliates (the "PPT Information") and/or Samples of PPT and its Affiliates ("PPT Samples"), provided that such Rhodia Partner has executed and delivered to one or more of RHODIA FRANCE or SOLVAY USA a confidentiality agreement substantially in the form of that attached hereto as **Exhibit "A"** (a "Third Party NDA"), wherein, among other things, such Rhodia Partner has agreed to (i) keep the PPT Information confidential, to use the same only for the purposes described therein, (ii) not to disclose the PPT

Information to other parties, except as allowed in such Third Party NDA, and (iii) not to analyze PPT Samples except in connection with such purposes described in the Third Party NDA and that, as between Rhodia and the Rhodia Partner, the results thereof are the confidential information of one or all of RHODIA FRANCE or SOLVAY USA."

4. A new Section 2.6 is hereby added to the Confidentiality Agreement, following Section 2.5, having the following text:

"2.6 Rhodia and PPT hereby agree that the results of any analyses or tests on the operational performance of PPT products (including Samples) or technology comprising PPT Confidential Information, which is undertaken by Rhodia, directly or indirectly, as allowed hereunder ("Performance Reports"), shall be the Confidential Information of both Rhodia and PPT under this Agreement. Rhodia and PPT hereby further agree that the results of any other analyses or studies undertaken by Rhodia, directly or indirectly, as allowed hereunder, in furtherance of the Purpose ("Other Reports"), shall be the sole property of Rhodia, subject, always, to Rhodia's compliance with its obligations under this Agreement to the extent that any such Other Report contains any Confidential Information of PPT; *provided that* Rhodia shall have no obligation under Section 2.1(e) hereof with respect to any such Other Report. Rhodia agrees to provide PPT with a copy of any Performance Report promptly after the completion thereof, but Rhodia will have no obligation to disclose the content of any of the Other Reports to PPT."

5. Except as set out in this First Amendment, all terms of the Confidentiality Agreement shall remain unchanged and in full force and effect.

6. This First Amendment shall be governed by and interpreted under the laws of the State of Delaware without giving effect to the choice of laws principles thereof, and may not be superseded, amended or modified except by written agreement between the parties.

7. This First Amendment may be executed in any number of counterparts and via electronic copy (pdf.). This has the same effect as if the signatures on the counterparts were on a single copy of this First Amendment.

In Witness Whereof, the parties have signed this First Amendment as of this $\underline{14}$th day of August 2014 through their authorized representatives as of the date first shown above.

RHODIA OPERATIONS S.A.S.

By: _____
   Name: _____
   Title: _____

SOLVAY USA INC.

By: _Laurent Thomas_
   Name: VP Strategy
   Title:

PPT RESEARCH, INC.

By: _____
   Name: DR. CHIP WARD
   Title: CEO

# Exhibit "A"

## CONFIDENTIALITY AGREEMENT

This **Confidentiality Agreement** ("Agreement") is, effective as of _____, 2014 ("Effective Date"), made by and between [one of RHODIA FRANCE or SOLVAY USA] ("SOLVAY"), a corporation organized and existing under the laws of _____ and having offices at _____, and _____ ("Partner"), a corporation organized and existing under the laws of _____ and having offices at _____.

SOLVAY wishes to discuss with Partner certain technologies for use in silicon wafer applications, and may want Partner to analyze certain product samples ("Samples") with SOLVAY's prior written approval and to provide SOLVAY with the results thereof (the "Results"). In such discussions, and in connection with any such Sample analysis and reporting of Results, it is anticipated that SOLVAY may, directly or indirectly, disclose or make available to PARTNER, orally, visually, by document, electronic mail, computer disks, magnetic tape, or by any other manner, business and technical information, including Samples, that SOLVAY regards as confidential, including without limitation information and/or Samples of PPT Research, Inc. which have been provided to SOLVAY under agreement of confidentiality (the "SOLVAY INFORMATION"). Such SOLVAY INFORMATION shall include but not be limited to chemical formulations and properties thereof, process and manufacturing methods and procedures, related technical data and information, trade secrets, trademarks, know-how, prototypes, patents, patent applications, formulae, processes, samples, reports, pricing and market information, and other intellectual property and confidential information, and all notes, analyses, compilations, studies and other documents based upon or including SOLVAY INFORMATION prepared by or on behalf of PARTNER. PARTNER acknowledges and understands that SOLVAY will not engage in the foregoing discussions, or permit the analysis of any Samples, without PARTNER's execution of this Agreement.

Now therefore, it is hereby agreed as follows:

**1.** The disclosure of SOLVAY INFORMATION, as well as the scope and content of the SOLVAY INFORMATION to be disclosed shall, at all times, be solely within the discretion of SOLVAY.

**2.** PARTNER shall: (a) hold SOLVAY INFORMATION in confidence and not disclose SOLVAY INFORMATION to any third party without SOLVAY's prior written consent; and (b) use SOLVAY INFORMATION only for the purpose of the discussions above and any Sample analysis and the reporting to SOLVAY of the Results (the "Purpose"); and (c) restrict disclosure of SOLVAY INFORMATION to those of its employees who have a need to know for the Purpose. The obligations of PARTNER under this paragraph 2 shall expire seven (7) years after the Effective Date.

**3.** Any Samples provided hereunder shall be used only for the Purpose. PARTNER will not analyze such Samples to determine their chemical composition, microscopic structure or method of manufacture without SOLVAY's prior written authorization and, then, only within the limits of such authorization. Upon completion of its evaluation of any Samples provided hereunder, PARTNER shall either return any unused Samples to SOLVAY together with materials derived therefrom, or shall certify in writing the disposal of same in a manner that does not reveal its identity or method of manufacture and, otherwise, in compliance with all applicable laws and regulations relating to health safety and the environment. PARTNER will report Results to SOLVAY in writing, and PARTNER agrees that such Results, as between SOLVAY and PARTER, shall be considered SOLVAY INFORMATION.

**4.** The obligations set forth in paragraph 2 above shall not apply to any SOLVAY INFORMATION that: (a) is in the possession of PARTNER, as evidenced by its written records, at the time of disclosure by SOLVAY; or (b) is or later becomes publicly known through no wrongful act of PARTNER; or (c) is independently discovered by PARTNER without reliance upon SOLVAY INFORMATION, as evidenced by PARTNER's written records; or (d) is provided to PARTNER free of restriction on disclosure by a third party having the right to so provide such SOLVAY INFORMATION; or (e) is

required to be disclosed by operation of law, provided that PARTNER shall provide notice of such requirement to SOLVAY prior to any disclosure, so that SOLVAY may seek an appropriate protective order or other remedy, and PARTNER shall give necessary information and support to SOLVAY in furtherance of seeking such remedies, and shall only disclose that portion of SOLVAY INFORMATION that PARTNER is strictly compelled to disclose. SOLVAY INFORMATION which is specific shall not be deemed to fall within any of the above exceptions merely because it is embraced by more general information in such exception. In addition, any combination of features shall not be deemed to be within any of the above exceptions merely because the features are individually within such exception, but only if the combination itself and its principle of operation are within such exception.

**5.** PARTNER shall return to SOLVAY, upon request, any and all written documents comprising SOLVAY INFORMATION, except that RECIPIENT's legal counsel may retain one copy of such documents for record keeping purposes only.

**6.** PARTNER shall return to SOLVAY, upon request, any and all written documents comprising SOLVAY INFORMATION, except that PARTNER's legal counsel may retain one copy of such documents for the sole purpose of determining its legal liability hereunder.

**7.** Except as otherwise expressly provided, nothing in this Agreement shall be construed as granting any right in or license to PARTNER under any SOLVAY INFORMATION.

**8.** Neither this Agreement nor the disclosure of SOLVAY INFORMATION hereunder shall result in any obligation on the part of either party to enter into any other agreement with the other or constitute any representation or warranty of any kind by SOLVAY with respect to SOLVAY INFORMATION disclosed.

**9.** This Agreement shall be governed by and construed in accordance with the substantive laws of the State of Delaware, excluding any choice of law principles thereof.

**10.** Because unauthorized disclosure or use of SOLVAY INFORMATION could cause irreparable harm and significant injury to SOLVAY, PARTNER agrees that SOLVAY shall have the right to seek immediate injunctive relief to enforce PARTNER's obligations under this Agreement in addition to any other rights and remedies it may have, including without limitation those permitted by the law.

**11.** This Agreement constitutes the entire understanding between the parties hereto as to the subject matter hereof and merges all prior discussions between them relating thereto. No amendment or modification of this Agreement shall be valid or binding on the parties unless made in writing and signed on behalf of each of the parties by their respective duly authorized officers or representatives.

**12.** This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become a binding agreement when one or more counterparts have been signed by each party and delivered to the other party. Signed counterparts of this Agreement may be delivered by facsimile and/or in electronic email in "portable document format" (".pdf").

IN WITNESS WHEREOF, PARTNER and SOLVAY have signed this Agreement through their respective authorized representatives.

**[Name of Partner]**

By _____
Name: _____
Title _____

**[Name of Solvay entity]**

By _____
Name: _____
Title _____

# RECIPROCAL CONFIDENTIALITY AGREEMENT

## A. Parties:

| | RHODIA OPERATIONS, a company incorporated in France, having its registered office located at 40 rue de la Haie Coq, 93306 Aubervilliers (France), | PPT RESEARCH, INC., a company incorporated in the state of Pennsylvania (USA), having its registered office located at 515 Business Park Lane Allentown, PA 18109 (USA), |
|---|---|---|
| | hereinafter referred to as "Rhodia", | hereinafter referred to as "PPT", |

## B. Recitals:

| | |
|---|---|
| | Rhodia is active in the development, production and sale of various chemicals and polymers, including, but not limited to, surfactants, polymers, lubricant formulations, and owns valuable know-how in connection therewith, |
| | PPT is active in the development, production and sale of various formulations, including, but not limited to, carriers and slurries for Solar, Semiconductors , and Optical Wafer Manufacturing, and owns valuable know-how in connection therewith, |
| | Rhodia and PPT wish to exchange certain information and samples which they consider as highly valuable and confidential to fulfill the Purpose (as hereinafter defined). |

## C. Definitions:

| Purpose | means the assessment (i) by Rhodia of the suitability to use PPT technologies in silicon wafer applications and (ii) by both parties of their interest to enter into a further agreement related to a collaboration between both companies |
|---|---|
| Effective Date | means 9 June 2014. |
| Exchange Period | means the period starting on the Effective Date and ending on 8 June 2015, unless earlier terminated by either party through notification thereof to the other party. |
| Secrecy Period | means the period starting on the Effective Date and ending on 8 June 2020 i.e. 5 (five) years after the end of the Exchange Period. |
| Governing Law | The law of Delaware (USA), excluding its conflicts of law principles. |
| Arbitration Rules | The Rules of Arbitration of the International Chamber of Commerce. |
| Arbitration Place | Delaware (USA) |

The parties agree to exchange their respective confidential information and samples under the terms and conditions set forth hereabove and in the hereunder General Terms and Conditions.

## GENERAL TERMS AND CONDITIONS

### 1. ADDITIONAL DEFINITIONS:

1.1. "Confidential Information" means (i) the Purpose, (ii) any technical, economic or business information disclosed by either party or its Affiliates ("Discloser") to the other party or its Affiliates ("Recipient") during the Exchange Period in relation with the Purpose, ((iii) any technical, economic or business information obtained by Recipient through the fulfillment of the Purpose from, and to the extent it relates to, any information under (ii)), and (iv) any information acquired visually by Recipient at the occasion of its visits to any of Discloser's facilities.
Confidential Information may include, without limitation, data, know-how, trade secrets, inventions, unpublished patent applications, specifications, product properties, compositions, technical capabilities and research and development programs.
Information shall be Confidential Information when, (i) if disclosed in writing or on any other tangible support, it is marked "confidential" by an appropriate legend or stamp, (ii) if disclosed orally or visually, it is identified as such during its disclosure and confirmed in writing within thirty (30) days after such disclosure, or (iii) acquired visually according to Sub-Clause 1.1 (v) hereabove.

1.2. "Sample" means any sample supplied by either party or its Affiliates ("Discloser") to the other party or its Affiliates ("Recipient") during the Exchange Period in relation with the Purpose.

1.3. "Affiliate" of a party means any entity or person controlling, or controlled by, or under common control with, such party, whether directly or indirectly; "control" (including, with correlative meanings, "controlling", "controlled by", and "under common control with") meaning the direct or indirect beneficial ownership of more than 50% of the voting or equity interest in such company or other entity.

1.4. For avoidance of doubt, Discloser and Recipient mean either Rhodia and its Affiliates or PPT and its Affiliates as the case may be.

### 2. CONFIDENTIALITY, NON DISCLOSURE AND RESTRICTED USE OBLIGATIONS:

2.1. With regard to Confidential Information and Samples, Recipient shall:

(a) hold the same in confidence using the same degree of care as it uses for protecting its own confidential information and samples of a like nature (but in no event less than a reasonable degree of care), including, by keeping in secure storage and reasonably separate from other information and materials (i) Confidential Information in tangible or documented form and (ii) Samples;

(b) not disclose or supply the same to any third party (including patent offices), except, to the extent required to fulfill the Purpose, to its Affiliates, or with Discloser's prior written agreement, or pursuant to Sub-Clause 2.2;

(c) limit access to the same, on a strict need to know basis, to its and its Affiliates' employees, requiring that access to fulfill the Purpose, provided (i) such employees are subject to confidentiality obligations no less stringent than those contained hereunder through appropriate agreements, (ii) such employees have been informed by Recipient of the obligations hereunder, and (iii) Recipient remains responsible for any violation of the obligations hereunder by such employees;

(d) not use, or in any way exploit for its benefit, the same except for the Purpose; and

(e) upon Discloser's written request and option, either return Confidential Information to Discloser, or destroy (or delete permanently in the case of digital or electronic media) the same, all Recipient's copies of the same and all extracts, notes, analyses, compilations, technical drawings, studies and other documents prepared by Recipient and embodying or utilizing any part of the same, except that (i) this obligation shall not apply to routinely created backup copies of electronic data, and (ii) Recipient may retain one (1) copy of Confidential Information in controlled access files in

accordance with the terms of this Agreement for the sole purpose of determining its legal obligations hereunder.

2.2. In the event Recipient is required to disclose Confidential Information or Samples under applicable law, regulation, supervisory authority or other applicable judicial or governmental order, Recipient shall (i) inform Discloser in writing before any disclosure thereof so that Discloser may seek an appropriate protective order, (ii) give upon Discloser's request all necessary information and support to ward off the disclosure thereof, (iii) ask the receiving third party to maintain confidentiality, and (iv) strictly limit the content of such disclosure to that portion of Confidential Information or Sample that it is strictly compelled to disclose. In any event, Recipient shall not oppose action by Discloser to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded to Confidential Information and Samples.

2.3. Recipient agrees that disclosure of any Confidential Information and (re-)export of any Sample, as authorized according to the provisions of Sub-Clause 2.1, shall be subject to all export laws, restrictions and regulations.

2.4. With regard to Samples, in addition to obligations defined in Sub-Clause 2.1, Recipient shall:

(a) not disassemble, analyze, or have others analyze, Samples or any portions thereof to determine their chemical composition, microscopic structure or method of manufacture, except to the extent strictly required for the Purpose;

(b) not disclose to any third party (including patent offices) and/or not publish, the results of Recipient's evaluation of the Samples supplied by Discloser. For the avoidance of doubt, said results shall be considered and treated by both parties as Confidential Information of both parties; and

(c) upon Discloser's written request and option, either return to Discloser any unused or unconsumed portion of the Samples and any materials derived from the Samples produced in performance of the evaluation, or dispose of the same in a manner that does not reveal their identity or method of manufacturing and in compliance with all laws and regulations relating to health, safety, and environment.

## 3. EXCEPTIONS:

The obligations of Article 2 shall not apply to any portion of Confidential Information or Sample that Recipient can prove:

(a) was available to the public prior to receipt or achievement hereunder, or becomes available to the public thereafter through no fault or negligence of Recipient, or

(b) was already in Recipient's possession prior to receipt or achievement hereunder, or

(c) was lawfully obtained from a third party legally entitled to do so after the time of receipt or achievement hereunder, and Recipient is free to disclose without breach of any of its obligations, or

(d) was independently developed by or for Recipient by person(s) not having access to Discloser's Confidential Information or Samples.

For the purpose of this Article, any information which is specific, shall not be deemed to be within any of the foregoing exceptions, merely because it is embraced by more general information which falls within any one or more of the foregoing exceptions. In addition, any combination of features shall not be deemed to be within any of the foregoing exceptions, merely because individual features fall within any one or more of the foregoing exceptions, but only if the combination itself falls within any one of the foregoing exceptions.

## 4. WARRANTIES AND DISCLAIMERS:

4.1 Recipient acknowledges that Confidential Information and Samples are provided by Discloser "as is", without guarantee, warranty or representation of any kind, express or implied, including, but not limited to, as to (i) their accuracy or completeness, (ii) their merchantability, fitness for a

particular purpose and non infringement of third parties' intellectual property rights, and (iii) their use, handling or disposal. Discloser shall incur no liabilities in connection with the foregoing.

4.2 In particular, and without prejudice to the generality of Sub-Clause 4.1, Recipient further acknowledges that (i) any Sample is of a developmental nature, and (ii) Discloser makes no representation, express or implied, that Discloser will supply it on a commercial basis.

4.3 Each party shall remain responsible for consequential damages caused to the other party through the breach of its obligations under Article 2.

## 5. TERM:

5.1 This Agreement shall enter into force as of the Effective Date.

5.2 At the end of the Exchange Period, Recipient shall discontinue its use of Confidential Information and Samples.

5.3 The obligations hereunder shall be binding upon each Recipient for the Secrecy Period.

## 6. CHOICE OF LAW AND DISPUTE RESOLUTION:

6.1 This Agreement shall be governed by and construed in accordance with the Governing Law.

6.2 All disputes arising out of, or in connection with, the validity, interpretation, performance and/or termination of this Agreement, which cannot be amicably settled between the parties, shall be finally settled under the Arbitration Rules by one or more arbitrators appointed in accordance with such Arbitration Rules without recourse to the ordinary courts of law. Arbitration proceedings shall take place in the Arbitration Place, shall be conducted in confidentiality and in the English language. The award rendered therein shall be final, confidential and binding upon the parties. The foregoing is without prejudice to each party's right to seek injunctions, exequatur and other relief in any appropriate court, to the extent the same are not available in arbitration.

## 7. MISCELLANEOUS:

7.1 Each disclosure or supply hereunder shall be at the sole discretion of Discloser.

7.2 Each Discloser shall hold ownership of its Confidential Information and Samples.

7.3 No right other than as set forth hereunder, or license, is granted hereby by Discloser to Recipient, expressly or by implication, with respect to Confidential Information and Samples.

7.4 This Agreement, as may be amended pursuant to the provisions hereof is the entire understanding between the parties concerning the Purpose and supersedes all agreements, communications, understandings, representations, or any other arrangement, whether written or oral, made or existing between the parties prior to or simultaneously with this Agreement in connection with the Purpose.

7.5 This Agreement shall not be deemed to be a commitment of either party to enter into another agreement whether or not in connection with the Purpose and neither party shall incur any obligation of any kind whatsoever other than as set forth in this Agreement.

7.6 No waiver of any provision of this Agreement shall constitute a waiver of any other provision nor shall any waiver constitute a continuing waiver.

7.7 If any provision of this Agreement is declared invalid or unenforceable, all remaining portions of this Agreement shall continue in full force and effect as if this Agreement had been executed without the invalid provision.

7.8 This Agreement may only be superseded, amended or modified by written instrument, properly executed by duly authorized employees of each party.

7.9 Neither party shall assign any of its rights or obligations under this Agreement without the prior written consent of the other party.

7.10 This Agreement may be executed in counterparts, all of which taken together shall be deemed to be one and the same agreement. Execution and delivery of this Agreement by delivery of a facsimile or electronically recorded copy (including a .pdf file) bearing a copy of the signature of a Party shall constitute a valid and binding execution and delivery of this Agreement by such Party.

**IN WITNESS THEREOF,** the parties have caused this Agreement to be executed through their duly authorized officers or representatives in two (2) original copies.

**RHODIA OPERATIONS**                    **PPT RESEARCH INC.**

Name: ~~Patrice PINSARD~~ Laurent THOMAS    Name: Chip Ward

Title: ~~Deputy President – Solvay Novecare Europe~~    Title:    President
VP Strategy Novecare



# EXHIBIT 3

# TECHNOLOGY LICENSE AGREEMENT

This Technology License Agreement ("Agreement") is made 20th day of February, 2015 between **SOLVAY USA INC.**, a Delaware corporation, acting on behalf of itself and its Affiliates and having offices at 8 Cedar Brook Drive, Cranbury, NJ 08512 ("Licensee") and **PPT RESEARCH, INC.**, a Pennsylvania corporation acting on behalf of itself and its Affiliates and having offices at 515 Business Park Lane, Allentown, PA   18109 ("Licensor") (Licensee and Licensor are separately "a Party" and together "the Parties").

**Whereas,** Licensor is the owner of technology relating to the Licensor's aqueous slurry product(s), including the manufacture thereof.

**Whereas,** Licensor wishes to grant and Licensee wishes to obtain (i) an exclusive license under the Technology (as defined below) to make, use or sell Product (as defined below) in the recited markets within the Exclusive Territories (as defined below).  Licensor is willing to grant this license to Licensee pursuant to the terms and conditions of this Agreement.

**Whereas,** Licensee agrees to abide by the technical choice by Licensor of Padarsh Pharmaceuticals Ltd. as the primary manufacturer of the water–based system known as "LVS" in its concentrated form as well as the "gel-particle" paste, used as a major component in the Product, wherein a signed and delivered manufacturing agreement between Licensee and Padarsh Pharmaceuticals Ltd. shall be a condition precedent to this Agreement with a date cap of April 30th, 2015.

**Now, therefore**, in consideration of the foregoing premises and of the mutual agreements and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## 1.    Definitions.

"Affiliates" shall mean any corporation or other business entity controlling, controlled by or under common control with, Licensor or Licensee, as the case may be, and for this purpose "control" of any entity shall mean the direct or indirect beneficial ownership of more than fifty percent (50%) of the voting interest in such entity, or such other relationship as, in fact, constitutes actual control thereof.

"Effective Date" shall mean the execution date of the manufacturing agreement between Licensee and Padarsh Pharmaceuticals Ltd. relating to the water–based system known as "LVS" in its concentrated form as well as the "gel-particle" paste.

"Exclusive Territories" shall mean the territories of China and South Korea for the license periods provided for in Article 14 below, and subject to any other terms and conditions provided for in this Agreement.

*UV 4/20/15*

"Scope of Use" shall mean the direct application of the Products and Technology (as hereinafter defined) to silicon ingot slicing and wafer production for the Solar, Semiconductor and optical wire-saw slicing industry.

"Know-How" shall mean the proprietary technological information owned or developed by Licensor, or otherwise proprietary information in which Licensor has a right or interest, (including but not limited to trade secrets) that relates to Licensor's aqueous slurry products, including operating instructions, processes, procedures, use and process knowledge for the Scope of Use, all technology, know-how, applications and use methods and processes related to the Products and formulations as it or they may relate to Scope of Use.

"Net Sales" shall mean the amount billed, invoiced, or received (whichever occurs first) for sales, leases, or other transfers of Product, less:

      i.    Amounts repaid or credited by reason of rejection or return.

      ii.    Taxes levied on and/or other governmental charges made as to production, sale transportation, delivery, or use and paid by or on behalf of Licensee including but not limited to VAT.

      iii.   Duties and charges for customs clearance.

"Patents" shall mean all patents, patent applications, PCT applications whether issued, filed or in written form directly relating to Licensor's aqueous slurry Product(s), as set forth in **Exhibit A** attached hereto, only to the extent that they directly relate to the Scope of Use.

"Patent Rights" shall mean all rights arising from the Patents to the extent that they directly relate to the Scope of Use.

"Product" shall mean aqueous or semi-aqueous slurry suspensions, suspension carriers, lubricants, coolants, vehicles, media and compositions, and formulations that are based on the Know-How, Technology, Patents plus any necessary and affiliated ancillary products required for use with primary suspension compositions; namely the LVS series of water based suspension carriers / lubricants/coolants as they directly relate to the Scope of Use.

"Reporting Period" shall mean each quarter (3 months) of the calendar year period during the term of this Agreement, with the first such period for a given year beginning on January 1 and ending on March 31 of such year and the second such period for such year beginning on April 1 and ending on June 30 of such year, and the third such period for such year beginning on July 1 and ending on September 30, and the forth such period for such year beginning on October 1 and ending on December 31; except the first Reporting Period shall begin on the Effective Date and end on the earlier of March 31 or June 30 of the same year.

CW 4/20/15

"Technology" shall mean the Patents, Patent Rights, technology developed, compositions, formulations, designs and Know-How of Licensor as they directly relate to the Scope of Use. Technology also shall include all process, methods, Q.C. equipment, processes, use know-how, training information, further technology and product development, whether made by Licensor or not, and technical applications information, disseminated process, operations or wire saw knowledge, process issue resolutions involving use or applications of Licensor's technology and Products, or Product composition alterations for the Scope of Use.

"Technology Package" means a collection of Licensor's information regarding the Products, knowledge, process, use, safety, methods, testing, Q.C. and any other technical disclosure from Licensor necessary for Licensee to properly dilute Product concentrate provided to Licensee, handle and store such Product, including but not limited to Know-How, Patents and Patent Rights, Patent applications and other related product composition, handling, dilution, use, safety and final "ready-to-use" product information that is available to Licensor as directly related to the Scope of Use. Licensor agrees to provide to Licensee all necessary information available to Licensor to manufacture and dilute the "LVS" and "SCA-2A" Products from supplied raw materials for the Scope of Use in the Exclusive Territories in accordance with the terms of this Agreement.

## 2. License Grant.

(a) Licensor hereby grants to Licensee, and its Affiliates, an exclusive license under the Technology to manufacture, have manufactured, use, sell or distribute the Products in accordance with the Scope of Use within the Exclusive Territories (collectively, the "License"). Any Affiliate of Licensee shall be bound by all terms and conditions of this Agreement and the exercise of any such rights or the performance of such obligations by an Affiliate of Licensee shall not relieve Licensee of its obligations under this Agreement. The right to manufacture Products of Licensor's Technology does not include the right to manufacture any of the Raw Materials comprising said Products. Further, on terms no worse than under the agreement between Licensor and Padarsh Pharmaceuticals Ltd. ("Padarsh") related to the Raw Materials, Licensee agrees to abide by the technical choice by Licensor of Padarsh as the primary manufacturer of the water–based system known as "LVS" in its concentrated form as well as the "gel-particle" paste used as a major component in said LVS product concentrate ("Raw Materials"), which comprises the LVS-FA Product.

b) Subject to the terms provided for herein, Licensee shall have the right to disclose confidential information to a selected and approved secondary manufacturer of said "gel-particle" paste or LVS Product concentrate. Any selected and approved secondary manufacturer shall be required to execute any and all documents reasonably required by Licensor to protect Licensor's confidential information. The selected secondary manufacturer shall be subject to and agree to be bound by all conditions of confidentially provided for in this Agreement and in the current Reciprocal Confidentiality Agreement between Licensor and Licensee, a copy of which is attached hereto as Exhibit C and incorporated herein by reference. The selected secondary

CM 4/20/15

manufacturer shall only be approved for use if (i) the volumes requested by Licensee exceed Padarsh's capacity or (ii) there arise issues with Padarsh's performance which remain unresolved after 30 days written notice, including any material failure in product quality (as established between PPT and Padarsh) problems with timely supply, lack of adherence to a negotiated price structure for a long-term supply contract, or any issues in product consistency. Licensor shall have the right to independently verify any quality control issues or deficiencies of the Product concentrate and gel particle paste claimed by Licensee. Any selection of such secondary supplier by Licensee will be discussed with Licensor and Licensor will have the right to refuse and withhold approval, within forty-five (45) days of receipt of Product made by secondary supplier, only if Licensor can demonstrate that the selected new supplier is unable to meet the quality, consistency and performance criteria in Exhibit B as attached hereto.

(c) Right to Sublicense:

Full Sublicense: Licensee shall not have the right to grant a sublicense under Section 2(a) without first obtaining the express written consent of Licensor on each occasion, which consent shall not be unreasonably withheld, conditioned or delayed. .By way of example and not limitation, Licensor may condition its consent on Licensee satisfying the following requirements and such conditions shall not be deemed unreasonable: (i) Licensee shall submit written requests to Licensor which shall disclose all reasonably pertinent information relating to prospective sub- licensee including, location, contact information and all relevant personnel contacts,. (ii) The prospective sub-licensee shall be required to complete and execute a non-disclosure/confidentiality agreement with Licensee and/or with Licensor that is at least as restrictive as that which exists between the Parties, a copy of which is attached hereto as Exhibit C. (iii) The Sublicense Agreement shall be in writing, it shall be consistent with and subordinate to this Agreement and it shall convey no rights which are greater than the rights contained herein. (iv)Licensor shall have the right to approve any proposed Agreement between Licensee and prospective Sub-Licensee.

Grant of Limited Sublicense: To the extent that a "limited sub-license" is necessary for a distributor to use and sell the Product and for customers to use the Product in the Exclusive Territories, and provided that customer and distributor are not provided with any confidential, Technology, Know-How or other proprietary information of Licensor, then Licensee may grant such limited sub-license without obtaining Licensor's prior written consent.

In addition to the right to receive royalties, Licensor shall be entitled to 30% of any fees or similar payments charged by Licensee and paid by Sub-licensee in connection with the Sub-license Agreement. No grant of consent by Licensor to any request to grant a sublicense shall relieve Licensee of its obligations hereunder and this Agreement shall remain binding upon the Licensee.

Licensee's failure to obtain Licensor's express written consent prior to the grant of any sublicense (excluding any "Limited Sublicense") shall constitute an event of default and a

CW 4/20/15

material breach of this Agreement.

(d)  The License granted in Section 2(a) shall remain in full force and effect during the Term and Renewal Terms (the "License Period").

(e)  For the benefit and protection of Licensor's Patent(s), Licensee, in exercising its License with respect to the Scope of Use of the Products in the Exclusive Territories, shall not disclose or reference the identity of Licensor or its connection with the Products (including any reference to the Patents or Patent Rights) when advertising or marketing the Products unless such disclosure is required by law or agreed to by Licensor. Licensee may market and sell the LVS Product under the name of "Supersol AR100" and will inform Licensor of any designations utilized by Licensee for other Products sold under this Agreement. The Parties agree to negotiate a marketing agreement wherein Licensor shall have the designation of being an "authorized agent" of Licensee with respect to protection from customer liability and litigation. Licensee names for Licensor Products may be registered, copyrighted or trademarked by Licensee provided that Licensor is informed of the same in writing.   Licensee's registration, copyright, or trademark shall not grant Licensee any additional rights to the underlying Products, Technology or Know-How which shall remain the sole and exclusive property of Licensor.

## 3.     Technology Transfer.

(a)  Within thirty (30) days after the execution of this Agreement, Licensor shall make the Technology Package available to Licensee.

(b)  Within thirty (30) days of receipt of the Technology Package by Licensee, representatives of Licensee and Licensor shall meet at an agreed upon location for up to three (3) working days to review the Technology Package and discuss implementation of the Technology Package by Licensee, as well as other related topics.

(c)  Licensor shall train and advise Licensee with respect to proper manufacture, storage and handling of final Product formulation by demonstrating appropriate and necessary manufacturing methods to create final Product; methods and processes of raw materials handling, plant and equipment operation, product testing and related environmental, health and safety procedures to a reasonable number of Licensee's personnel at the appropriate Licensor designated facilities or Licensee's designated facilities, whichever is mutually agreed upon by the Parties.

(d)  After completion of the training referred to in Section 3(c) above, Licensor shall make its appropriate personnel available to consult with Licensee at Licensee's designated site (preferably where Licensee has the "LVS" Product manufactured and in-use) regarding License's implementation of the Technology Package.

(e)  Both Parties acknowledge that such consultation by Licensor shall be subject to a fee

4/20/15

arrangement separate from the license or royalty fees paid hereunder, as follows:

(e)(i)  Should Licensee request a consultation from Licensor's employees within the first 6 months following the Effective Date, Licensee shall be responsible to approve and pay all of Licensor's for reasonable expenses in connection with the request including without limitation, any and all airfare,  lodging, meals, communication,  and incidental costs related thereto No additional consultation fee will be due.  If Licensor provides up-front payment for pre-approved travel expenses, Licensee shall reimburse Licensor for said payments within  30 ( thirty) days of submission of an expense report with supporting receipts; said receipts being required for any expense exceeding $25.

(e)(ii) For any consultation required by Licensee and performed by an external consultant trained and/or under consulting arrangement with Licensor, Licensee will pay, as full payment of such services to Licensor a consulting fee of $300USD /day including travel time in addition to the reasonable travel expenses in accordance with Section 3(e)(i).

(e)(iii) For any consultation done by Licensor's employees after the first 6 months of the last date of execution of the Agreement, the Licensee will pay to Licensor a consulting fee of $300USD /day including travel time in addition to the travel  expenses in accordance with Section 3(e)(i).

(f)  Licensor shall promptly disclose to Licensee any improvements or modifications to the Technology and/or Products, which disclosure shall not exceed thirty (30) days from the date Licensor confirms and proves in and internally demonstrates such improvement or modification.

## 4.     Acknowledgment of Licensor's Ownership and Cooperation.

Licensee acknowledges and agrees that Licensor is and shall remain the sole and exclusive owner of the Technology, Technology Package, Products, and Know-how described in this Agreement.

The Parties covenant and agree  to cooperate with one another at all times, to keep the other reasonably informed, and to exercise good faith and fair dealing in carrying out their duties and obligations under the terms of this Agreement.  To this end, Licensee agrees to provide Licensor with updated marketing reports at the end of each Reporting Period that will include general information about the penetration of the Products, Technology and the issues faced by customers in connection with their use of the Products and/or Technology. Such report may include, for example, the number of companies that have approved the Product(s); the number of customers that have running business or issues with the Products from Licensee or Sub-Licensee approved pursuant to Article 2(c).

## 5.     Registration Infringement and Indemnification.

*av*
4/20/15

(a) If either Party learns of any claim or act of any third party that constitutes or may constitute or result in an infringement, misappropriation, or misuse of the Product(s), Technology, or any other violation of any rights provided for in this Agreement ("Infringement") that Party shall promptly notify the other in writing of same.   Licensor shall have the first option to institute and prosecute any action or suits against any violation at its sole cost and expense.  If Licensor advises Licensee that it does not intend to exercise this option, Licensee shall have an affirmative duty to take action to prevent or resolve any Infringement or threatened Infringement at its sole cost and expense to the extent possible... The Parties shall cooperate with one another in the prosecution of any such claim and render all reasonable assistance to the other party including providing testimony, witnesses, information and documents in its custody or control and joining in as a party to the extent reasonably necessary.  Licensor shall keep Licensee reasonably informed of the progress of the case and shall prosecute it using such means and methods at it deems reasonable and necessary, however, in no case shall Licensee settle any claims without first obtaining Licensor's consent, which shall not be unreasonably withheld. The net recovery from any award or settlement (i.e. total amount less reasonable costs, fees, and expenses) shall be divided 75% to the litigating party and 25% to the non-litigating party.    In no event shall either Party be liable to the other for any Infringement unless such Infringement is the direct result of some negligent or intentional act of a Party.

(b) Licensor's Duty to Indemnify:  Licensor shall indemnify defend and hold Licensee , its officers, directors, employees, and agents harmless from and against any losses or damages incurred to the extent that they are the result of: (i) any material failure of Licensor to perform the duties and obligations provided for herein, (ii) any material breach of a representation or warranty of Licensor, or (iii) any material inaccuracy in the technical data, literature or training materials provided to Licensee.

(c) Licensee's Duty to Indemnify:  As described in Licensor's Warranty/Disclaimer materials which are attached hereto and incorporated herein as Exhibit D, Licensor expressly disclaims all warranties, express or implied with respect to the Product including without limitation, its use, testing, storage, disposal, handling and the like.  Licensor has disclosed to Licensee, inter alia, that the use and storage of the Product in contact with Silicon particles may result in the production of H2 gas which may be flammable or explosive under certain conditions. By executing this Agreement Licensee acknowledges that it has made its own independent investigation and is satisfied with the Product and its application in the Scope of Use. Licensee assumes all risks of loss or damage in connection with the use of the Product by any third party within the Exclusive Territories and shall be responsible for providing the appropriate warranty disclaimers, safety precautions, training and instructions to all customers, distributors, sub-licensees or end-users.  Licensee further agrees that it shall indemnify save, defend and hold Licensor, its officers, directors, employees, and agents harmless from and against any claims, losses or damages including property damage, personal injury or death to the extent that they arise out of or relate to the use of the Product by Licensee or any Sub-licensee, or Licensee's customers or any Sub-licensee's customers.

CW
4/20/15

(f) During the term of this Agreement, Licensor shall be responsible for and use commercially reasonable efforts to maintain the registration of the Patents in effect, and to obtain issuance of all Patents currently pending; save but those in China. Such decision to seek and obtain patents in China shall be made between Licensee and Licensor. Until such decision is mutually made, Licensor shall continue to maintain registration of existing patents relevant to the Technology, Products, and Scope of Use within the Exclusive Territories, and obtain issuance of patents from any such filed applications currently existing at the time of execution of this Agreement. In the event that Licensor decides not to maintain or seek to obtain issuance of any relevant Patent, Licensor shall provide Licensee with notice of its intention not to pursue the Patent at which point Licensee may offer to purchase the Patents, patent application or Technology from Licensor at a price to be mutually agreed upon by the Parties., If no such price can be agreed upon, Licensee may take such actions reasonably necessary to maintain or obtain issuance of such Patents within the Exclusive Territories and subtract any direct costs incurred from future Royalty payments to Licensor. Licensor shall cooperate with Licensee in taking these actions, but all Patents and Technology shall remain the exclusive and sole property of Licensor.

## 6.    Confidentiality.

(a) Except with respect to any Affiliate or approved Secondary Manufacturer, Licensee shall (i) hold the Know-How and Technology in confidence using the same care and caution Licensee affords its own confidential information, but no less than a reasonable degree of care including that described and detailed in the Reciprocal Confidentiality Agreement between the Parties and Section – 6 herein, (ii) not use or allow the Know-How and Technology to be used except within the scope of this License, and (iii) restrict disclosure of the Know-How and Technology to only those employees, staff, approved contractors and any approved "full Sub-Licensees "of Licensee that have a direct need to know for the purpose of using such Know-How and/or Technology within the scope of this License and only to the extent directly needed. (iv) Licensee shall also ensure that any third party not directly bound by this Agreement and the reciprocal confidentiality agreement attached hereto, shall be required to execute a separate confidentiality agreement that is at least as restrictive as that which exists between the Parties, prior to disclosing any confidential information, Know-How or Technology. Licensee shall not otherwise disclose any information of Licensor that is not generally known or available to the public at large, without the expressed written permission of Licensor. Licensee shall institute reasonable policies and procedures consistent with this Section – 6 and the Reciprocal Confidentiality Agreement between the Parties to prevent the disclosure of Licensor's confidential information, shall have a duty to pursue damages on behalf of Licensor and indemnify Licensor for any losses caused by Licensee's disclosure of Licensor's confidential information.

(b) The obligations of Section 6(a) above shall not apply to information which (i) is demonstrated to have been in the Licensee's possession prior to receipt thereof from Licensor,

(ii) is established to be in the public domain otherwise than as a consequence of a breach of an obligation not to disclose the information, (iii) is independently developed by an employee of Licensee without reference to Licensor's Know-How or confidential information prior to the consummation of this agreement, which does not fall under the terms of the Reciprocal Confidentiality Agreement between the Parties between the parties, or (iv) is required to be disclosed by operation of law, provided Licensor receives timely notice from Licensee of any action to have such Know-How disclosed and Licensor has a reasonable opportunity to object to such disclosure. Licensee shall enforce all restrictions on the Technology and proprietary information against all known and potential breaches by persons who are provided with such information by Licensee and Licensee shall have a duty to pursue damages on behalf of Licensor in the event of such a breach. Additionally, Licensor shall enforce all restrictions on the Technology and proprietary information against all known and potential breaches by persons who are provided with such information by Licensor and Licensor shall have a duty to pursue damages on behalf of Licensee in the event of such a breach and indemnify Licensee from any losses caused by Licensor's disclosure of Licensor's confidential information to those unauthorized entities who are not bound by this agreement or confidentiality at least as restrictive as this agreement and the Reciprocal Confidentiality Agreement between the Parties.

**7.    Notice.**

All notices, claims, certificates, requests, demands and other communications hereunder will be in writing and will be deemed to  have been duly given if personally delivered or on the date of receipt or refusal indicated on the return receipt if delivered or mailed (registered or certified mail, postage prepaid, return receipt requested) as follows:

(a) If to the Licensee:


Solvay USA Inc.
8 Cedar Brook Drive
Cranbury, NJ 08512
Attn: Legal Department
cc: Eric Aubay



(b)     If to the Licensor:

PPT Research, Inc.
515 Business Park Lane
Allentown, PA   18109

*CW 4/20/15*

Attn: Dr. Chip Ward -  President / CEO

With a copy to:
Santanasto Law Office
210 E. Broad Street,
Bethlehem, PA 18018

or to such other address as the person to whom notice is to be given may have previously
furnished to the other in writing in the manner set forth above.

## 8.    Compensation.

(a)  Licensee shall pay to Licensor on the Effective Date a one-time royalty fee advance of one
hundred thousand dollars ($100,000.00 USD).  The royalty fee advance shall be credited
against future royalties accrued as provided under Section 8(c) below on Net Sales, if any,
during the year in which such royalty payment is made.

(b)  Licensee shall pay to Licensor a licensing and technology transfer fee of two hundred
sixteen thousand dollars ($216,000.00 USD), payable of installments of thirty six thousand
dollars ($36,000.00 USD) per month over a six (6) month period measured from the Effective
Date.

(c) Licensee shall pay to Licensor a running royalty, payable to Licensor within 30 days of the
end of each Reporting Period, calculated at a rate of seven percent (7%) based on Net Sales of
Product sold by Licensee (as defined in Section 1 of this Agreement) during the License Period
in the Exclusive Territories.  All Royalties shall be paid in United States dollars.

## 9.    Reporting.

(a)  Licensee shall, within no more than 20 days after the end of each Reporting Period, submit
to Licensor a royalty report setting forth for such Reporting Period the following information:

    (i)      the quantity and the amount of each named product  billed, invoiced, or received
(whichever occurs first), for any sale, lease, or other transfer of Product sold or otherwise
transferred by Licensee, and

    (ii)     calculation of the amount of royalties due under Section 8.

(b)  Licensee shall, concurrent with each report under Section 9(a) above, pay to Licensor
royalties at the rate specified in Section 8 above for the Product included in the report.  A notice
of payment and payment to Licensor shall be made no later than 10 days following the "on-time"
submitted royalty report by Licensee pursuant to Section 9(a).  Said notice and payment shall be
sent to the address specified for the Licensor in Section 7 above.

(c)  Licensee agrees to maintain, for  seven (7) years following the end of the calendar year to

*CW 4/20/15*

which they pertain, complete and accurate records regarding the information specified in Sections 8 and 9 above in sufficient detail to allow the royalties payable hereunder by Licensee to be determined, to permit its books and records to be examined from time to time to the extent necessary to verify the reports provided under this Section 9 are complete and accurate, such examination to be made at the expense of Licensor during normal business hours by an auditor appointed by Licensor who shall be reasonably acceptable to Licensee.

(d)  If any examination under this Section 9(c) reveals that any royalty payment to Licensor was less than the royalty due under the provisions of Section 8 above, then Licensee shall, within thirty (30) days after receipt of written notice thereof, pay to Licensor any undisputed amounts that constitute the difference between the amount paid and the amount due plus the expenses incurred by Licensor for the audit that identified the shortfall.


## 10.    Events of Default.

(a) Except as otherwise provided in this Agreement, if any of the following events ("Events of Default") should occur at any time during the term of this Agreement, the non-defaulting party may, upon written notice to the other party as required herein, terminate this Agreement and the License granted herein:

(a)(i)  Insolvency.  An event of default shall be deemed to have occurred, without notice from the other party, if a party is liquidated or dissolved, becomes insolvent, suffers the appointment of a receiver or trustee, makes a general assignment for the benefit of creditors or institutes or has instituted against it any proceedings under any law relating to bankruptcy or insolvency or the reorganization or relief of debtors;

(a)(ii)  Material Breach.   An event of default shall have occurred if either party shall fail to perform in any material respect, or shall be in material breach of any of its obligations hereunder.  To the extent that the breach is of a nature that it could reasonably be cured given time, the non-breaching Party shall give the breaching party written notice and 45 days within which to cure the default. The failure of the non-breaching party to cure the default and provide reasonable evidence of the same within this period shall be treated as an event of default.

(b) In the event that Licensor is liquidated or dissolved, becomes insolvent, suffers the appointment of a receiver or trustee, makes a general assignment for the benefit of creditors or institutes or has instituted against it any proceedings under any law relating to bankruptcy or insolvency or the reorganization or relief of debtors, Licensor shall notify Licensee in writing within thirty (30) days of such an event, and Licensee shall have an option for a period of sixty (60) days from the date the notice is received by Licensee to elect to purchase all or substantially all of the Patents (including Patent Rights) of Licensor directly related to The Scope of Use and Exclusive Territories; at a price to be established by a Business valuation expert mutually agreed upon by the Parties.

CW 4/20/15

## 11. Dispute Resolution and Applicable Law.

(a) Any controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof shall, if possible, be settled by friendly negotiation. If settlement cannot be obtained through such friendly negotiation, such controversy, claim or dispute, may be submitted to arbitration as provided in Section 11(b) below for resolution.

(b) All disputes arising in connection with this Agreement and which cannot be settled amicably shall be settled by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce (ICC). The arbitral tribunal shall be composed of a single arbitrator to be appointed in accordance with said ICC Rules. The place of arbitration shall be Pennsylvania, the arbitration shall be conducted in the English language and all documents not in English language submitted by any Party shall be accompanied by an accurate English language translation thereof. The arbitral tribunal shall apply the state laws of the Pennsylvania and the federal laws of the United States of America. The arbitral tribunal shall not have the power to alter, modify, amend, add to or subtract from any term or provision of this Agreement. The Parties expressly waive any right of appeal to the courts of any award, which shall be final and binding on the Parties. Judgment upon the award of the arbitrators may be entered in any court of competent jurisdiction in the Commonwealth of Pennsylvania.

(c) Regardless of the places of agreement, the places of performance, or otherwise, this Agreement and all amendments, modifications, alterations or supplements thereto shall be construed under, governed by and the legal relationships determined in accordance with the laws of the Commonwealth of Pennsylvania.

## 12. Successors and Assigns.

Licensor shall have the right to Assign this Agreement in its sole discretion only in the limited circumstance where Licensor has received a bona fide third party offer to buy all or substantially all of the assets of Licensor, or the assets directly related to the Products, Technology, Know-How and Patent Rights and Licensee declines to exercise the purchase option available under 15(f) of this Agreement. Except for the limited circumstance provided for above, this Agreement shall not otherwise be assigned by either party without the prior written consent of the other party.

Notwithstanding the foregoing right of Licensee to assign this agreement to an Affiliate, Affiliate shall have no further right of assignment, except with the written consent of Licensor, which may be granted at Licensor's sole discretion.

## 13. Representations and Warranties.

(a) Licensor represents and warrants that Licensor has the authority to enter into this Agreement, has the right to disclose the Know-How and Technology and has the right to grant

CW 4/20/15

the License hereunder.

(b) Licensee represents and warrants that Licensee has the authority and the right to enter into this Agreement.

**14.    Term and Termination.**

(a)  This Agreement shall commence on the Effective Date and except as otherwise provided for herein, it shall terminate four (4) years from the Effective Date (the "Term").  This Agreement shall thereafter automatically renew for successive one (1) year terms (a "Renewal Term" or, collectively, "Renewal Terms") unless terminated by either party at the end of the Term or any Renewal Term upon the delivery of 180 (one-hundred, eighty)  days prior written notice ("Termination Term") within or before the end of the existing term or term renewal period. All the obligations of the Parties under this Agreement shall remain the same during the Termination Term.  Notwithstanding any of the foregoing, the Term of Licensee's exclusive license for the territory of South Korea shall commence on the Effective Date, but shall be for a trial term of eighteen (18) months ("Trial Term"). If at the expiration of the Trial Term, Licensee has met the Minimum Performance requirements for the territory provided below in 14(b)(ii), then Licensor shall renew this License for the remainder of the Term and any Renewal Terms.

(b)  Minimum Performance Requirement:  During the Term and any Renewal Term, Licensee shall exercise good faith and commercially reasonable efforts to market and sell the Products in the Exclusive Territories. At a minimum, in order to maintain its Exclusive License in the Territories, Licensee shall meet the following requirements:

      i.  China: Licensee must have secured six (6) "committed customers" within two (2) years from the Effective Date.  For the purposes of this Agreement, a "Committed Customer" means that a customer has validated that the Products can be used for industrial production solar wafer cutting applications at their facilities

      ii. South Korea: Licensee must have one (1) Committed Customer in the Territory prior to the expiration of the Trial Term.

 In the event that Licensee fails to meet these minimum requirements, Licensor shall have the option, but not the obligation to terminate the Agreement.

(c) Termination: This Agreement may be terminated by Licensor, at its sole discretion and  upon written Notice to Licensee for any of the following reasons:  (i) if Licensor receives a bona fide offer from an unaffiliated third party to buy all or substantially all of the assets of Licensor, or all or substantially all of the assets  related to the Products, Technology, Know-How and Patent Rights, and Licensee declines to exercise the purchase option provided for in 15(f) below; or (ii) if Licensee shall fail to make timely payment to the Licensor of any undisputed amount agreed to be paid by Licensee hereunder, or (iii) Licensee fails to satisfy the Minimum Performance Requirements of Section 14(b) above; or (iv) in the case of any event of default by Licensee that

*CN* 4/20/15

is not timely cured or curable. In the event of default by Licensee under Sections 14(c)(ii) and 14(c)(iii), and as described in Article 10 of this Agreement Licensee shall transfer to Licensor, without cost, fee, charge or consideration, all customer information, contacts, locations, Product use information test status information, and all other customer information for all customers ever contacted by Licensee or its Distributors or other authorized agents, using the Product, testing the Product, customers where presentations about the Product have been made by Licensee, as well as any information concerning customers contacted who have rejected the Products. No expiration or termination of this Agreement shall relieve either party of any obligation accrued prior to the date of expiration or termination or relieve a party in default from liability for damages for breach of this Agreement. Waiver by any party of a single default or breach or a succession of defaults or breaches shall not deprive such party of any right to terminate this Agreement arising by reason of any subsequent default or breach.

(d) All rights and obligations created hereunder shall expire upon termination of this .Agreement, except that the Definitions, Sections 5(b-c), all confidentiality requirements of Section 6, and Sections 9(c), & 11 shall survive expiration or earlier termination of this Agreement. In no event shall termination of this Agreement release Licensee from the obligation to pay any amounts that became due on or before the date of such termination. For Sections 5(b-c), enforcement of said Sections shall continue for 6 months following termination of this Agreement as described in Section – 14.

(e) In case of a termination of this Agreement by Licensee, or an election by Licensee not to renew. Licensee shall continue to faithfully and properly service its' existing customers for the full 180 day period prior to termination. In such event, both Parties agree, covenant and promise that during and after said 180 day period, neither they, nor their agents, manufacturer's Representatives, sales personnel, technical support personnel, marketing or any other related staff engaged in any direct or indirect action of marketing, servicing, supporting and maintaining any customer relationship, Product delivery or Product / Technical support needs of said customer or potential customer, as the case may be, shall engage in any activity that disparages or creates a negative impression of any sort within said customer or potential customer concerning the other Party or the Products being used, tested, qualified, acquired, purchased or otherwise evaluated by the customer or potential customer. Such covenant and promise by each Party shall include the integrity of the other Party, any material information about the position, condition, size, capabilities, or any of the other Party's general business information. In the event of a Termination of this Agreement by Licensee or should Licensee elect not to renew this Agreement, except for termination by Licensee under Section 10 above, Licensee shall provide to Licensor at no cost, charge or other consideration on or before 60 days prior to the termination of this Agreement or Licensees' election not to renew the full list of customers that are using the product or that have approved the product, or have tested the product, or have had the Product presented to them, or have rejected the Product following initial presentations, testing, or other evaluations of any kind, or have been contacted about the Product, including all the relevant contact information of the customer representative, employee,

Clv 4/20/15

engineer, or other such individuals involved in the consideration, testing, evaluation or presentation of the Product or its ancillary Products ("Customer List")

(f) In case of termination of this Agreement by Licensor, Licensee, at Licensor's request, shall continue to faithfully and properly service its' existing customers for the full 180 day period prior to termination. In such event, both Parties covenant and agree that neither they, nor their agents, manufacturer's Representatives, sales personnel, technical support personnel, marketing or any other related staff will engage in any direct or indirect action of marketing, servicing, supporting and maintaining any customer relationship, Product delivery or Product / Technical support needs of said customer or potential customer, as the case may be, nor shall either Party engage in any activity that disparages or creates a negative impression of any sort with any customer or potential customer concerning the other Party or the Products being used, tested, qualified, acquired, purchased or otherwise evaluated by the customer or potential customer. Such covenant and promise by each Party shall include the integrity of the other Party, any material information about the position, condition, size, capabilities, or any of the other Party's general business information.

15. **Miscellaneous.**

(a) In the event that any provision of this Agreement shall be held invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect any other provision of this Agreement, and the parties shall negotiate in good faith to modify the Agreement to preserve (to the extent possible) their original intent. If the parties fail to reach a modified agreement within one (1) month after the relevant provision is held invalid or unenforceable, then the dispute shall be resolved in accordance with the dispute resolution procedures set forth in Section 11 above.

(b) All headings are for convenience only and shall not affect the meaning of any provision of this Agreement.

(c) Any failure to enforce any of the provisions of this Agreement or to require at any time performance of any of the obligations hereof, shall in no way affect the validity of this Agreement or any part thereof, or the right thereafter to enforce each and every such provision.

(d) No party has relied on any representation or warranty of any kind in entering into this Agreement, or as an inducement to enter into this Agreement, except for those representations and warranties expressly set forth herein.

(e) All rights and licenses granted pursuant to any section of this Agreement are, and will otherwise be, for purposes of Section 365(n) of the U.S. Bankruptcy Code and/or any similar or comparable section of the U.S. Bankruptcy Code (as such sections may be modified, amended, replaced, or renumbered from time to time), executory licenses of rights to "intellectual property," as defined under **Section 101 (35A)** of the U.S. Bankruptcy Code and/or any similar or comparable section of the U.S. Bankruptcy Code (as such sections may be modified, amended, replaced, or renumbered from time to time). The parties will retain and may fully

exercise all of their respective rights and elections under the U.S. Bankruptcy Code. Accordingly, the licensee of such rights shall retain and may fully exercise all of its rights and elections under the U.S. Bankruptcy Code. Upon the commencement of bankruptcy proceedings by or against Licensor under the U.S. Bankruptcy Code, the Licensee shall be entitled to retain all of its license rights and use rights granted under this Agreement.

(f)  Purchase Option:

(f)(i)    In the event that Licensor, during the License Period, desires to sell and has received a bona fide offer in writing from an unaffiliated third party to buy all or substantially all of the assets of Licensor, or the assets directly related to the Products, Technology, Know-How and Patent Rights (as defined in Article 1 "Definitions" of this Agreement), Licensor shall first notify Licensee in writing of the proposed sale ("(f)(i) Offer Notice"). Each (f)(i) Offer Notice shall contain all material terms of the proposed sale, including, without limitation, a copy of the written offer received, the purchase price ("(f)(i) Offer Price") and terms of payment, the date and place of the proposed sale, and any other material terms.  Licensee shall have an option for a period of sixty (60) days from the date the (f)(i) Offer Notice is received to elect to purchase all or substantially all of the assets of Licensor or assets of Licensor's business as directly related to the Products of this Agreement as detailed herein in Section 15(f)(i) at a price discounted by 17.5% of the (f)(i) Offer Price and subject to the same material terms and conditions as described in the (f)(i) Offer Notice (or terms and conditions as similar as reasonably possible). Licensee may exercise such purchase option and, thereby, purchase all (or substantially all) of the assets of Licensor as described and detailed herein in this Section 15(f) by notifying Licensor in writing before expiration of such sixty (60) day period.  If during the License Period, an (f)(i) Offer Notice is presented to Licensee and Licensee declines to exercise its purchase option, then Licensor shall have the obligation to purchase the Customer List at a price equal to 17.5% of that third party (f)(i) Offer Notice only at such time as the sale of assets is consummated and within 30 days of final settlement of said sale..  In such case, the sale of the Customer List to Licensor shall take place within 30 days of said settlement date..

(f)(ii)    In the event that Licensor, during the License Period, desires to sell and has received a bona fide offer in writing from an unaffiliated third party to buy assets of Licensor that does not, directly or indirectly, related to the Products, Technology, Know-How and Patent Rights (as defined in Article 1 of this Agreement), Licensor shall first notify Licensee in writing of the proposed sale ("(f)(ii) Offer Notice"). Each (f)(ii) Offer Notice shall contain all material terms of the proposed sale, including, without limitation, a copy of the written offer received, the purchase price ("(f)(ii) Offer Price") and terms of payment, the date and place of the proposed sale, and any other material terms.  Licensee shall have an option for a period of sixty (60) days from the date the (f)(ii) Offer Notice is received to elect to purchase said assets of Licensor or assets of Licensor's business as detailed herein in Section 15(f)(ii) at the full (f)(ii) Offer Price (i.e., no discount) and subject to the same material terms and conditions as described in the (f)(ii) Offer Notice (or terms and conditions as similar as reasonably possible).    Licensee may

exercise such purchase option and, thereby, purchase said assets of Licensor or assets of Licensor's business as described and detailed herein in this Section 15(f)(ii) by notifying Licensor in writing before expiration of such sixty (60) day period. If during the License Period, an (f)(ii) Offer Notice is presented to Licensee and Licensee declines to exercise its purchase option, then Licensor shall have no obligation to purchase the Customer List.

(g) This Agreement may be executed in two or more counterparts, each of which shall be deemed to constitute an original, but all of which together shall constitute one and the same instrument.

(h) Each party acknowledges that information provided under this Agreement may be subject to export and import restrictions, and any use or transfer of controlled information must be authorized under those regulations. Each party agrees that it will not use, distribute, transfer, or transmit the information of the other party in any products except in compliance with the laws and regulations of the country from which the product and/or information furnished hereunder is being exported and/or to which it is being imported. This obligation survives any termination of this Agreement.

(i) This Agreement constitutes the entire understanding between the parties with respect to the subject matter of this Agreement and merges all prior discussions between them relating thereto. No amendment or modification of this Agreement shall be valid or binding on the parties unless made in writing and signed on behalf of each of the parties by their respective duly authorized officers or representatives.

(j) Binding Nature. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

(k) Headings. Headings in this Agreement are for convenience only and shall not be used to interpret or construe its provisions.

(l) Non-Waiver. No delay or failure by either party to exercise any right hereunder, and no partial or singly exercise of any such right, shall constitute a waiver of that or any other right, unless expressly provided herein.

(m) Time of Essence. Time is of the essence of this Agreement.

(n) Amendments. No amendments to this Agreement shall be valid unless they are in a writing signed by the Parties.

CW 4/20/15

IN WITNESS WHEREOF, the parties hereto have executed and this Agreement as of the date first above written.


**PPT RESEARCH, INC.**

By: _____

Title: _____PRESIDENT_____

Date: _____4/20/15_____

**SOLVAY USA INC.**

By: _____

Title: __VP GM Novecare NA.___

Date: _____5.5.15_____

Exhibit A

[List of PPT Patents to be supplied by PPT]


1)  U.S. Patent #7,381,690
2)  U.S. Patent Application;  Serial #12/586,507
3)  PCT Applications related to (1) and (2) above

Exhibit B

[Quality, consistency and performance criteria]

1) LVS Gel – Particle Quality
   a) Quality of gel particles defined by:
      i.    Particle Size Distribution curve using Laser Diffraction Analyzer (Coulter LS-230 or LS-320) as compared to standard material.
      ii.   Level of water contained in gel-paste material that affects total solids content of gel-paste and gel-particles to be used in LVS.
      iii.  Analytical determination of oxide level and hydroxide level of gel-particles. Ratio must match or be superior to standard material.
      iv.   Contamination. No visible or hidden contamination caused by external material or extra solids added to gel-particles or gel-paste
      v.    Visual inspection: Dried or partially dried gel-paste is unacceptable. Water level in paste must match or be within +2 – 4% of that for standard material
      vi.   Packaging of Gel-Paste: Must be double bagged and completely sealed on arrival. Otherwise, dried surface particles may form, compromising integrity of gel-particles within.
      vii.  Gel –particle resistance to shear. Gel-particles properly prepared must be resistant to shear forces present in saw operations. High shear mixing followed by PDC analysis confirms shear resistance vs. that of standard material.
      viii. Etc.
   b) Gel Particle Consistency
      i.    Gel-Particle Consistency is determined by measuring quality requirements listed above for a minimum of at least 3 separate lots of production scale lots of gel-paste; preferably 4 lots at the discretion of PPT.
      ii.   Deviation of more than that of standard material between lots may disqualify supplier's gel-paste material.
      iii.  Ability to supply material in quantities needed on a consistent basis by supplier is an additional criterion for consistency.
      iv.   Supplier must be ISO -9001-2000 or better certified as a tangible show of product production consistency. GMP certification is preferred.
      v.    Etc.
   c) Gel – Particle Performance:
      i.    Gel-particles must pass PPT standard "Soft – Settle" testing sequence with at least equal or superior results than those of standard material at all dilution levels.
      ii.   Slurry settling rates of LVS made with supplier's gel-particles must be equal or slower than that for standard material at the same dilution level.
      iii.  There must be no or small variations in slurry viscosity between standard material and

CW 4/20/15

supplier's material at various dilution levels.

iv.    Gel-Material as "LVS" must not show any adverse suspension characteristics at close to freezing temperatures.  No suspension expectations exist once freezing occurs.

v.    LVS material must rinse from wafer surfaces without remaining residue using standard rinsing techniques at PPT (i.e.; PPT 3-bath rinse station).

vi.    Settling of gel-particles in LVS suspension carrier must not be higher than that of standard material.

vii.    Etc.

# Exhibit – C

## (Reciprocal Confidentiality Agreement)



Solvay NDA.pdf

# Exhibit – D

## (PRODUCT WARNING AND DISCLAIMER)

## PRODUCT WARNING AND DISCLAIMER

**WARNING:** *The reaction between Silicon particles and/or Silicon and Water is known to produce Hydrogen Gas ("H2"). The LVS and SCA compositions ("Products") are water-based. The use of this Product series to slice, grind, lap, rinse, clean or cut Silicon ingots or bricks will produce Silicon "kerf" or small Silicon particles. When these particles are mixed with, stored together with, or otherwise come in contact with the LVS and/or SCA aqueous products, Hydrogen Gas may be produced. H2 is dangerous and can be highly flammable and/or explosive under certain conditions.*

**Warranty Disclaimer:** In addition to highlighting the inherent danger of H2 production from use, testing, employing, or implementation of the LVS Products or other aqueous based ancillary rinse aids (i.e.; SCA product series) with silicon slicing, this document contains safety and Product use information, suggested procedures, use limitations, safety recommendations, H2 gas remediation suggestions, recommended conditions for safe use, and suggestions for potential equipment designs. This information is being offered for the "end – user's" evaluation only.  As such, it is the sole responsibility and duty of the "end – user" / Customer to fully investigate and develop ALL the safety precautions, procedures, equipment, tools and facilities necessary for the safe use and implementation of the LVS / SCA water based carriers / rinses with Silicon or with any other metal or semi-metal that may similarly produce dangerous, toxic, or flammable by-products as a result of exposure to or combination with the LVS / SCA aqueous systems.  The information provided by PPT Research Inc. ("PPT") represents information and data gathered from test results and other available sources.  PPT represents that this information is accurate only to the best of PPT's information and belief based on limited testing under specific circumstances,  and PPT makes no representation or warranty that the information is complete or that it will be applicable to "end – user's" particular application for the LVS / SCA Products. The information is intended only as an initial guideline and it is being offered "as-is" without further representation or warranty as to its accuracy, completeness or applicability to "end – user's" / Customer's actual or intended use. Customer / "end – user" acknowledges, understands and agrees that it is anticipated that Customer/end-user will conduct its own tests and investigations as to the proper safety and appropriate use and application of the LVS / SCA

Products and Customer / end-user agrees to release and hold PPT, its officers, directors, employees and representatives harmless from and against any claims, losses or damages relating to any failure to warn or relating to Customer's reliance on the information provided.

By choosing to acquire or accept the LVS / SCA Products, Customer / end-user acknowledges, understands and agrees that it is purchasing or acquiring the Products in their current "as-designed" and "as-is" condition as described in the SDS or MSDS for said Products, which are delivered without the presence of or any exposure to any mentioned metals or semi-metals, which may cause reaction with Products.

PPT, its officers, directors, employees, and representatives make no warranties, and to the extent legally permissible, expressly disclaim any and all warranties, whether oral or written, whether express or implied, and whether arising out of statute, custom, usage, trade or otherwise; including without limitation, any warranty concerning the design, safety, application, merchantability or fitness of the LVS Products for any particular purpose or use.

**Release and Indemnity:**  By accepting, opening, using, handling, testing, mixing, transferring, storing, disposing or otherwise employing the LVS / SCA Products, resulting in exposure, use or process that creates contact between the LVS / SCA Products and Silicon and/or Silicon particles or any other such metal or semi-metal that may be reactive with water or water solutions, Customer/end-user acknowledges and agrees that PPT shall not be held responsible or otherwise liable in any manner whatsoever to either to Customer/end-user, to any end-user supplied by Customer, or to any other third party, for any losses or damages related to the Products, their use, testing, employment, handling or processing.

Further,  by accepting, opening, using, handling, testing, mixing, transferring, storing, disposing or otherwise employing the LVS / SCA Products, resulting in exposure, use or process that creates contact between the LVS / SCA Products and Silicon and/or Silicon particles or any other such metal or semi-metal that may be reactive with water or water solutions,  Customer/end-user further agrees to release, indemnify defend and hold PPT harmless, from, for and/or against any and all claims,  losses, fines, costs, fees, including reasonable attorney's fees, or other damages, whether to property or to persons, including serious bodily injury or death, that may arise out of, relate to, result from, or which may otherwise be attributed to Customer's / end-user's use, misuse, employment of, testing, shipping, storage, collection, mixing, dilution, modification, or disposal of the LVS products.

CW 4/20/15



**EXHIBIT 4**

# FIRST AMENDMENT TO TECHNOLOGY LICENSE AGREEMENT

This First Amendment to Technology License Agreement (hereinafter, the "Amendment") is made effective as of *April 6, 2016* by and between **SOLVAY USA INC.**, a Delaware corporation, acting on behalf of itself and its Affiliates and having offices at 504 Carnegie Center, Princeton, NJ 08540 ("Licensee" or "Solvay") and **PPT RESEARCH, INC.**, a Pennsylvania corporation acting on behalf of itself and its Affiliates and having offices at 515 Business Park Lane, Allentown, PA 18109 ("Licensor" or "PPT") (Licensee and Licensor are separately "a Party" and together "the Parties").

**Whereas,** Licensor is the owner of the Technology and Products relating to the Licensor's aqueous slurry product(s), including the manufacture thereof.

**Whereas**, Licensor and Licensee entered into a Technology License Agreement (the "License Agreement" or "TLA") dated February 20, 2015, with an Effective Date of April 30, 2015; and

**Whereas**, The Parties acknowledge that certain performance and logistical issues have existed relating to commercialization of the Product(s) at certain customer sites; and

**Whereas**, the Parties now wish to amend certain terms of the License Agreement pursuant to this Amendment.

**Now, therefore,** in consideration of the mutual covenants set forth in this Amendment and other good and valuable consideration, the Parties, intending to be legally bound hereby agree as follows:

I.    Article 14(a)-(b) of the TLA are hereby deleted in their entirety and replaced with the following language:

14(a) This Agreement shall commence on the Effective Date and except as otherwise provided for herein, it shall terminate on the date that is six (6) years from the Effective Date (the "Term").This Agreement shall thereafter automatically renew for successive one (1) year terms (a "Renewal Term" or, collectively, "Renewal Terms") until one Party delivers written notice to the other Party of its intent not to renew ("Termination Notice"). Except for termination pursuant to Articles 10, 14(c) or 15(f), a Party's Termination Notice must be delivered at least one-hundred eighty (180) days prior to the expiration of the then current Term or Renewal Term ("Termination Term"). All the obligations of the Parties under this Agreement shall remain the same during the Termination Term.

14(b) Minimum Performance Requirements: During the Term and any Renewal Term, Licensee shall exercise good faith and commercially reasonable efforts to market and sell the Products in the Exclusive Territories. At a minimum, in order to maintain its Exclusive License in the Territories, Licensee shall meet the following requirements for the respective Territories ("Minimum Performance Requirements") within three and a half  (3.5) years of the Effective Date ("Performance Deadline"):

    i.    China: Licensee must have secured GCL – Poly Energy Holdings  and its affiliates ("GCL") as a Committed Customer or alternatively, Licensee shall secure at least 6 Committed Customers

before the expiration of the Performance Deadline. During each 12 month period following the Performance Deadline, the Licensee must achieve a commercially reasonable increase in sales from the amount of sales from the prior year. The Parties agree that they shall meet and exercise good faith efforts to agree upon a commercially reasonable increase in sales for the year based on current conditions.

ii. South Korea. Licensee must have secured and maintain at least one (1) Committed Customer before expiration of the Performance Deadline. During each 12 month period following the Performance Deadline, the Licensee must achieve a commercially reasonable increase in sales from the amount of sales from the prior year. The Parties agree that they shall meet and exercise good faith efforts to agree upon a commercially reasonable increase in sales for the year based on current conditions.

iii. Japan, Indonesia, Singapore, India, Vietnam, Malaysia, Philippines: Licensee must secure and maintain at least three (3) Committed Customers from the combination of these Territories before the expiration of the Performance Deadline. During each 12 month period following the Performance Deadline, the Licensee must achieve a commercially reasonable increase in sales from the amount of sales from the prior year. The Parties agree that they shall meet and exercise good faith efforts to agree upon a commercially reasonable increase in sales for the year based on current conditions.

iv. Taiwan: Licensee must have secured and maintain GET as a Committed Customers before the expiration of the Performance Time. During each 12 month period following the Performance Deadline, the Licensee must achieve a commercially reasonable increase in sales from the amount of sales from the prior year. The Parties agree that they shall meet and exercise good faith efforts to agree upon a commercially reasonable increase in sales for the year based on current conditions.

v. Effect of Failure to meet Minimum Performance Requirements: In the event that Licensee fails to meet or maintain the Minimum Performance Requirements for any of the Exclusive Territories under i-iv, Licensor may, terminate Licensee's exclusivity rights for those territories where the Minimum Performance Requirements were not met and/or maintained. In the event that Licensor elects to terminate Licensee's exclusivity for territories where the Minimum Performance Requirements were not met or maintained, Licensee shall provide Licensor with customer information for those territories consistent with 14(c).

II. The Definition of "Exclusive Territories" in Article 1 is hereby deleted in its entirety and replaced with the following language:

"Exclusive Territories" shall mean the territories of Japan, Indonesia, Singapore, India, Vietnam, Malaysia, Philippines, China, South Korea. and Taiwan.

III. Article 8(c) is hereby deleted in its entirety and replaced with the following language:

Licensee shall pay to Licensor a running royalty, payable within 30 days of the

end of each Reporting Period, calculated at a rate of seven percent (7%) based on Net Sales of Product sold by Licensee during the License Period for sales in China and South Korea, and **7%** for any of the other Exclusive Territories, with the exception of Taiwan. Payment shall be in U.S. Dollars.

With respect to Taiwan, Licensee agrees to pay to Licensor a running royalty, payable within 30 days of the end of each Reporting Period, calculated at a rate of seventy (70%) percent of the Gross Margin of Product sold by Licensee within the Territories. For the purposes of this Agreement, "Gross Margins" shall be defined as: Net Sales less, direct manufacturing costs incurred by Licensee (excluding manufacturing and packaging costs by Padarsh or any permitted successor or sublicensed manufacturer, but including packaging, re-packaging, and dilution by Licensee) less freight and logistics costs directly incurred by Licensee.

By way of example and not limitation, Gross Margin shall not include Sales, Marketing, Administrative and Technical Support costs of Licensee. Licensee shall submit expense reports with each running royalty payment to verify Gross Margins.

--

IV.    Article 4 of the License Agreement is hereby amended to add the following language:

The Parties further acknowledge that a performance issue was observed during initial testing of Licensor's Product; specifically, the inconsistent production of thick and thin wafers during wire saw cutting of silicon ingots under certain test conditions. Licensor had developed a resolution to this issue, which Licensee did not believe to be commercially appropriate. Licensor disagrees with this assessment. Licensee has developed an alternate solution to this issue ("Alternate Technology") and contends that its Alternate Technology is beyond, and/or outside of the scope of the Technology Package, Technology, Product(s) and Know-How of Licensor and the TLA. Licensor adamantly disputes this contention. The Parties, however, have agreed to the following terms to resolve this specific dispute:

   i.    For the life of any patents sought for the Alternate Technology, or for a period of 25 years from the Effective Date, whichever period is longer, Licensee shall, and does hereby grant to Licensor, its Affiliates and assigns, including any third-party purchaser of Licensor or its assets, or its assets directly related to the Technology, Patents, Patent Rights, Product(s) and Know-How of the Technology License Agreement (TLA), a royalty-free, world-wide, fully-transferable, non-exclusive license with full detailed disclosure to the Alternate Technology. The right to use the Alternate Technology shall be a right that is limited to: (a) Licensor, its Affiliates, successors and permitted assigns, (b) customers, to the extent necessary for use of the Product in accordance with Article 2, but in no case shall Licensee reveal the composition of the Alternate technology beyond that which is contained in the patent application. and (c) any third party purchaser acquiring Licensor's assets, or stock as provided for in Article 15(f).
   ii.    The Parties  hereby agrees that they shall keep one another informed of the details of any Product composition development, research, improvements, changes, modifications or alterations of any kind within not more than 30 days.
   iii.    All future Product composition improvements, alterations, developments or changes shall be and remain the sole and exclusive property of Licensor.

V.    The Alternate Technology shall be disclosed to Licensor by Licensee in the form of a comprehensive, detailed report from Solvay as part of said license in accordance with the following:

a.  Within ten (10) days of the execution of this Amendment, Licensee shall provide Licensor with the composition and within 30 days Licensee shall provide Licensor full disclosure report of its "Additive / Process" resolution, or whatever constitutes the full and complete resolution to the "thick / thin" wafer issue. Disclosure by "patent application" of Licensee shall not be considered acceptable disclosure, though it shall be included in the disclosure documents. Full disclosure shall include a written disclosure report which shall include the following (to the extent that this information or documentation is within Licensee's possession or control:

(i)    complete compositional, structural, accurate proportions of components in the case of multiple component additive composition, and proper chemical and trade compound name(s) identification of the final component additive(s) that was or are used or to be used or employed within or as part of the LVS-FA / SuperSol AR-100 basic composition or other composition based on the Technology or Product(s), or similar water based suspension system currently used or being tested at customer sites including GCL within China or any other sites within the exclusive territories to resolve the "Thick – Thin" wafer issue. This shall include the exact weight percentage or proportion of additive component(s) employed within the LVS-FA / SuperSol AR-100 ready-to-use carrier system from which production slicing slurry is made or prepared;.

(ii)   full chemical and trade name  identification of any additives previously tested that failed to resolve the issue;

(iii)  full details on any and all wire saw set-up, run and process parameter changes or alterations, or any specific or altered use processes for the LVS-FA / SuperSol AR-100 compositions containing the final, successful additive(s) that were utilized to resolve the Thick - Thin issue; and

(iv)   a detailed summary of the test results from all tests as well as identification of any customer site(s) where testing occurred, and from all of which the test data results are presented in said report that demonstrate and prove the claimed Licensee "thick / thin" resolution is fully functional with  consistent successful results within a production slicing environment at customer sites.

(v)    Full description in detail of any issues that remain with the Licensee claimed resolution for the Thick / Thin wafer issue that must still be resolved for complete and successful production use

VI.    Except as set forth in this Amendment, all terms of the License Agreement shall remain unchanged and in full force and effect.

VII.   The Recitals above are hereby incorporated by reference as if set forth at length herein.

VII.   Except as explicitly set forth in this Amendment, the capitalized terms used herein shall have the meaning ascribed to it in Technology License Agreement (TLA).

IV.    This Amendment may be executed in one or more counterparts, each of which shall be deemed to be an original copy and all of which, when taken together, shall be deemed to constitute one and the same document.

*CW*
*LT*

IN WITNESS WHEREOF, each of the Parties hereto, agreed to be legally bound, has caused this Amendment to be executed by a duly authorized officer or representative.

**SOLVAY USA INC.**

By: _____

Name: _L. THOMAS_

Title: _VP Strategy_

**PPT RESEARCH, INC.**

By: _____

Name: _CHIP WARD_

Title: _CEO_