AUBAY DECLARATION

# EXHIBIT 1

# TECHNOLOGY LICENSE AGREEMENT

This Technology License Agreement ("Agreement") is made January 22, 2015 between **SOLVAY USA INC.**, a Delaware corporation, having offices at 8 Cedar Brook Drive, Cranbury 08512 ("Licensee") and **PPT RESEARCH, INC.**, a Pennsylvania corporation acting on behalf of itself and its Affiliates and having offices at 515 Business Park Lane, Allentown, PA 18109 ("Licensor") (Licensee and Licensor are separately "a Party" and together "the Parties").

**Whereas,** Licensor is the owner of technology relating to the Licensor's aqueous slurry product(s), including the manufacture thereof.

**Whereas,** Licensor wishes to grant and Licensee wishes to obtain (i) an exclusive license under the Technology (as defined below) to make, use or sell Product (as defined below) in the recited markets within the Exclusive Territories (as defined below). Licensor is willing to grant this license to Licensee pursuant to the terms and conditions of this Agreement.

**Now, therefore**, in consideration of the foregoing premises and of the mutual agreements and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

**1.      Definitions.**

"Affiliates" shall mean any corporation or other business entity controlling, controlled by or under common control with, Licensor or Licensee, as the case may be, and for this purpose "control" of any entity shall mean the direct or indirect beneficial ownership of more than fifty percent (50%) of the voting interest in such entity, or such other relationship as, in fact, constitutes actual control thereof.

"Effective Date" shall mean January 22, 2015.

"Exclusive Territories" shall mean China for the term and all renewals of this agreement, and South Korea for an initial period of 18 months from the date of execution of this agreement to achieve success, with any renewals of said territory to be mutually negotiated between Licensee and Licensor. Success in this context shall be defined as the successful Product qualification at the customer which includes a production use ramp-up schedule that is agreed to by both SOLVAY and the customer in question. With said success, SOLVAY retains exclusive rights in accordance with the terms of this agreement for the customer and Korean territory as long as the production use ramp-up schedule is met. If not met, upon Licensee providing written notice to Licensor then the customer and territory shall revert to Licensor, unless

-1

mutually agreed otherwise between the parties.

"Know-How" shall mean the proprietary technological information owned or developed by Licensor, or otherwise proprietary information in which Licensor has a right or interest, (including but not limited to trade secrets) that relates to Licensor's aqueous slurry products, including operating instructions, processes, procedures, use and process knowledge for applications to wire saw slicing industries, all technology, know-how, applications and use methods and processes related to the Products and formulations as it or they may relate to the applications of wire saw ingot slicing in the solar, semiconductor and optical industries.

"Net Sales" means the amount billed, invoiced, or received (whichever occurs first) for sales, leases, or other transfers of Product, less:

(a)(i)  customary trade, quantity or cash discounts, and non-affiliated brokers' or agents' commissions actually allowed and taken,

(a)(ii)  amounts repaid or credited by reason of rejection or return,

(a)(iii)  taxes levied on and/or other governmental charges made as to production, sale transportation, delivery, or use and paid by or on behalf of Licensee, including but not limited to VAT,

(a)(iv)  delivery or transportation charges provided by third parties, and

(a)(v)  duties and charges for customs clearance.

"Patents" shall mean all patents relating to Licensor's aqueous slurry product(s), as set forth in **Exhibit A** attached hereto.

"Patent Rights" shall mean all rights arising from the Patents, filed patent applications and any subsequent related patent applications or patents.

"Product" shall mean aqueous or semi-aqueous slurry suspensions and formulations that are based on the Know-How, Technology, Patents and patent applications plus any necessary and affiliated ancillary products required for use with primary suspension compositions;  namely the LVS series of water based suspension carriers / lubricants/coolants.

"Reporting Period" shall mean each quarter (3 months) of the calendar year period during the term of this Agreement, with the first such period for a given year beginning on January 1 and ending on March 31 of such year and the second such period for such year beginning on April 1 and ending on June 30 of such year, and the third such period for such year beginning on July 1 and ending on September 30, and the forth such period for such year beginning on October 1 and ending on December 31; except

the first Reporting Period shall begin on the Effective Date and end on the earlier of March 31 or June 30 of the same year.

"Technology" shall mean the Patent Rights, patent applications, technology developed, compositions, formulations, designs and Know-How of Licensor.  Technology also shall include all process, methods, Q.C. equipment processes, use know-how, training information, further technology and product development, whether made by Licensor or not, and technical applications information, disseminated knowledge, process issue resolutions involving use or applications of Licensor's technology and products, or product composition alterations for use in the discussed named industries and applications areas stated in this agreement.

"Technology Package" means a collection of Licensor information regarding the Products, knowledge, process, use, safety, methods, testing, Q.C. and any other technical disclosure from Licensor necessary for Licensee to properly dilute  product concentrate provided to Licensee, handle and store such Product, including but not limited to Know-How, Patents and Patent Rights, Patent applications and other related product composition, handling, dilution, use, safety and final "ready-to-use" product information that is available to Licensor. Licensor agrees to provide to Licensee all necessary information available to it to manufacture and dilute the "LVS" and "SCA-2A" Products from supplied raw materials.

## 2.     License Grant.

(a)  Licensor hereby grants to Licensee, and its Affiliates, an exclusive license under the Technology to manufacture, have manufactured, use, sell or distribute the Products in the markets of wire saw slicing of ingots within the Solar, semiconductor and optics industries  within the Exclusive Territories (collectively, the "License").  The right to manufacture Products of Licensor's Technology does not include the right to manufacture any of the Raw Materials comprising said products.  Further, on terms no worse than under the agreement between Licensor and Padarsh related to the Raw Materials, Licensee agrees to abide by the technical choice by Licensor of PADARSH PHARMACEUTICALS Ltd. ("Padarsh") as the primary manufacturer of the water–based system known as "LVS" in its <u>concentrated form</u> as well as the "gel-particle" paste used as a major component in said LVS product concentrate ("Raw Materials"), which comprises the Products.

b)  Licensee shall have the right to choose and qualify a secondary manufacturer of said "gel-particle" paste or LVS Product concentrate to be used as a supplier in the event (i) the volumes requested by Licensee exceeds the capacity installed by Padarsh or (ii) of unresolved issues with Padarsh, which include: product quality as established between PPT and Padarsh, timely supply, adherence to a negotiated price structure for a long-term supply contract, product consistency, which issues remain unresolved after

30 days written notice is provided to Padarsh. Any selection of such secondary supplier by Licensee will be discussed with Licensor and Licensor will have the right to refuse, within thirty (30) days of receipt of Product made by secondary supplier, only if Licensor can demonstrate that the selected new supplier is unable to meet the quality, consistency and performance criteria in Exhibit B, attached hereto.

(c) Licensee shall only have the right to grant two types of sublicenses under Section 2(a) as follows:

(c)(i) Limited sublicense: Limited sublicense for customers or distributors of Licensee to use the Products or to resale the Products to customers for the purpose of developing the business; provided that for such sublicense, the sublicensee will access only the information required for such purpose.. Licensee in its sole discretion will be free to select any sub-licensee as long as the sublicensee's targeted customers are in the Exclusive Territories. No specific authorization from Licensor will be required for such limited sublicense

(c)(ii) Full sublicense: full sub-licensee, with similar right than the licenses. Prior to the grant of the full sublicense, Licensee shall disclose all reasonably pertinent information relating to sub-licensee, including location, contact information, full personnel contacts, customers served or solicited, and markets to be served and only with the written authorization of Licensor. Additionally, any proposed sub-licensee selected by Licensee shall complete and execute an approved non-disclosure agreement with Licensor separate from any other NDA said sub-licensee must complete with Licensee. Said grant of sub-licensee to sell and support PPT proprietary technology and water – based products in the markets detailed shall be contingent upon completion of requirements detailed in this paragraph.

(d) The License granted in Section 2(a) shall remain in full force and effect during the Term and Renewal Terms (the "License Period").

(e) Licensor hereby grants to Licensee the exclusive right to market and promote the Product in the Exclusive Territories; provided, however, that Licensee, in its sole discretion, shall not mention any reference to Licensor when advertising the Products or any other link between the Products and Licensor (including any reference to the Patents or Patent Rights) .

**3.     Technology Transfer.**

(a)  Within thirty (30) days after the execution of this Agreement, Licensor shall make the Technology Package available to Licensee.

(b)  Within thirty (30) days of receipt of the Technology Package by Licensee,

representatives of Licensee and Licensor shall meet at an agreed upon location for up to three (3) working days to review the Technology Package and discuss implementation of the Technology Package by Licensee, as well as other related topics.

(c)  Licensor shall train and advise Licensee with respect to proper manufacture, storage and handling of final Product formulation by demonstrating appropriate and necessary manufacturing methods to create final Product; methods and processes of raw materials handling, plant and equipment operation, product testing and related environmental, health and safety procedures to a reasonable number of Licensee's personnel at the appropriate Licensor designated facilities or Licensee's designated facilities, whichever is mutually agreed upon by the Parties.

(d)  After completion of the training referred to in Section 3(c) above, Licensor shall, make its appropriate personnel available to consult with Licensee at Licensee's designated site (preferably where Licensee has the "LVS" Product manufactured and in-use) regarding License's implementation of the Technology Package.

(e)  Both Parties acknowledge that such consultation by Licensor shall be subject to a fee arrangement separate from the license or royalty fees paid hereunder, as follows:

(e)(i) For any consultation done by Licensor's employees within the first 6 months of the last date of execution of the Agreement, Licensee will support all reasonable expenses related to travel that have been requested by Licensee, as long as such expenses has been approved in a prior writing by Licensee. No additional consultation fee will be due.

(e)(ii) For any consultation required by Licensee and performed by an external consultant recommend by Licensor, Licensee will pay, as full payment of such services,to Licensor a consulting fee of 300 $/day in addition of the reasonable travel expenses in accordance with Section 3(e)(i).

(e)(iii) For any consultation done by Licensor's employees after the first 6 months of the last date of execution of the Agreement, the Licensor will pay to Licensor a consulting fee of 300 $/day in addition of the travel expenses in accordance with Section 3(e)(i).


(f)  Licensor shall promptly disclose to Licensee any improvements or modifications to the Technology and/or Products, which disclosure shall not exceed thirty (30) days from the date Licensor discovers such improvement or modification.

4. **Acknowledgment of Licensor's Ownership and Cooperation.**

Licensee acknowledges and agrees that Licensor is and shall remain the owner of the Technology.

Licensee and Licensor in their verbal discussions and agreements have both pledged to one another full cooperation in their joint dealings as related to this Agreement. As such, both parties agree to the following: License will provide to Licensor an updated marketing report at the end of each reporting period that will include general information about the penetration of the technology and issues face by customers to use the LVS technology. Such report may include, for example, the number of companies that have approved the LVS, the number of customers that have running business on LVS with License or main limitation of the LVS technology.

### 5. Registration and Infringement.

(a) Licensee shall promptly notify Licensor in writing upon learning that the Technology is actually or potentially being infringed by a third party. Licensor shall be given the initial opportunity to take appropriate action to resolve such third party infringement. Should Licensor decline to take action within thirty (30) days of receipt of notice from Licensee (or such shorter period as may be required in connection with any such defense), then Licensee may, at its option, take reasonable action to resolve such third party infringement. The party defending or prosecuting a claim shall be deemed the "Litigating Party" and the other party the "Non-Litigating Party" for purposes of this Section 5. The Non-Litigating Party at its expense shall have the right to be independently represented by counsel and the Litigating Party shall inform the Non-Litigating Party of any significant events relating to pending litigation.

(b) In any action brought pursuant to Section 5(a), the costs of the action shall be borne and any recovery shall be retained by the Litigating Party; provided, however that if the Licensor is the Litigating Party and recovers damages attributable to (i) the profits of a third party infringer; or (ii) lost profits or lost sales of the Non-Litigating Party; or (iii) punitive damages against the third party infringer; then any net recovery to the Litigating Party (i.e. total amount of recovery, less court and legal costs, Litigating Party expenses including travel, lodging, meal and personnel expenses, and attorney's fees), shall be divided 75% to Litigating Party and 25% to Non-Litigating Party.

(c) Licensor shall indemnify, defend and hold harmless Licensee and its directors, officers, employees, and agents and their respective successors, heirs and assigns (the "Indemnitees") against any breach of \_\_\_\_ ==[PPT to list Licensor Product warranty as specified in Licensor literature, Technical Data Sheets, or other relevant literature provided or available to Licensee]==.

(d) Licensor shall not indemnify Licensee for any neglect, disregard, failure to train, failure to ensure, failure to comply or have any affiliate, agent, employee or respective successors, heirs and assigns, plus any third party purchaser, user, tester, or acquirer of Licensor Products comply with all use and safety recommendations, equipment installations, procedures, tests, methods of use, storage or disposal instructions

provided by Licensor.

(e)  Licensor shall not indemnify Licensee for failure to adequately train any and all users, testers or acquirers or Licensor's Products with all information available to or provided to Licensee for such activities, or failure to monitor customer or user activities along with supervision, instruction and monitoring of use and safety procedures, plus recommended production methods of use, equipment settings, process parameters, required saw alterations, installation and proper use of recommended safety equipment, processes and methods to ensure safe use of Licensor Products and accompanied requirements for said proper and safe use of LVS products as evidenced by information available to and / or provided to Licensee from Licensor.

(f) During the term of this Agreement, Licensor shall be responsible for and use commercially reasonable efforts to maintain the registration of the Patents in effect, and to obtain issuance of all Patents currently pending.   In the event that Licensor decides not to maintain or seek to obtain issuance of any Patent, Licensor shall provide Licensee with notice of its intention and Licensee may then take the actions necessary to maintain or obtain issuance of such pending Patent(s), and Licensor shall execute such documents and instruments necessary to assign, transfer, and convey to Licensee any and all of Licensor's ownership rights and interests in such Patent. Concurrently, Licensor and Licensee shall negotiate an assignment fee related to such transfer of Patents that is mutually acceptable to the Parties.**6.	Confidentiality.**

(a)  Licensee shall (i) hold the Know-How in confidence using the same care and caution Licensee affords its own confidential information, but no less than a reasonable degree of care, (ii) not use the Know-How except within the scope of the License, and (iii) restrict disclosure of Know-How to only those employees and contractors of Licensee that have a need to know the Know-How for the purpose of using such Know-How within the scope of the License, that Licensee has informed of the obligations assumed hereunder and that have undertaken written obligations to Licensee of confidentiality, nondisclosure and limited use that cover Know-How and that are at least as restrictive as those of this Agreement.

(b)  The obligations of Section 6(a) above shall not apply to information which (i) is demonstrated to have been in the Licensee's possession prior to receipt thereof from Licensor, (ii) is established to be in the public domain otherwise than as a consequence of a breach of an obligation not to disclose the information, (iii) is independently developed by an employee of Licensee without reference to Licensor's Know-How or confidential information, or (iv) is required to be disclosed by operation of law, provided Licensor receives timely notice from Licensee of any action to have such Know-How disclosed and Licensor has a reasonable opportunity to object to such disclosure.

**7.	Notice.**

All notices, claims, certificates, requests, demands and other communications hereunder will be in writing and will be deemed to have been duly given if personally delivered or on the date of receipt or refusal indicated on the return receipt if delivered or mailed (registered or certified mail, postage prepaid, return receipt requested) as follows:

    (a)    If to the Licensee:

Solvay USA Inc.
8 Cedar Brook Drive
Cranbury, NJ 08512
Attn: Legal Department
cc: Eric Aubay

    (b)    If to the Licensor:

PPT Research, Inc.
515 Business Park Lane
Allentown, PA   18109

Attn: Dr. Chip Ward -  President / CEO

or to such other address as the person to whom notice is to be given may have previously furnished to the other in writing in the manner set forth above.

**8.    Compensation.**

(a)  Licensee shall pay to Licensor a one-time royalty fee advance of one hundred thousand dollars ($100,000.00 USD).  The royalty fee advance shall be credited against future royalties accrued as provided under Section 8(c) below on Net Sales, if any, during the year in which such royalty payment is made.

(b)  Licensee shall pay to Licensor a licensing and technology transfer fee of two hundred sixteen thousand dollars ($216,000.00 USD), payable of installments of thirty six thousand dollars ($36,000.00 USD) per month over a six (6) month period measured from the Effective Date.

(c) Licensee shall pay to Licensor a running royalty, payable to Licensor within 30 days of the end of each Reporting Period, calculated at a rate of seven percent (7%) based on Net Sales of Product sold by Licensee (as defined in Section 1 of this Agreement)

during the License Period in the Exclusive Territories.

**9.    Reporting.**

(a)  Licensee shall, within no more than 20 days after the end of each Reporting Period, submit to Licensor a royalty report setting forth for such Reporting Period the following information:

   (i)    the quantity and the amount of each named product  billed, invoiced, or received (whichever occurs first), for any sale, lease, or other transfer of Product sold or otherwise transferred by Licensee, and

   (ii)    calculation of the amount of royalties due under Section 8.

(b)  Licensee shall, concurrent with each report under Section 9(a) above, pay to Licensor royalties at the rate specified in Section 8 above for the Product included in the report.  A notice of payment and payment to Licensor shall be made no later than 10 days following the "on-time" submitted royalty report by Licensee pursuant to Section 9(a).  Said notice and payment shall be sent to the address specified for the Licensor in Section 7 above.

(c)  Licensee agrees to maintain, for three (3) years following the end of the calendar year to which they pertain, complete and accurate records regarding the information specified in Sections 8 and 9 above in sufficient detail to allow the royalties payable hereunder by Licensee to be determined, to permit its books and records to be examined from time to time to the extent necessary to verify the reports provided under this Section 9 are complete and accurate, such examination to be made at the expense of Licensor during normal business hours by an auditor appointed by Licensor who shall be reasonably acceptable to Licensee.

(d)  If any examination under this Section 9(c) reveals that any royalty payment to Licensor was less than the royalty due under the provisions of Section 8 above, then Licensee shall, within thirty (30) days after receipt of written notice thereof, pay to Licensor any undisputed amounts that constitute the difference between the amount paid and the amount due.

**10.    Events of Default.**

(a) Except as otherwise provided in this Agreement, if any of the following events ("Events of Default") should occur at any time during the term of this Agreement, the non-defaulting party may, upon written notice to the other party as required herein, terminate this Agreement and the License granted herein:

   (a)(i)  Insolvency.  An event of default shall be deemed to have occurred, without notice from the other party, if a party is liquidated or dissolved, becomes insolvent,

suffers the appointment of a receiver or trustee, makes a general assignment for the benefit of creditors or institutes or has instituted against it any proceedings under any law relating to bankruptcy or insolvency or the reorganization or relief of debtors;

      (a)(ii)  Material Breach.   An event of default shall have occurred if either party shall fail to perform in any material respect, or shall be in material breach of, any of its obligations hereunder and fails to remedy such failure or breach within forty-five (45) days after receipt of written notice thereof from the non-defaulting party.

(b) In the event that Licensor is liquidated or dissolved, becomes insolvent, suffers the appointment of a receiver or trustee, makes a general assignment for the benefit of creditors or institutes or has instituted against it any proceedings under any law relating to bankruptcy or insolvency or the reorganization or relief of debtors, Licensor shall notify Licensee in writing within thirty (30) days of such an event, and Licensee shall have an option for a period of sixty (60) days from the date the notice is received by Licensee to elect to purchase all or substantially all of the Patents (including Patent Rights) of Licensor subject to a purchase price and under terms mutually acceptable by the Parties.

**11.    Dispute Resolution and Applicable Law.**

(a)  Any controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof shall, if possible, be settled by friendly negotiation. If settlement cannot be obtained through such friendly negotiation, such controversy, claim or dispute, may be submitted to arbitration as provided in Section 11(b) below for resolution.

(b)  All disputes arising in connection with this Agreement and which cannot be settled amicably shall be settled by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce (ICC).  The arbitral tribunal shall be composed of a single arbitrator to be appointed in accordance with said ICC Rules.  The place of arbitration shall be New York, New York, the arbitration shall be conducted in the English language and all documents not in English language submitted by any Party shall be accompanied by an accurate English language translation thereof.  The arbitral tribunal shall apply the state laws of the State of New York and the federal laws of the United States of America. The arbitral tribunal shall not have the power to alter, modify, amend, add to or subtract from any term or provision of this Agreement. The Parties expressly waive any right of appeal to the courts of any award, which shall be final and binding on the Parties.  Judgment upon the award of the arbitrators may be entered in any court of competent jurisdiction.

(c) Regardless of the places of agreement, the places of performance, or otherwise, this Agreement and all amendments, modifications, alterations or supplements thereto

shall be construed under, governed by and the legal relationships determined in accordance with the laws of the State of New York, U.S.A.

**12.    Successors and Assigns.**

This Agreement shall not be assigned by either party without the prior written consent of the other party, except that, without consent of the other party, either party may assign this Agreement to (a) the purchaser of all or any portion of its business relating to the Product or (b) any Affiliate as long as said Affiliate has completed and executed the appropriate non-disclosure agreements with Licensor or Licensee, as the case may be, and with Licensor in particular in the case of Licensee Affiliate.   Subject to the foregoing restriction, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. This Agreement is not intended to confer any rights or benefits on any persons other than the parties hereto.

**13.    Representations and Warranties.**

(a)  Licensor represents and warrants that Licensor has the authority to enter into this Agreement, has the right to disclose the Know-How and has the right to grant the License hereunder.

(b) Licensee represents and warrants that Licensee has the authority and the right to enter into this Agreement.

**14.     Term and Termination.**

(a)  This Agreement shall commence on the Effective Date and shall terminate four (4) years from the Effective Date (the "Term").  This Agreement shall thereafter automatically renew for successive one (1) year terms (a "Renewal Term" or, collectively, "Renewal Terms") unless terminated by either party at the end of the Term or any Renewal Term upon the delivery of 180 (one-hundred, eighty)  days prior written notice ("Termination Term") within or before the end of the existing term or term renewal period. All the obligations of the Parties under this Agreement shall remain the same during the Termination Term.

(b)  If Licensee shall fail to make timely payment to the Licensor of any undisputed amount agreed to be paid by Licensee hereunder, and does not cure any such failure within one (1) month after receiving written notice thereof by Licensor, then Licensor may, at its option, terminate this Agreement upon written notice of such termination to Licensee.

(c)  If either party commits a material breach of its obligations under this Agreement and does not cure such breach within two (2) months after receiving written notice thereof, then the non-breaching party may, at its option, terminate this Agreement immediately upon written notice of such termination to the breaching party. No

expiration or termination of this Agreement shall relieve either party of any obligation accrued prior to the date of expiration or termination or relieve a party in default from liability for damages for breach of this Agreement.  Waiver by any party of a single default or breach or a succession of defaults or breaches shall not deprive such party of any right to terminate this Agreement arising by reason of any subsequent default or breach.

(d)  All rights and obligations created hereunder shall expire upon termination of this agreement, except that Sections 5(c) and 11 shall survive expiration or termination of this Agreement.  In no event shall termination of this Agreement release Licensee from the obligation to pay any amounts that became due on or before the date of such termination.

(e)   In case of termination of this Agreement by Licensee, licensee shall continue to faithfully and properly service its' existing customers for the full 180 day period prior to termination.  In such event, both Parties agree, covenant and promise that neither they, nor their agents, manufacturer's Representatives, sales personnel, technical support personnel, marketing or any other related staff engaged in any direct or indirect action of marketing, servicing, supporting and maintaining any customer relationship, Product delivery or Product / Technical support needs of said customer or potential customer, as the case may be, shall engage in any activity that disparages or creates a negative impression of any sort within said customer or potential customer concerning the other Party or the Products being used, tested, qualified, acquired, purchased or otherwise evaluated by the customer or potential customer.  Such covenant and promise by each Party shall include the integrity of the other Party, any material information about the position, condition, size, capabilities, or any of the other Party's general business information.  With respect to the Licensee under this Section (e), Licensee shall provide to Licensor on or before 30 days prior the termination of this Agreement the full list of customers that are using the product or that have approved the product, including all the relevant contact information of the customer representative.

(f)  In case of termination of this agreement by Licensor, Licensee shall continue to faithfully and properly service its' existing customers for the full 180 day period prior to termination.  In such event, both Parties agree, covenant and promise that neither they, nor their agents, manufacturer's Representatives, sales personnel, technical support personnel, marketing or any other related staff engaged in any direct or indirect action of marketing, servicing, supporting and maintaining any customer relationship, Product delivery or Product / Technical support needs of said customer or potential customer, as the case may be, shall engage in any activity that disparages or creates a negative impression of any sort within said customer or potential customer concerning the other Party or the Products being used, tested, qualified, acquired, purchased or otherwise evaluated by the customer or potential customer.  Such covenant and promise by each

Party shall include the integrity of the other Party, any material information about the position, condition, size, capabilities, or any of the other Party's general business information.

15. **Miscellaneous.**

(a)  In the event that any provision of this Agreement shall be held invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect any other provision of this Agreement, and the parties shall negotiate in good faith to modify the Agreement to preserve (to the extent possible) their original intent.  If the parties fail to reach a modified agreement within one (1) month after the relevant provision is held invalid or unenforceable, then the dispute shall be resolved in accordance with the dispute resolution procedures set forth in Section 11 above.

(b)  All headings are for convenience only and shall not affect the meaning of any provision of this Agreement.

(c)  Any failure to enforce any of the provisions of this Agreement or to require at any time performance of any of the obligations hereof, shall in no way affect the validity of this Agreement or any part thereof, or the right thereafter to enforce each and every such provision.

(d)  No party has relied on any representation or warranty of any kind in entering into this Agreement, or as an inducement to enter into this Agreement, except for those representations and warranties expressly set forth herein.

(e)  All rights and licenses granted pursuant to any section of this Agreement are, and will otherwise be, for purposes of Section 365(n) of the U.S. Bankruptcy Code and/or any similar or comparable section of the U.S. Bankruptcy Code (as such sections may be modified, amended, replaced, or renumbered from time to time), executory licenses of rights to "intellectual property," as defined under **Section 101 (35A)** of the U.S. Bankruptcy Code and/or any similar or comparable section of the U.S. Bankruptcy Code (as such sections may be modified, amended, replaced, or renumbered from time to time). The parties will retain and may fully exercise all of their respective rights and elections under the U.S. Bankruptcy Code. Accordingly, the licensee of such rights shall retain and may fully exercise all of its rights and elections under the U.S. Bankruptcy Code. Upon the commencement of bankruptcy proceedings by or against Licensor under the U.S. Bankruptcy Code, the Licensee shall be entitled to retain all of its license rights and use rights granted under this Agreement.

(f)  In the event that Licensor desires to sell and has received a bona fide offer in writing from an unaffiliated third party to buy all or substantially all of the assets of Licensor, or the assets directly related to the Products, Technology, Know-How and Patent Rights (as defined in Section 1 of this Agreement), Licensor shall first notify Licensee in writing

of the proposed sale ("Offer Notice"). Each Offer Notice shall contain all material terms of the proposed sale, including, without limitation, a copy of the written offer received, the purchase price and terms of payment, the date and place of the proposed sale, and any other material terms. Licensee shall have an option for a period of sixty (60) days from the date the Offer Notice is received to elect to purchase the all or substantially all of the assets of Licensor as detailed herein in Section 15(f) at a price discounted by 30% and subject to the same material terms and conditions as described in the Offer Notice (or terms and conditions as similar as reasonably possible). Licensee may exercise such purchase option and, thereby, purchase all (or substantially all) of the assets of Licensor as described and detailed herein in this Section 15(f) by notifying Licensor in writing before expiration of such sixty (60) day period.

If Licensee declines to exercise the purchase option as described this Section 15(f), Licensor shall purchase from Licensee a list of customers using the LVS technology ("Customer List") and Licensee shall sell the Customer List at the price of 30% of the Offer Notice. In such an event, the sale of the Customer List to Licensor shall take place 30 days before the termination of the Agreement.

(g) This Agreement may be executed in two or more counterparts, each of which shall be deemed to constitute an original, but all of which together shall constitute one and the same instrument. (Explanation of counterpart is requested) [Explanation: Standard language, which just means that *copies* of the agreement can be signed in lieu of orginals, so no need to ship originals to/from one party to the other party].

(h) Each party acknowledges that information provided under this Agreement may be subject to export and import restrictions, and any use or transfer of controlled information must be authorized under those regulations. Each party agrees that it will not use, distribute, transfer, or transmit the information of the other party in any products except in compliance with the laws and regulations of the country from which the product and/or information furnished hereunder is being exported and/or to which it is being imported. This obligation survives any termination of this Agreement.

(i) This Agreement constitutes the entire understanding between the parties with respect to the subject matter of this Agreement and merges all prior discussions between them relating thereto. No amendment or modification of this Agreement shall be valid or binding on the parties unless made in writing and signed on behalf of each of the parties by their respective duly authorized officers or representatives.

IN WITNESS WHEREOF, the parties hereto have executed and this Agreement as of the date first above written.

**PPT RESEARCH, INC.**                                **SOLVAY USA INC.**

**By:**_____                  **By:**_____

**Title:**_____                  **Title:**_____

**Date:**_____                   **Date:**_____

Exhibit A

[List of PPT Patents to be supplied by PPT]

Exhibit B

[Quality, consistency and performance criteria]