**THOMAS DECLARATION**

# EXHIBIT 3

# TECHNOLOGY LICENSE AGREEMENT

This Technology License Agreement ("Agreement") is made 20th day of February, 2015 between **SOLVAY USA INC.**, a Delaware corporation, acting on behalf of itself and its Affiliates and having offices at 8 Cedar Brook Drive, Cranbury, NJ 08512 ("Licensee") and **PPT RESEARCH, INC.**, a Pennsylvania corporation acting on behalf of itself and its Affiliates and having offices at 515 Business Park Lane, Allentown, PA   18109 ("Licensor") (Licensee and Licensor are separately "a Party" and together "the Parties").

**Whereas,** Licensor is the owner of technology relating to the Licensor's aqueous slurry product(s), including the manufacture thereof.

**Whereas,** Licensor wishes to grant and Licensee wishes to obtain (i) an exclusive license under the Technology (as defined below) to make, use or sell Product (as defined below) in the recited markets within the Exclusive Territories (as defined below).  Licensor is willing to grant this license to Licensee pursuant to the terms and conditions of this Agreement.

**Whereas,** Licensee agrees to abide by the technical choice by Licensor of Padarsh Pharmaceuticals Ltd. as the primary manufacturer of the water–based system known as "LVS" in its concentrated form as well as the "gel-particle" paste, used as a major component in the Product, wherein a signed and delivered manufacturing agreement between Licensee and Padarsh Pharmaceuticals Ltd. shall be a condition precedent to this Agreement with a date cap of April 30th, 2015.

**Now, therefore**, in consideration of the foregoing premises and of the mutual agreements and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## 1.    Definitions.

"Affiliates" shall mean any corporation or other business entity controlling, controlled by or under common control with, Licensor or Licensee, as the case may be, and for this purpose "control" of any entity shall mean the direct or indirect beneficial ownership of more than fifty percent (50%) of the voting interest in such entity, or such other relationship as, in fact, constitutes actual control thereof.

"Effective Date" shall mean the execution date of the manufacturing agreement between Licensee and Padarsh Pharmaceuticals Ltd. relating to the water–based system known as "LVS" in its concentrated form as well as the "gel-particle" paste.

"Exclusive Territories" shall mean the territories of China and South Korea for the license periods provided for in Article 14 below, and subject to any other terms and conditions provided for in this Agreement.

*CW* 4/20/15

"Scope of Use" shall mean the direct application of the Products and Technology (as hereinafter defined) to silicon ingot slicing and wafer production for the Solar, Semiconductor and optical wire-saw slicing industry.

"Know-How" shall mean the proprietary technological information owned or developed by Licensor, or otherwise proprietary information in which Licensor has a right or interest, (including but not limited to trade secrets) that relates to Licensor's aqueous slurry products, including operating instructions, processes, procedures, use and process knowledge for the Scope of Use, all technology, know-how, applications and use methods and processes related to the Products and formulations as it or they may relate to Scope of Use.

"Net Sales" shall mean the amount billed, invoiced, or received (whichever occurs first) for sales, leases, or other transfers of Product, less:

     i.    Amounts repaid or credited by reason of rejection or return.

    ii.    Taxes levied on and/or other governmental charges made as to production, sale transportation, delivery, or use and paid by or on behalf of Licensee including but not limited to VAT.

   iii.    Duties and charges for customs clearance.

"Patents" shall mean all patents, patent applications, PCT applications whether issued, filed or in written form directly relating to Licensor's aqueous slurry Product(s), as set forth in **Exhibit A** attached hereto, only to the extent that they directly relate to the Scope of Use.

"Patent Rights" shall mean all rights arising from the Patents to the extent that they directly relate to the Scope of Use.

"Product" shall mean aqueous or semi-aqueous slurry suspensions, suspension carriers, lubricants, coolants, vehicles, media and compositions, and formulations that are based on the Know-How, Technology, Patents plus any necessary and affiliated ancillary products required for use with primary suspension compositions; namely the LVS series of water based suspension carriers / lubricants/coolants as they directly relate to the Scope of Use.

"Reporting Period" shall mean each quarter (3 months) of the calendar year period during the term of this Agreement, with the first such period for a given year beginning on January 1 and ending on March 31 of such year and the second such period for such year beginning on April 1 and ending on June 30 of such year, and the third such period for such year beginning on July 1 and ending on September 30, and the forth such period for such year beginning on October 1 and ending on December 31; except the first Reporting Period shall begin on the Effective Date and end on the earlier of March 31 or June 30 of the same year.

"Technology" shall mean the Patents, Patent Rights, technology developed, compositions, formulations, designs and Know-How of Licensor as they directly relate to the Scope of Use. Technology also shall include all process, methods, Q.C. equipment, processes, use know-how, training information, further technology and product development, whether made by Licensor or not, and technical applications information, disseminated process, operations or wire saw knowledge, process issue resolutions involving use or applications of Licensor's technology and Products, or Product composition alterations for the Scope of Use.

"Technology Package" means a collection of Licensor's information regarding the Products, knowledge, process, use, safety, methods, testing, Q.C. and any other technical disclosure from Licensor necessary for Licensee to properly dilute Product concentrate provided to Licensee, handle and store such Product, including but not limited to Know-How, Patents and Patent Rights, Patent applications and other related product composition, handling, dilution, use, safety and final "ready-to-use" product information that is available to Licensor as directly related to the Scope of Use. Licensor agrees to provide to Licensee all necessary information available to Licensor to manufacture and dilute the "LVS" and "SCA-2A" Products from supplied raw materials for the Scope of Use in the Exclusive Territories in accordance with the terms of this Agreement.

## 2. License Grant.

(a)  Licensor hereby grants to Licensee, and its Affiliates, an exclusive license under the Technology to manufacture, have manufactured, use, sell or distribute the Products in accordance with the Scope of Use within the Exclusive Territories (collectively, the "License"). Any Affiliate of Licensee shall be bound by all terms and conditions of this Agreement and the exercise of any such rights or the performance of such obligations by an Affiliate of Licensee shall not relieve Licensee of its obligations under this Agreement. The right to manufacture Products of Licensor's Technology does not include the right to manufacture any of the Raw Materials comprising said Products.  Further, on terms no worse than under the agreement between Licensor and Padarsh Pharmaceuticals Ltd. ("Padarsh") related to the Raw Materials, Licensee agrees to abide by the technical choice by Licensor of Padarsh as the primary manufacturer of the water–based system known as "LVS" in its concentrated form as well as the "gel-particle" paste used as a major component in said LVS product concentrate ("Raw Materials"), which comprises the LVS-FA Product.

b)  Subject to the terms provided for herein, Licensee shall have the right to disclose confidential information to a selected and approved secondary manufacturer of said "gel-particle" paste or LVS Product concentrate.  Any selected and approved secondary manufacturer shall be required to execute any and all documents reasonably required by Licensor to protect Licensor's confidential information.  The selected secondary manufacturer shall be subject to and agree to be bound by all conditions of confidentially provided for in this Agreement and in the current Reciprocal Confidentiality Agreement between  Licensor and Licensee, a copy of which is attached hereto as Exhibit C and incorporated herein by reference.  The selected secondary

CN 4/20/15

manufacturer shall only be approved for use if (i) the volumes requested by Licensee exceed Padarsh's capacity or (ii) there arise issues with Padarsh's performance which remain unresolved after 30 days written notice, including any material failure in product quality (as established between PPT and Padarsh) problems with timely supply, lack of adherence to a negotiated price structure for a long-term supply contract, or any issues in product consistency. Licensor shall have the right to independently verify any quality control issues or deficiencies of the Product concentrate and gel particle paste claimed by Licensee. Any selection of such secondary supplier by Licensee will be discussed with Licensor and Licensor will have the right to refuse and withhold approval, within forty-five (45) days of receipt of Product made by secondary supplier, only if Licensor can demonstrate that the selected new supplier is unable to meet the quality, consistency and performance criteria in Exhibit B as attached hereto.

(c) Right to Sublicense:

Full Sublicense: Licensee shall not have the right to grant a sublicense under Section 2(a) without first obtaining the express written consent of Licensor on each occasion, which consent shall not be unreasonably withheld, conditioned or delayed. .By way of example and not limitation, Licensor may condition its consent on Licensee satisfying the following requirements and such conditions shall not be deemed unreasonable: (i) Licensee shall submit written requests to Licensor which shall disclose all reasonably pertinent information relating to prospective sub- licensee including, location, contact information and all relevant personnel contacts,. (ii)  The prospective sub-licensee shall be required to complete and execute a non-disclosure/confidentiality agreement with Licensee and/or with Licensor that is at least as restrictive as that which exists between the Parties, a copy of which is attached hereto as Exhibit C. (iii) The Sublicense Agreement shall be in writing, it shall be consistent with and subordinate to this Agreement and it shall convey no rights which are greater than the rights contained herein. (iv)Licensor shall have the right to approve any proposed Agreement between Licensee and prospective Sub-Licensee.

Grant of Limited Sublicense: To the extent that a "limited sub-license" is necessary for a distributor to use and sell the Product and for customers to use the Product in the Exclusive Territories, and provided that customer and distributor are not provided with any confidential, Technology, Know-How or other proprietary information of Licensor, then Licensee may grant such limited sub-license without obtaining Licensor's prior written consent.

In addition to the right to receive royalties, Licensor shall be entitled to 30% of any fees or similar payments charged by Licensee and paid by Sub-licensee in connection with the Sub-license Agreement. No grant of consent by Licensor to any request to grant a sublicense shall relieve Licensee of its obligations hereunder and this Agreement shall remain binding upon the Licensee.

Licensee's failure to obtain Licensor's express written consent prior to the grant of any sublicense (excluding any "Limited Sublicense") shall constitute an event of default and a

CW
4/20/15

material breach of this Agreement.

(d)  The License granted in Section 2(a) shall remain in full force and effect during the Term and Renewal Terms (the "License Period").

(e)  For the benefit and protection of Licensor's Patent(s), Licensee, in exercising its License with respect to the Scope of Use of the Products in the Exclusive Territories, shall not disclose or reference the identity of Licensor or its connection with the Products (including any reference to the Patents or Patent Rights) when advertising or marketing the Products unless such disclosure is required by law or agreed to by Licensor. Licensee may market and sell the LVS Product under the name of "Supersol AR100" and will inform Licensor of any designations utilized by Licensee for other Products sold under this Agreement. The Parties agree to negotiate a marketing agreement wherein Licensor shall have the designation of being an "authorized agent" of Licensee with respect to protection from customer liability and litigation. Licensee names for Licensor Products may be registered, copyrighted or trademarked by Licensee provided that Licensor is informed of the same in writing.   Licensee's registration, copyright, or trademark shall not grant Licensee any additional rights to the underlying Products, Technology or Know-How which shall remain the sole and exclusive property of Licensor.


**3.     Technology Transfer.**

(a)  Within thirty (30) days after the execution of this Agreement, Licensor shall make the Technology Package available to Licensee.

(b)  Within thirty (30) days of receipt of the Technology Package by Licensee, representatives of Licensee and Licensor shall meet at an agreed upon location for up to three (3) working days to review the Technology Package and discuss implementation of the Technology Package by Licensee, as well as other related topics.

(c)  Licensor shall train and advise Licensee with respect to proper manufacture, storage and handling of final Product formulation by demonstrating appropriate and necessary manufacturing methods to create final Product; methods and processes of raw materials handling, plant and equipment operation, product testing and related environmental, health and safety procedures to a reasonable number of Licensee's personnel at the appropriate Licensor designated facilities or Licensee's designated facilities, whichever is mutually agreed upon by the Parties.

(d)  After completion of the training referred to in Section 3(c) above, Licensor shall make its appropriate personnel available to consult with Licensee at Licensee's designated site (preferably where Licensee has the "LVS" Product manufactured and in-use) regarding License's implementation of the Technology Package.

(e)  Both Parties acknowledge that such consultation by Licensor shall be subject to a fee

4/20/15

arrangement separate from the license or royalty fees paid hereunder, as follows:

(e)(i)  Should Licensee request a consultation from Licensor's employees within the first 6 months following the Effective Date, Licensee shall be responsible to approve and pay all of Licensor's for reasonable expenses in connection with the request including without limitation, any and all airfare,  lodging, meals, communication,  and incidental costs related thereto No additional consultation fee will be due.  If Licensor provides up-front payment for pre-approved travel expenses, Licensee shall reimburse Licensor for said payments within  30 ( thirty) days of submission of an expense report with supporting receipts; said receipts being required for any expense exceeding $25.

(e)(ii) For any consultation required by Licensee and performed by an external consultant trained and/or under consulting arrangement with Licensor, Licensee will pay, as full payment of such services to Licensor a consulting fee of $300USD /day including travel time in addition to the reasonable travel expenses in accordance with Section 3(e)(i).

(e)(iii) For any consultation done by Licensor's employees after the first 6 months of the last date of execution of the Agreement, the Licensee will pay to Licensor a consulting fee of $300USD /day including travel time in addition to the travel  expenses in accordance with Section 3(e)(i).

(f)  Licensor shall promptly disclose to Licensee any improvements or modifications to the Technology and/or Products, which disclosure shall not exceed thirty (30) days from the date Licensor confirms and proves in and internally demonstrates such improvement or modification.

## 4.      Acknowledgment of Licensor's Ownership and Cooperation.

Licensee acknowledges and agrees that Licensor is and shall remain the sole and exclusive owner of the Technology, Technology Package, Products, and Know-how described in this Agreement.

The Parties covenant and agree  to cooperate with one another at all times, to keep the other reasonably informed, and to exercise good faith and fair dealing in carrying out their duties and obligations under the terms of this Agreement.  To this end, Licensee agrees to provide Licensor with updated marketing reports at the end of each Reporting Period that will include general information about the penetration of the Products, Technology and the issues faced by customers in connection with their use of the Products and/or Technology. Such report may include, for example, the number of companies that have approved the Product(s); the number of customers that have running business or issues with the Products from Licensee or Sub-Licensee approved pursuant to Article 2(c).

## 5.      Registration Infringement and Indemnification.

(a) If either Party learns of any claim or act of any third party that constitutes or may constitute or result in an infringement, misappropriation, or misuse of the Product(s), Technology, or any other violation of any rights provided for in this Agreement ("Infringement") that Party shall promptly notify the other in writing of same.   Licensor shall have the first option to institute and prosecute any action or suits against any violation at its sole cost and expense.  If Licensor advises Licensee that it does not intend to exercise this option, Licensee shall have an affirmative duty to take action to prevent or resolve any Infringement or threatened Infringement at its sole cost and expense to the extent possible... The Parties shall cooperate with one another in the prosecution of any such claim and render all reasonable assistance to the other party including providing testimony, witnesses, information and documents in its custody or control and joining in as a party to the extent reasonably necessary.  Licensor shall keep Licensee reasonably informed of the progress of the case and shall prosecute it using such means and methods at it deems reasonable and necessary, however, in no case shall Licensee settle any claims without first obtaining Licensor's consent, which shall not be unreasonably withheld. The net recovery from any award or settlement (i.e. total amount less reasonable costs, fees, and expenses) shall be divided 75% to the litigating party and 25% to the non-litigating party.    In no event shall either Party be liable to the other for any Infringement unless such Infringement is the direct result of some negligent or intentional act of a Party.

(b) Licensor's Duty to Indemnify:  Licensor shall indemnify defend and hold Licensee , its officers, directors, employees, and agents harmless from and against any losses or damages incurred to the extent that they are the result of: (i) any material failure of Licensor to perform the duties and obligations provided for herein, (ii) any material breach of a representation or warranty of Licensor, or (iii) any material inaccuracy in the technical data, literature or training materials provided to Licensee.

(c) Licensee's Duty to Indemnify:  As described in Licensor's Warranty/Disclaimer materials which are attached hereto and incorporated herein as Exhibit D, Licensor expressly disclaims all warranties, express or implied with respect to the Product including without limitation, its use, testing, storage, disposal, handling and the like.  Licensor has disclosed to Licensee, inter alia, that the use and storage of the Product in contact with Silicon particles may result in the production of H2 gas which may be flammable or explosive under certain conditions. By executing this Agreement Licensee acknowledges that it has made its own independent investigation and is satisfied with the Product and its application in the Scope of Use. Licensee assumes all risks of loss or damage in connection with the use of the Product by any third party within the Exclusive Territories and shall be responsible for providing the appropriate warranty disclaimers, safety precautions, training and instructions to all customers, distributors, sub-licensees or end-users.  Licensee further agrees that it shall indemnify save, defend and hold Licensor, its officers, directors, employees, and agents harmless from and against any claims, losses or damages including property damage, personal injury or death to the extent that they arise out of or relate to the use of the Product by Licensee or any Sub-licensee, or Licensee's customers or any Sub-licensee's customers.

CW
4/20/15

(f) During the term of this Agreement, Licensor shall be responsible for and use commercially reasonable efforts to maintain the registration of the Patents in effect, and to obtain issuance of all Patents currently pending; save but those in China. Such decision to seek and obtain patents in China shall be made between Licensee and Licensor. Until such decision is mutually made, Licensor shall continue to maintain registration of existing patents relevant to the Technology, Products, and Scope of Use within the Exclusive Territories, and obtain issuance of patents from any such filed applications currently existing at the time of execution of this Agreement. In the event that Licensor decides not to maintain or seek to obtain issuance of any relevant Patent, Licensor shall provide Licensee with notice of its intention not to pursue the Patent at which point Licensee may offer to purchase the Patents, patent application or Technology from Licensor at a price to be mutually agreed upon by the Parties., If no such price can be agreed upon, Licensee may take such actions reasonably necessary to maintain or obtain issuance of such Patents within the Exclusive Territories and subtract any direct costs incurred from future Royalty payments to Licensor. Licensor shall cooperate with Licensee in taking these actions, but all Patents and Technology shall remain the exclusive and sole property of Licensor.

## 6.    Confidentiality.

(a) Except with respect to any Affiliate or approved Secondary Manufacturer, Licensee shall (i) hold the Know-How and Technology in confidence using the same care and caution Licensee affords its own confidential information, but no less than a reasonable degree of care including that described and detailed in the Reciprocal Confidentiality Agreement between the Parties and Section – 6 herein, (ii) not use or allow the Know-How and Technology to be used except within the scope of this License, and (iii) restrict disclosure of the Know-How and Technology to only those employees, staff, approved contractors and any approved "full Sub-Licensees "of Licensee that have a direct need to know for the purpose of using such Know-How and/or Technology within the scope of this License and only to the extent directly needed. (iv) Licensee shall also ensure that any third party not directly bound by this Agreement and the reciprocal confidentiality agreement attached hereto, shall be required to execute a separate confidentiality agreement that is at least as restrictive as that which exists between the Parties, prior to disclosing any confidential information, Know-How or Technology. Licensee shall not otherwise disclose any information of Licensor that is not generally known or available to the public at large, without the expressed written permission of Licensor. Licensee shall institute reasonable policies and procedures consistent with this Section – 6 and the Reciprocal Confidentiality Agreement between the Parties to prevent the disclosure of Licensor's confidential information, shall have a duty to pursue damages on behalf of Licensor and indemnify Licensor for any losses caused by Licensee's disclosure of Licensor's confidential information.

(b) The obligations of Section 6(a) above shall not apply to information which (i) is demonstrated to have been in the Licensee's possession prior to receipt thereof from Licensor,

(ii) is established to be in the public domain otherwise than as a consequence of a breach of an obligation not to disclose the information, (iii) is independently developed by an employee of Licensee without reference to Licensor's Know-How or confidential information prior to the consummation of this agreement, which does not fall under the terms of the Reciprocal Confidentiality Agreement between the Parties between the parties, or (iv) is required to be disclosed by operation of law, provided Licensor receives timely notice from Licensee of any action to have such Know-How disclosed and Licensor has a reasonable opportunity to object to such disclosure. Licensee shall enforce all restrictions on the Technology and proprietary information against all known and potential breaches by persons who are provided with such information by Licensee and Licensee shall have a duty to pursue damages on behalf of Licensor in the event of such a breach. Additionally, Licensor shall enforce all restrictions on the Technology and proprietary information against all known and potential breaches by persons who are provided with such information by Licensor and Licensor shall have a duty to pursue damages on behalf of Licensee in the event of such a breach and indemnify Licensee from any losses caused by Licensor's disclosure of Licensor's confidential information to those unauthorized entities who are not bound by this agreement or confidentiality at least as restrictive as this agreement and the Reciprocal Confidentiality Agreement between the Parties.


**7.    Notice.**

All notices, claims, certificates, requests, demands and other communications hereunder will be in writing and will be deemed to  have been duly given if personally delivered or on the date of receipt or refusal indicated on the return receipt if delivered or mailed (registered or certified mail, postage prepaid, return receipt requested) as follows:

   (a) If to the Licensee:


Solvay USA Inc.
8 Cedar Brook Drive
Cranbury, NJ 08512
Attn: Legal Department
cc: Eric Aubay



   (b)    If to the Licensor:

PPT Research, Inc.
515 Business Park Lane
Allentown, PA   18109

*CW 4/20/15*

Attn: Dr. Chip Ward -  President / CEO

With a copy to:
Santanasto Law Office
210 E. Broad Street,
Bethlehem, PA 18018

or to such other address as the person to whom notice is to be given may have previously furnished to the other in writing in the manner set forth above.

## 8.    Compensation.

(a)  Licensee shall pay to Licensor on the Effective Date a one-time royalty fee advance of one hundred thousand dollars ($100,000.00 USD).  The royalty fee advance shall be credited against future royalties accrued as provided under Section 8(c) below on Net Sales, if any, during the year in which such royalty payment is made.

(b)  Licensee shall pay to Licensor a licensing and technology transfer fee of two hundred sixteen thousand dollars ($216,000.00 USD), payable of installments of thirty six thousand dollars ($36,000.00 USD) per month over a six (6) month period measured from the Effective Date.

(c) Licensee shall pay to Licensor a running royalty, payable to Licensor within 30 days of the end of each Reporting Period, calculated at a rate of seven percent (7%) based on Net Sales of Product sold by Licensee (as defined in Section 1 of this Agreement) during the License Period in the Exclusive Territories.  All Royalties shall be paid in United States dollars.

## 9.    Reporting.

(a)  Licensee shall, within no more than 20 days after the end of each Reporting Period, submit to Licensor a royalty report setting forth for such Reporting Period the following information:

     (i)    the quantity and the amount of each named product  billed, invoiced, or received (whichever occurs first), for any sale, lease, or other transfer of Product sold or otherwise transferred by Licensee, and

     (ii)    calculation of the amount of royalties due under Section 8.

(b)  Licensee shall, concurrent with each report under Section 9(a) above, pay to Licensor royalties at the rate specified in Section 8 above for the Product included in the report.  A notice of payment and payment to Licensor shall be made no later than 10 days following the "on-time" submitted royalty report by Licensee pursuant to Section 9(a).  Said notice and payment shall be sent to the address specified for the Licensor in Section 7 above.

(c)  Licensee agrees to maintain, for  seven (7) years following the end of the calendar year to

*CW 4/20/15*

which they pertain, complete and accurate records regarding the information specified in Sections 8 and 9 above in sufficient detail to allow the royalties payable hereunder by Licensee to be determined, to permit its books and records to be examined from time to time to the extent necessary to verify the reports provided under this Section 9 are complete and accurate, such examination to be made at the expense of Licensor during normal business hours by an auditor appointed by Licensor who shall be reasonably acceptable to Licensee.

(d) If any examination under this Section 9(c) reveals that any royalty payment to Licensor was less than the royalty due under the provisions of Section 8 above, then Licensee shall, within thirty (30) days after receipt of written notice thereof, pay to Licensor any undisputed amounts that constitute the difference between the amount paid and the amount due plus the expenses incurred by Licensor for the audit that identified the shortfall.

## 10. Events of Default.

(a) Except as otherwise provided in this Agreement, if any of the following events ("Events of Default") should occur at any time during the term of this Agreement, the non-defaulting party may, upon written notice to the other party as required herein, terminate this Agreement and the License granted herein:

(a)(i)  Insolvency.  An event of default shall be deemed to have occurred, without notice from the other party, if a party is liquidated or dissolved, becomes insolvent, suffers the appointment of a receiver or trustee, makes a general assignment for the benefit of creditors or institutes or has instituted against it any proceedings under any law relating to bankruptcy or insolvency or the reorganization or relief of debtors;

(a)(ii)  Material Breach.   An event of default shall have occurred if either party shall fail to perform in any material respect, or shall be in material breach of any of its obligations hereunder.  To the extent that the breach is of a nature that it could reasonably be cured given time, the non-breaching Party shall give the breaching party written notice and 45 days within which to cure the default. The failure of the non-breaching party to cure the default and provide reasonable evidence of the same within this period shall be treated as an event of default.

(b) In the event that Licensor is liquidated or dissolved, becomes insolvent, suffers the appointment of a receiver or trustee, makes a general assignment for the benefit of creditors or institutes or has instituted against it any proceedings under any law relating to bankruptcy or insolvency or the reorganization or relief of debtors, Licensor shall notify Licensee in writing within thirty (30) days of such an event, and Licensee shall have an option for a period of sixty (60) days from the date the notice is received by Licensee to elect to purchase all or substantially all of the Patents (including Patent Rights) of Licensor directly related to The Scope of Use and Exclusive Territories; at a price to be established by a Business valuation expert mutually agreed upon by the Parties.

CW 4/20/15

## 11.    Dispute Resolution and Applicable Law.

(a)  Any controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof shall, if possible, be settled by friendly negotiation. If settlement cannot be obtained through such friendly negotiation, such controversy, claim or dispute, may be submitted to arbitration as provided in Section 11(b) below for resolution.

(b)  All disputes arising in connection with this Agreement and which cannot be settled amicably shall be settled by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce (ICC).  The arbitral tribunal shall be composed of a single arbitrator to be appointed in accordance with said ICC Rules.  The place of arbitration shall be Pennsylvania, the arbitration shall be conducted in the English language and all documents not in English language submitted by any Party shall be accompanied by an accurate English language translation thereof.  The arbitral tribunal shall apply the state laws of the Pennsylvania and the federal laws of the United States of America. The arbitral tribunal shall not have the power to alter, modify, amend, add to or subtract from any term or provision of this Agreement. The Parties expressly waive any right of appeal to the courts of any award, which shall be final and binding on the Parties.  Judgment upon the award of the arbitrators may be entered in any court of competent jurisdiction in the Commonwealth of Pennsylvania.

(c)  Regardless of the places of agreement, the places of performance, or otherwise, this Agreement and all amendments, modifications, alterations or supplements thereto shall be construed under, governed by and the legal relationships determined in accordance with the laws of the Commonwealth of Pennsylvania.

## 12.    Successors and Assigns.

Licensor shall have the right to Assign this Agreement in its sole discretion only in the limited circumstance where Licensor has received a bona fide third party offer to buy all or substantially all of the assets of Licensor, or the assets directly related to the Products, Technology, Know-How and Patent Rights and Licensee declines to exercise the purchase option available under 15(f) of this Agreement.  Except for the limited circumstance provided for above, this Agreement shall not otherwise be assigned by either party without the prior written consent of the other party.

Notwithstanding the foregoing right of Licensee to assign this agreement to an Affiliate, Affiliate shall have no further right of assignment, except with the written consent of Licensor, which may be granted at Licensor's sole discretion.

## 13.    Representations and Warranties.

(a)  Licensor represents and warrants that Licensor has the authority to enter into this Agreement, has the right to disclose the Know-How and Technology and has the right to grant

CM 4/20/15

the License hereunder.

(b) Licensee represents and warrants that Licensee has the authority and the right to enter into this Agreement.

## 14.    Term and Termination.

(a)   This Agreement shall commence on the Effective Date and except as otherwise provided for herein, it shall terminate four (4) years from the Effective Date (the "Term").  This Agreement shall thereafter automatically renew for successive one (1) year terms (a "Renewal Term" or, collectively, "Renewal Terms") unless terminated by either party at the end of the Term or any Renewal Term upon the delivery of 180 (one-hundred, eighty)  days prior written notice ("Termination Term") within or before the end of the existing term or term renewal period. All the obligations of the Parties under this Agreement shall remain the same during the Termination Term.  Notwithstanding any of the foregoing, the Term of Licensee's exclusive license for the territory of South Korea shall commence on the Effective Date, but shall be for a trial term of eighteen (18) months ("Trial Term"). If at the expiration of the Trial Term, Licensee has met the Minimum Performance requirements for the territory provided below in 14(b)(ii), then Licensor shall renew this License for the remainder of the Term and any Renewal Terms.

(b)   Minimum Performance Requirement: During the Term and any Renewal Term, Licensee shall exercise good faith and commercially reasonable efforts to market and sell the Products in the Exclusive Territories. At a minimum, in order to maintain its Exclusive License in the Territories, Licensee shall meet the following requirements:

   i.  China: Licensee must have secured six (6) "committed customers" within two (2) years from the Effective Date.  For the purposes of this Agreement, a "Committed Customer" means that a customer has validated that the Products can be used for industrial production solar wafer cutting applications at their facilities

   ii. South Korea: Licensee must have one (1) Committed Customer in the Territory prior to the expiration of the Trial Term.

 In the event that Licensee fails to meet these minimum requirements, Licensor shall have the option, but not the obligation to terminate the Agreement.

(c) Termination: This Agreement may be terminated by Licensor, at its sole discretion and  upon written Notice to Licensee for any of the following reasons:  (i) if Licensor receives a bona fide offer from an unaffiliated third party to buy all or substantially all of the assets of Licensor, or all or substantially all of the assets  related to the Products, Technology, Know-How and Patent Rights, and Licensee declines to exercise the purchase option provided for in 15(f) below; or (ii) if Licensee shall fail to make timely payment to the Licensor of any undisputed amount agreed to be paid by Licensee hereunder, or (iii) Licensee fails to satisfy the Minimum Performance Requirements of Section 14(b) above; or (iv) in the case of any event of default by Licensee that

*CN* 4/20/15

is not timely cured or curable. In the event of default by Licensee under Sections 14(c)(ii) and 14(c)(iii), and as described in Article 10 of this Agreement Licensee shall transfer to Licensor, without cost, fee, charge or consideration, all customer information, contacts, locations, Product use information test status information, and all other customer information for all customers ever contacted by Licensee or its Distributors or other authorized agents, using the Product, testing the Product, customers where presentations about the Product have been made by Licensee, as well as any information concerning customers contacted who have rejected the Products. No expiration or termination of this Agreement shall relieve either party of any obligation accrued prior to the date of expiration or termination or relieve a party in default from liability for damages for breach of this Agreement.  Waiver by any party of a single default or breach or a succession of defaults or breaches shall not deprive such party of any right to terminate this Agreement arising by reason of any subsequent default or breach.

(d)  All rights and obligations created hereunder shall expire upon termination of this .Agreement, except that the Definitions, Sections 5(b-c), all confidentiality requirements of Section 6, and Sections 9(c), & 11 shall survive expiration or earlier termination of this Agreement.  In no event shall termination of this Agreement release Licensee from the obligation to pay any amounts that became due on or before the date of such termination.  For Sections 5(b-c), enforcement of said Sections shall continue for 6 months following termination of this Agreement as described in Section – 14.

(e)   In case of a termination of this Agreement by Licensee, or an election by Licensee not to renew. Licensee shall continue to faithfully and properly service its' existing customers for the full 180 day period prior to termination.  In such event, both Parties agree, covenant and promise that during and  after said 180 day period,  neither they, nor their agents, manufacturer's Representatives, sales personnel, technical support personnel, marketing or any other related staff engaged in any direct or indirect action of marketing, servicing, supporting and maintaining any customer relationship, Product delivery or Product / Technical support needs of said customer or potential customer, as the case may be, shall engage in any activity that disparages or creates a negative impression of any sort within said customer or potential customer concerning the other Party or the Products being used, tested, qualified, acquired, purchased or otherwise evaluated by the customer or potential customer.  Such covenant and promise by each Party shall include the integrity of the other Party, any material information about the position, condition, size, capabilities, or any of the other Party's general business information.  In the event of a Termination of this Agreement by Licensee or should Licensee elect not to renew this Agreement, except for termination by Licensee under Section 10 above, Licensee shall provide to Licensor at no cost, charge or other consideration on or before 60 days prior to the termination of this Agreement or Licensees' election not to renew the full list of customers that are using the product or that have approved the product, or have tested the product, or have had the Product presented to them, or have rejected the Product following initial presentations, testing, or other evaluations of any kind, or have been contacted about the Product, including all the relevant contact information of the customer representative, employee,

CW 4/20/15

engineer, or other such individuals involved in the consideration, testing, evaluation or presentation of the Product or its ancillary Products ("Customer List")

(f)  In case of termination of this Agreement by Licensor, Licensee, at Licensor's request, shall continue to faithfully and properly service its' existing customers for the full 180 day period prior to termination.  In such event, both Parties covenant and agree that neither they, nor their agents, manufacturer's Representatives, sales personnel, technical support personnel, marketing or any other related staff will engage in any direct or indirect action of marketing, servicing, supporting and maintaining any customer relationship, Product delivery or Product / Technical support needs of said customer or potential customer, as the case may be, nor shall either Party engage in any activity that disparages or creates a negative impression of any sort with any customer or potential customer concerning the other Party or the Products being used, tested, qualified, acquired, purchased or otherwise evaluated by the customer or potential customer.  Such covenant and promise by each Party shall include the integrity of the other Party, any material information about the position, condition, size, capabilities, or any of the other Party's general business information.

15.  **Miscellaneous.**

(a)  In the event that any provision of this Agreement shall be held invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect any other provision of this Agreement, and the parties shall negotiate in good faith to modify the Agreement to preserve (to the extent possible) their original intent.  If the parties fail to reach a modified agreement within one (1) month after the relevant provision is held invalid or unenforceable, then the dispute shall be resolved in accordance with the dispute resolution procedures set forth in Section 11 above.

(b)  All headings are for convenience only and shall not affect the meaning of any provision of this Agreement.

(c)  Any failure to enforce any of the provisions of this Agreement or to require at any time performance of any of the obligations hereof, shall in no way affect the validity of this Agreement or any part thereof, or the right thereafter to enforce each and every such provision.

(d)  No party has relied on any representation or warranty of any kind in entering into this Agreement, or as an inducement to enter into this Agreement, except for those representations and warranties expressly set forth herein.

(e)  All rights and licenses granted pursuant to any section of this Agreement are, and will otherwise be, for purposes of Section 365(n) of the U.S. Bankruptcy Code and/or any similar or comparable section of the U.S. Bankruptcy Code (as such sections may be modified, amended, replaced, or renumbered from time to time), executory licenses of rights to "intellectual property," as defined under **Section 101 (35A)** of the U.S. Bankruptcy Code and/or any similar or comparable section of the U.S. Bankruptcy Code (as such sections may be modified, amended, replaced, or renumbered from time to time). The parties will retain and may fully

exercise all of their respective rights and elections under the U.S. Bankruptcy Code. Accordingly, the licensee of such rights shall retain and may fully exercise all of its rights and elections under the U.S. Bankruptcy Code. Upon the commencement of bankruptcy proceedings by or against Licensor under the U.S. Bankruptcy Code, the Licensee shall be entitled to retain all of its license rights and use rights granted under this Agreement.

(f)  Purchase Option:

(f)(i)    In the event that Licensor, during the License Period, desires to sell and has received a bona fide offer in writing from an unaffiliated third party to buy all or substantially all of the assets of Licensor, or the assets directly related to the Products, Technology, Know-How and Patent Rights (as defined in Article 1 "Definitions" of this Agreement), Licensor shall first notify Licensee in writing of the proposed sale ("(f)(i) Offer Notice"). Each (f)(i) Offer Notice shall contain all material terms of the proposed sale, including, without limitation, a copy of the written offer received, the purchase price ("(f)(i) Offer Price") and terms of payment, the date and place of the proposed sale, and any other material terms.  Licensee shall have an option for a period of sixty (60) days from the date the (f)(i) Offer Notice is received to elect to purchase all or substantially all of the assets of Licensor or assets of Licensor's business as directly related to the Products of this Agreement as detailed herein in Section 15(f)(i) at a price discounted by 17.5% of the (f)(i) Offer Price and subject to the same material terms and conditions as described in the (f)(i) Offer Notice (or terms and conditions as similar as reasonably possible). Licensee may exercise such purchase option and, thereby, purchase all (or substantially all) of the assets of Licensor as described and detailed herein in this Section 15(f) by notifying Licensor in writing before expiration of such sixty (60) day period.  If during the License Period, an (f)(i) Offer Notice is presented to Licensee and Licensee declines to exercise its purchase option, then Licensor shall have the obligation to purchase the Customer List at a price equal to 17.5% of that third party (f)(i) Offer Notice only at such time as the sale of assets is consummated and within 30 days of final settlement of said sale..  In such case, the sale of the Customer List to Licensor shall take place within 30 days of said settlement date..

(f)(ii)    In the event that Licensor, during the License Period, desires to sell and has received a bona fide offer in writing from an unaffiliated third party to buy assets of Licensor that does not, directly or indirectly, related to the Products, Technology, Know-How and Patent Rights (as defined in Article 1 of this Agreement), Licensor shall first notify Licensee in writing of the proposed sale ("(f)(ii) Offer Notice"). Each (f)(ii) Offer Notice shall contain all material terms of the proposed sale, including, without limitation, a copy of the written offer received, the purchase price ("(f)(ii) Offer Price") and terms of payment, the date and place of the proposed sale, and any other material terms.  Licensee shall have an option for a period of sixty (60) days from the date the (f)(ii) Offer Notice is received to elect to purchase said assets of Licensor or assets of Licensor's business as detailed herein in Section 15(f)(ii) at the full (f)(ii) Offer Price (i.e., no discount) and subject to the same material terms and conditions as described in the (f)(ii) Offer Notice (or terms and conditions as similar as reasonably possible).    Licensee may

exercise such purchase option and, thereby, purchase said assets of Licensor or assets of Licensor's business as described and detailed herein in this Section 15(f)(ii) by notifying Licensor in writing before expiration of such sixty (60) day period. If during the License Period, an (f)(ii) Offer Notice is presented to Licensee and Licensee declines to exercise its purchase option, then Licensor shall have no obligation to purchase the Customer List.

(g) This Agreement may be executed in two or more counterparts, each of which shall be deemed to constitute an original, but all of which together shall constitute one and the same instrument.

(h) Each party acknowledges that information provided under this Agreement may be subject to export and import restrictions, and any use or transfer of controlled information must be authorized under those regulations. Each party agrees that it will not use, distribute, transfer, or transmit the information of the other party in any products except in compliance with the laws and regulations of the country from which the product and/or information furnished hereunder is being exported and/or to which it is being imported. This obligation survives any termination of this Agreement.

(i) This Agreement constitutes the entire understanding between the parties with respect to the subject matter of this Agreement and merges all prior discussions between them relating thereto. No amendment or modification of this Agreement shall be valid or binding on the parties unless made in writing and signed on behalf of each of the parties by their respective duly authorized officers or representatives.

(j) Binding Nature. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

(k) Headings. Headings in this Agreement are for convenience only and shall not be used to interpret or construe its provisions.

(l) Non-Waiver. No delay or failure by either party to exercise any right hereunder, and no partial or singly exercise of any such right, shall constitute a waiver of that or any other right, unless expressly provided herein.

(m) Time of Essence. Time is of the essence of this Agreement.

(n) Amendments. No amendments to this Agreement shall be valid unless they are in a writing signed by the Parties.

CW 4/20/15

IN WITNESS WHEREOF, the parties hereto have executed and this Agreement as of the date first above written.

PPT RESEARCH, INC.

By: _____

Title: _____PRESIDENT_____

Date: _____4/20/15_____

SOLVAY USA INC.

By: _____

Title: _____VP GM Novecare NA._____

Date: _____5.5.15_____

Exhibit A

[List of PPT Patents to be supplied by PPT]

1)  U.S. Patent #7,381,690
2)  U.S. Patent Application;  Serial #12/586,507
3)  PCT Applications related to (1) and (2) above

*CW* 4/20/15

Exhibit B

[Quality, consistency and performance criteria]

1) LVS Gel – Particle  Quality
    a) Quality of gel particles defined by:
        i.   Particle Size Distribution curve using Laser Diffraction Analyzer (Coulter LS-230 or LS-320) as compared to standard material.
        ii.  Level of water contained in gel-paste material that affects total solids content of gel-paste and gel-particles to be used in LVS.
        iii. Analytical determination of oxide level and hydroxide level of gel-particles.  Ratio must match or be superior to standard material.
        iv.  Contamination.  No visible or hidden contamination caused by external material or extra solids added to gel-particles or gel-paste
        v.   Visual inspection:  Dried or partially dried gel-paste is unacceptable.  Water level in paste must match or be within +2 – 4% of that for standard material
        vi.  Packaging of Gel-Paste:  Must be double bagged and completely sealed on arrival.  Otherwise, dried surface particles may form, compromising integrity of gel-particles within.
        vii. Gel –particle resistance to shear.  Gel-particles properly prepared must be resistant to shear forces present in saw operations.  High shear mixing followed by PDC analysis confirms shear resistance vs. that of standard material.
        viii. Etc.
    b) Gel Particle Consistency
        i.   Gel-Particle Consistency is determined by measuring quality requirements listed above for a minimum of at least 3 separate lots of production scale lots of gel-paste;  preferably 4 lots at the discretion of PPT.
        ii.  Deviation of more than that of standard material between lots may disqualify supplier's  gel-paste material.
        iii. Ability to supply material in quantities needed on a consistent basis by supplier is an additional criterion for consistency.
        iv.  Supplier must be ISO -9001-2000 or better certified as a tangible show of product production consistency.  GMP certification is preferred.
        v.   Etc.
    c) Gel – Particle Performance:
        i.   Gel-particles must pass PPT standard "Soft – Settle" testing sequence with at least equal or superior results than those of standard material at all dilution levels.
        ii.  Slurry settling rates of LVS made with supplier's gel-particles must be equal or slower than that for standard material at the same dilution level.
        iii. There must be no or small variations in slurry viscosity between standard material and

CW 4/20/15

supplier's material at various dilution levels.

iv.    Gel-Material as "LVS" must not show any adverse suspension characteristics at close to freezing temperatures. No suspension expectations exist once freezing occurs.

v.    LVS material must rinse from wafer surfaces without remaining residue using standard rinsing techniques at PPT (i.e.; PPT 3-bath rinse station).

vi.    Settling of gel-particles in LVS suspension carrier must not be higher than that of standard material.

vii.    Etc.

# Exhibit – C

### (Reciprocal Confidentiality Agreement)



Solvay NDA.pdf

*Clv 4/20/15*

# Exhibit – D

## (PRODUCT WARNING AND DISCLAIMER)

## PRODUCT WARNING AND DISCLAIMER

**WARNING:**   *The reaction between Silicon particles and/or Silicon and Water is known to produce Hydrogen Gas ("H2"). The LVS and SCA compositions ("Products") are water-based. The use of this Product series to slice, grind, lap, rinse, clean or cut Silicon ingots or bricks will produce Silicon "kerf" or small Silicon particles. When these particles are mixed with, stored together with, or otherwise come in contact with the LVS and/or SCA aqueous products, Hydrogen Gas may be produced. H2 is dangerous and can be highly flammable and/or explosive under certain conditions.*

**Warranty Disclaimer:** In addition to highlighting the inherent danger of H2 production from use, testing, employing, or implementation of the LVS Products or other aqueous based ancillary rinse aids (i.e.; SCA product series) with silicon slicing, this document contains safety and Product use information, suggested procedures, use limitations, safety recommendations, H2 gas remediation suggestions, recommended conditions for safe use, and suggestions for potential equipment designs. This information is being offered for the "end – user's" evaluation only.  As such, it is the sole responsibility and duty of the "end – user" / Customer to fully investigate and develop ALL the safety precautions, procedures, equipment, tools and facilities necessary for the safe use and implementation of the LVS / SCA water based carriers / rinses with Silicon or with any other metal or semi-metal that may similarly produce dangerous, toxic, or flammable by-products as a result of exposure to or combination with the LVS / SCA aqueous systems.  The information provided by PPT Research Inc. ("PPT") represents information and data gathered from test results and other available sources.  PPT represents that this information is accurate only to the best of PPT's information and belief based on limited testing under specific circumstances,  and PPT makes no representation or warranty that the information is complete or that it will be applicable to "end – user's" particular application for the LVS / SCA Products. The information is intended only as an initial guideline and it is being offered "as-is" without further representation or warranty as to its accuracy, completeness or applicability to "end – user's" / Customer's actual or intended use. Customer / "end – user" acknowledges, understands and agrees that it is anticipated that Customer/end-user will conduct its own tests and investigations as to the proper safety and appropriate use and application of the LVS / SCA

Products and Customer / end-user agrees to release and hold PPT, its officers, directors, employees and representatives harmless from and against any claims, losses or damages relating to any failure to warn or relating to Customer's reliance on the information provided.

By choosing to acquire or accept the LVS / SCA Products, Customer / end-user acknowledges, understands and agrees that it is purchasing or acquiring the Products in their current "as-designed" and "as-is" condition as described in the SDS or MSDS for said Products, which are delivered without the presence of or any exposure to any mentioned metals or semi-metals, which may cause reaction with Products.

PPT, its officers, directors, employees, and representatives make no warranties, and to the extent legally permissible, expressly disclaim any and all warranties, whether oral or written, whether express or implied, and whether arising out of statute, custom, usage, trade or otherwise; including without limitation, any warranty concerning the design, safety, application, merchantability or fitness of the LVS Products for any particular purpose or use.

**Release and Indemnity:**  By accepting, opening, using, handling, testing, mixing, transferring, storing, disposing or otherwise employing the LVS / SCA Products, resulting in exposure, use or process that creates contact between the LVS / SCA Products and Silicon and/or Silicon particles or any other such metal or semi-metal that may be reactive with water or water solutions, Customer/end-user acknowledges and agrees that PPT shall not be held responsible or otherwise liable in any manner whatsoever to either to Customer/end-user, to any end-user supplied by Customer, or to any other third party, for any losses or damages related to the Products, their use, testing, employment, handling or processing.

Further,  by accepting, opening, using, handling, testing, mixing, transferring, storing, disposing or otherwise employing the LVS / SCA Products, resulting in exposure, use or process that creates contact between the LVS / SCA Products and Silicon and/or Silicon particles or any other such metal or semi-metal that may be reactive with water or water solutions,  Customer/end-user further agrees to release, indemnify defend and hold PPT harmless, from, for and/or against any and all claims,  losses, fines, costs, fees, including reasonable attorney's fees, or other damages, whether to property or to persons, including serious bodily injury or death, that may arise out of, relate to, result from, or which may otherwise be attributed to Customer's / end-user's use, misuse, employment of, testing, shipping, storage, collection, mixing, dilution, modification, or disposal of the LVS products.