# THOMAS DECLARATION

# EXHIBIT 4

# FIRST AMENDMENT TO TECHNOLOGY LICENSE AGREEMENT

This First Amendment to Technology License Agreement (hereinafter, the "Amendment") is made effective as of *April 6, 2016* by and between **SOLVAY USA INC.**, a Delaware corporation, acting on behalf of itself and its Affiliates and having offices at 504 Carnegie Center, Princeton, NJ 08540 ("Licensee" or "Solvay") and **PPT RESEARCH, INC.**, a Pennsylvania corporation acting on behalf of itself and its Affiliates and having offices at 515 Business Park Lane, Allentown, PA 18109 ("Licensor" or "PPT") (Licensee and Licensor are separately "a Party" and together "the Parties").

**Whereas,** Licensor is the owner of the Technology and Products relating to the Licensor's aqueous slurry product(s), including the manufacture thereof.

**Whereas**, Licensor and Licensee entered into a Technology License Agreement (the "License Agreement" or "TLA") dated February 20, 2015, with an Effective Date of April 30, 2015; and

**Whereas**, The Parties acknowledge that certain performance and logistical issues have existed relating to commercialization of the Product(s) at certain customer sites; and

**Whereas**, the Parties now wish to amend certain terms of the License Agreement pursuant to this Amendment.

**Now, therefore,** in consideration of the mutual covenants set forth in this Amendment and other good and valuable consideration, the Parties, intending to be legally bound hereby agree as follows:

I. Article 14(a)-(b) of the TLA are hereby deleted in their entirety and replaced with the following language:

14(a) This Agreement shall commence on the Effective Date and except as otherwise provided for herein, it shall terminate on the date that is six (6) years from the Effective Date (the "Term"). This Agreement shall thereafter automatically renew for successive one (1) year terms (a "Renewal Term" or, collectively, "Renewal Terms") until one Party delivers written notice to the other Party of its intent not to renew ("Termination Notice"). Except for termination pursuant to Articles 10, 14(c) or 15(f), a Party's Termination Notice must be delivered at least one-hundred eighty (180) days prior to the expiration of the then current Term or Renewal Term ("Termination Term"). All the obligations of the Parties under this Agreement shall remain the same during the Termination Term.

14(b) Minimum Performance Requirements: During the Term and any Renewal Term, Licensee shall exercise good faith and commercially reasonable efforts to market and sell the Products in the Exclusive Territories. At a minimum, in order to maintain its Exclusive License in the Territories, Licensee shall meet the following requirements for the respective Territories ("Minimum Performance Requirements") within three and a half (3.5) years of the Effective Date ("Performance Deadline"):

   i. China: Licensee must have secured GCL – Poly Energy Holdings and its affiliates ("GCL") as a Committed Customer or alternatively, Licensee shall secure at least 6 Committed Customers

before the expiration of the Performance Deadline. During each 12 month period following the Performance Deadline, the Licensee must achieve a commercially reasonable increase in sales from the amount of sales from the prior year. The Parties agree that they shall meet and exercise good faith efforts to agree upon a commercially reasonable increase in sales for the year based on current conditions.

    ii. <u>South Korea, Licensee must have secured and maintain at least one (1) Committed Customer before expiration of the Performance Deadline.</u> During each 12 month period following the Performance Deadline, the Licensee must achieve a commercially reasonable increase in sales from the amount of sales from the prior year. The Parties agree that they shall meet and exercise good faith efforts to agree upon a commercially reasonable increase in sales for the year based on current conditions.

    iii. <u>Japan, Indonesia, Singapore, India, Vietnam, Malaysia, Philippines:</u> Licensee must secure and maintain at least three (3) Committed Customers from the combination of these Territories before the expiration of the Performance Deadline. During each 12 month period following the Performance Deadline, the Licensee must achieve a commercially reasonable increase in sales from the amount of sales from the prior year. The Parties agree that they shall meet and exercise good faith efforts to agree upon a commercially reasonable increase in sales for the year based on current conditions.

    iv. <u>Taiwan: Licensee must have secured and maintain GET as a Committed Customers before the expiration of the Performance Time. During each 12 month period following the Performance Deadline, the Licensee must achieve a commercially reasonable increase in sales from the amount of sales from the prior year. The Parties agree that they shall meet and exercise good faith efforts to agree upon a commercially reasonable increase in sales for the year based on current conditions.</u>

    v. <u>Effect of Failure to meet Minimum Performance Requirements:</u>
<u>In the event that Licensee fails to meet or maintain the Minimum Performance Requirements for any of the Exclusive Territories under i-iv, Licensor may, terminate Licensee's exclusivity rights for those territories where the Minimum Performance Requirements were not met and/or maintained. In the event that Licensor elects to terminate Licensee's exclusivity for territories where the Minimum Performance Requirements were not met or maintained, Licensee shall provide Licensor with customer information for those territories consistent with 14(c).</u>

II.    The Definition of "Exclusive Territories" in Article 1 is hereby deleted in its entirety and replaced with the following language:

    "Exclusive Territories" shall mean the territories of Japan, Indonesia, Singapore, India, Vietnam, Malaysia, Philippines, China, South Korea. and Taiwan.

III.    Article 8(c) is hereby deleted in its entirety and replaced with the following language:

    Licensee shall pay to Licensor a running royalty, payable within 30 days of the

end of each Reporting Period, calculated at a rate of seven percent (7%) based on Net Sales of Product sold by Licensee during the License Period for sales in China and South Korea, and **7%** for any of the other Exclusive Territories, with the exception of Taiwan. Payment shall be in U.S. Dollars.

With respect to Taiwan, Licensee agrees to pay to Licensor a running royalty, payable within 30 days of the end of each Reporting Period, calculated at a rate of seventy (70%) percent of the Gross Margin of Product sold by Licensee within the Territories. For the purposes of this Agreement, "Gross Margins" shall be defined as: Net Sales less, direct manufacturing costs incurred by Licensee (excluding manufacturing and packaging costs by Padarsh or any permitted successor or sublicensed manufacturer, but including packaging, re-packaging, and dilution by Licensee) less freight and logistics costs directly incurred by Licensee.

By way of example and not limitation, Gross Margin shall not include Sales, Marketing, Administrative and Technical Support costs of Licensee. Licensee shall submit expense reports with each running royalty payment to verify Gross Margins.

--

IV. Article 4 of the License Agreement is hereby amended to add the following language:

The Parties further acknowledge that a performance issue was observed during initial testing of Licensor's Product; specifically, the inconsistent production of thick and thin wafers during wire saw cutting of silicon ingots under certain test conditions. Licensor had developed a resolution to this issue, which Licensee did not believe to be commercially appropriate. Licensor disagrees with this assessment. Licensee has developed an alternate solution to this issue ("Alternate Technology") and contends that its Alternate Technology is beyond, and/or outside of the scope of the Technology Package, Technology, Product(s) and Know-How of Licensor and the TLA. Licensor adamantly disputes this contention. The Parties, however, have agreed to the following terms to resolve this specific dispute:

i. For the life of any patents sought for the Alternate Technology, or for a period of 25 years from the Effective Date, whichever period is longer, Licensee shall, and does hereby grant to Licensor, its Affiliates and assigns, including any third-party purchaser of Licensor or its assets, or its assets directly related to the Technology, Patents, Patent Rights, Product(s) and Know-How of the Technology License Agreement (TLA), a royalty-free, world-wide, fully-transferable, non-exclusive license with full detailed disclosure to the Alternate Technology. The right to use the Alternate Technology shall be a right that is limited to: (a) Licensor, its Affiliates, successors and permitted assigns, (b) customers, to the extent necessary for use of the Product in accordance with Article 2, but in no case shall Licensee reveal the composition of the Alternate technology beyond that which is contained in the patent application. and (c) any third party purchaser acquiring Licensor's assets, or stock as provided for in Article 15(f).

ii. The Parties hereby agrees that they shall keep one another informed of the details of any Product composition development, research, improvements, changes, modifications or alterations of any kind within not more than 30 days.

iii. All future Product composition improvements, alterations, developments or changes shall be and remain the sole and exclusive property of Licensor.

V. The Alternate Technology shall be disclosed to Licensor by Licensee in the form of a comprehensive, detailed report from Solvay as part of said license in accordance with the following:

    a. Within ten (10) days of the execution of this Amendment, Licensee shall provide Licensor with the composition and within 30 days Licensee shall provide Licensor full disclosure report of its "Additive / Process" resolution, or whatever constitutes the full and complete resolution to the "thick / thin" wafer issue. Disclosure by "patent application" of Licensee shall not be considered acceptable disclosure, though it shall be included in the disclosure documents. Full disclosure shall include a written disclosure report which shall include the following (to the extent that this information or documentation is within Licensee's possession or control:

        (i) complete compositional, structural, accurate proportions of components in the case of multiple component additive composition, and proper chemical and trade compound name(s) identification of the final component additive(s) that was or are used or to be used or employed within or as part of the LVS-FA / SuperSol AR-100 basic composition or other composition based on the Technology or Product(s), or similar water based suspension system currently used or being tested at customer sites including GCL within China or any other sites within the exclusive territories to resolve the "Thick – Thin" wafer issue. This shall include the exact weight percentage or proportion of additive component(s) employed within the LVS-FA / SuperSol AR-100 ready-to-use carrier system from which production slicing slurry is made or prepared;.

        (ii) full chemical and trade name identification of any additives previously tested that failed to resolve the issue;

        (iii) full details on any and all wire saw set-up, run and process parameter changes or alterations, or any specific or altered use processes for the LVS-FA / SuperSol AR-100 compositions containing the final, successful additive(s) that were utilized to resolve the Thick - Thin issue; and

        (iv) a detailed summary of the test results from all tests as well as identification of any customer site(s) where testing occurred, and from all of which the test data results are presented in said report that demonstrate and prove the claimed Licensee "thick / thin" resolution is fully functional with consistent successful results within a production slicing environment at customer sites.

        (v) Full description in detail of any issues that remain with the Licensee claimed resolution for the Thick / Thin wafer issue that must still be resolved for complete and successful production use

VI. Except as set forth in this Amendment, all terms of the License Agreement shall remain unchanged and in full force and effect.

VII. The Recitals above are hereby incorporated by reference as if set forth at length herein.

VII. Except as explicitly set forth in this Amendment, the capitalized terms used herein shall have the meaning ascribed to it in Technology License Agreement (TLA).

IV. This Amendment may be executed in one or more counterparts, each of which shall be deemed to be an original copy and all of which, when taken together, shall be deemed to constitute one and the same document.

IN WITNESS WHEREOF, each of the Parties hereto, agreed to be legally bound, has caused this Amendment to be executed by a duly authorized officer or representative.

| SOLVAY USA INC. | PPT RESEARCH, INC. |
|---|---|
| By: _[signature]_ | By: _Chip Ward_ |
| Name: L. THOMAS | Name: CHIP WARD |
| Title: VP Strategy | Title: CEO |