IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PPT RESEARCH, INC., | | |
| Plaintiff, | | |
| v. | | CIVIL ACTION |
| | | NO. 20-2645 |
| SOLVAY USA, INC., d/b/a SOLVAY-RHODIA, SOLVAY AND SOLVAY USA, *et al*, | | |
| Defendants. | | |

## MEMORANDUM OPINION

**Schmehl, J.  /s/ JLS**                                                                **July 7, 2021**

## I.    INTRODUCTION

Before the Court are the motions to compel arbitration of Solvay USA, Inc., and

Rhodia Operations S.A.S. ("Defendants") Plaintiff PPT filed a Complaint in this matter

against all defendants, asserting breaches of two separate contracts, trade secret

misappropriation and injunctive relief. Based upon the parties' submissions and after oral

argument being held in this matter, Defendants' motions are granted, and this matter is

stayed pending an arbitration.

## II.    BACKGROUND

PPT Research developed a technology called LVS micro-gel particle slurry

suspension system ("MGP Technology"), a technology that has application in the cutting

of silicon wafers for use in producing solar cells. Complaint, ¶ 2. In March of 2014,

Solvay was introduced to PPT Research to discuss a potential joint venture involving the

MGP Technology. *Id.* ¶ 88. To effectuate the confidential exchange of information

related to PPT Research's trade secrets, PPT Research entered into a Reciprocal

Confidentiality Agreement ("RCA") with Solvay's subsidiary, Rhodia Operations S.A.S. ("Rhodia") in June 2014. *Id.* ¶ 89. In August 2014, the RCA was amended to include Solvay. *Id.* ¶ 90. In January 2015 Solvay indicated to PPT that it was interested in licensing its use in certain Asian markets. *Id.* ¶ 109. Accordingly, Solvay and PPT executed a Technology Licensing Agreement ("TLA") on April 27, 2015. *Id.* ¶ 104.

The RCA and TLA both contain arbitration clauses. The RCA's arbitration clause reads as follows:

> All disputes arising out of, or in connection with, the validity, interpretation, performance and/or termination of this Agreement, which cannot be amicably settled between the parties, shall be finally settled under the Arbitration Rules by one or more arbitrators appointed in accordance with such Arbitration Rules without recourse to the ordinary courts of law. Arbitration proceedings shall take place in the Arbitration Place, shall be conducted in confidentiality and in the English language. The award rendered therein shall be final, confidential and binding upon the parties. The foregoing is without prejudice to each party's right to seek injunctions, exequatur and other relief in any appropriate court, to the extent the same are not available in arbitration.

RCA § 6.2. The "Arbitration Rules" are defined as "The Rules of Arbitration of the International Chamber of Commerce." RCA § C. The "Arbitration Place" is defined as Delaware. *Id.* The governing law under the agreement is Delaware law. *Id.* The arbitration clauses of the TLA are as follows:

> (a) Any controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof shall, if possible, be settled by friendly negotiation. If settlement cannot be obtained through such friendly negotiation, such controversy, claim or dispute, may be submitted to arbitration as provided in Section 11(b) below for resolution.
> (b) All disputes arising in connection with this Agreement and which cannot be settled amicably shall be settled by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce (ICC). The arbitral tribunal shall be composed of a single arbitrator to be appointed in accordance with said ICC Rules. The place of arbitration shall be Pennsylvania, the arbitration shall be conducted in the English language and all documents not in English language submitted by any

Party shall be accompanied by an accurate English language translation thereof. The arbitral tribunal shall apply the state laws of Pennsylvania and the federal laws of the United States of America.

TLA § 11.

## III.  PROCEDURAL HISTORY

The Complaint in this matter raises claims for breach of both the RCA and the TLA, misappropriation of trade secrets and injunctive relief. After PPT commenced this action, Defendants commenced an arbitration against PPT in the International Chamber of Commerce. In response to PPT's emergency motion to stay the ICC arbitration, this Court entered an order staying that arbitration until it had a chance to address the instant motions to compel. PPT opposes Defendants' motions to compel arbitration based upon the "effective vindication" rule, claiming that it does not have the financial resources to proceed with an ICC arbitration.

## IV.  LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Before compelling arbitration, "a court must determine that (1) a valid agreement to arbitration exists, and (2) the particular dispute falls within the scope of that agreement*." Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (citations omitted).

In analyzing the validity of an arbitration agreement, courts "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 944 (1995) (citations omitted); *Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 288 (3d Cir. 2017).

"When it is clear on the face of the complaint that a validly formed and enforceable arbitration agreement exists and a party's claim is subject to that agreement," courts must apply a Rule 12(b)(6) motion to dismiss standard "without discovery's delay." *MZM Constr. Co., Inc. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 406 (3d Cir. 2020) (quoting *Guidotti v. Legal Helpers Debt Resol., LLC*, 716 F.3d 764, 776 (3d Cir. 2013). "But if the complaint states a claim or the parties come forward with facts that put the formation of the arbitration agreement in issue," a court may permit "limited discovery" to resolve the matter, and will "consider the question anew, using a summary judgment standard under Rule 56." *Id.*

In the instant matter, a valid and enforceable arbitration agreement exists. Accordingly, Defendants' motion shall be evaluated using the 12(b)(6) standard.

## V.    **DISCUSSION**

Initially, PPT argues that this Court and not the arbitrator must determine the validity of the arbitration provisions in this matter. Further, PPT argues that in analyzing the arbitration provision, this Court should not compel arbitration. As will be discussed below, I find that the question of arbitrability in this matter was delegated to the arbitrator. Accordingly, Defendants' motions to compel arbitration are granted.

### A.  **Arbitrability**

There is a general presumption that courts decide questions related to arbitrability, i.e., whether a certain dispute falls within the scope of an arbitration clause. *Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 187 (3d Cir. 2010). Parties to an arbitration agreement can agree to delegate this decision to an arbitrator instead, but because of this presumption, the delegation must be "clear and unmistakable." See *Henry*

*Schein, Inc. v. Archer & White Sales, Inc.*, 139 S.Ct. 524, 531 (2019); *Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 335 (3d Cir. 2014). The Third Circuit has described this "clear and unmistakable" standard as "onerous," and required an "express" and "unambiguous" expression of intent to arbitrate arbitrability in order to satisfy it. *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 753 (3d. Cir. 2016).

The question here is whether the RCA and TLA contain delegation provisions, thus reassigning the authority to address PPT's challenges to the agreements to the arbitrator, and whether said provisions are valid. As recently stated by Judge Brann in the Middle District of Pennsylvania:

> Case law suggests that to demonstrate clear and unmistakable intent to delegate questions of arbitrability, provisions must be both specific and exclusive. For example, expressly stating that issues regarding the validity or enforceability of an arbitration agreement shall be determined by an arbitrator is likely sufficient. Expansive language that arbitration shall govern "any dispute of 'any kind' that arises 'in connection with' or 'relating to'" the arbitration agreement may also be helpful, even if "a broadly worded arbitration clause is not enough" standing alone.

*Jean v. Bucknell Univ.*, 2021 WL 1521724, *5 (M.D. Pa. Apr. 16, 2021) (internal citations omitted). Further, the Third Circuit has found that the incorporation of AAA Rules (or other arbitral rules) provides clear and unmistakable evidence of intent to delegate, as long as a contract does not "otherwise muddy the clarity of the parties' intent to delegate." *Richardson v. Coverall N. Am., Inc.*, 2020 WL 2028523, at *2-3 (3d Cir. 2020).

As set forth above, the RCA contains an arbitration provision that states:

> All disputes arising out of, or in connection with, the validity, interpretation, performance and/or termination of this Agreement, which cannot be amicably settled between the parties, shall be finally settled

under the Arbitration Rules by one or more arbitrators appointed in
accordance with such Arbitration Rules without recourse to the ordinary
courts of law.

RCA § 6.2. The "Arbitration Rules" are defined as "The Rules of Arbitration of

the International Chamber of Commerce."

This clause incorporates a set of clearly worded arbitral rules, which is the

exact scenario contemplated by the Third Circuit in *Richardson*. Therefore, the

RCA provides clear and unmistakable evidence that the parties intended to

delegate arbitrability to the arbitrator. It is true that *Richardson* discussed in a

footnote a highly specific set of facts that could "muddy the clarity of the parties'

intent to delegate," notwithstanding the incorporation of arbitral rules, and require

additional evidence of intent to delegate arbitrability, however, there are no such

facts here. *Richardson* required "jumping from 1) the contract, to 2) the reference

to unspecified AAA rules; to 3) the AAA Commercial Rules, and, lastly, to 4) the

AAA Supplemental rules, which ultimately vested an arbitrator with the authority

to decide class arbitrability." 811 F.App'x 100, 103, n.2. In this matter, the RCA

provision is straightforward and incorporates the ICC rules, which state that "any

decision as to the jurisdiction of the arbitral tribunal, . . . shall then be taken by the

arbitral tribunal itself." Int'l Chamber of Commerce Arbitration Rules, Art. 6(5),

ECF No. 9, Ex. 2 to Kay Declaration. The RCA refers all disputes to the ICC, and

the ICC rules state that its arbitrators can determine jurisdiction. As to the RCA,

the analysis ends there. This agreement clearly intended to delegate the question

of arbitrability to the arbitrators.

Similar to the RCA, the TLA states that "[a]ll disputes arising in connection with this Agreement and which cannot be settled amicably shall be settled by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce (ICC)." TLA §11(b). As with the RCA, Defendants argue that because the TLA contains language incorporating ICC Rules, and the ICC Rules allow an arbitrator to decide jurisdiction, arbitrability has been delegated to the arbitrator. I agree and see no reason to treat the arbitration clause in the TLA any different than the clause in the RCA.

PPT makes several creative arguments against delegation, all of which fail. First, PPT argues that the arbitration provision contained in the RCA contains a "carve-out" that "expressly authorizes PPT Research to seek injunctive relief from the courts." ECF No. 12, p. 10. PPT claims that where the "arbitration clause does not generally refer all controversies to arbitration, . . . something other than incorporation of AAA rules would be needed to establish that the parties intended to submit arbitrability questions to an arbitration." *James & Jackson, LLC v Willie Gary, LLC*, 906 A.2d 76, 81 (Del. 2006).[1] The language of the RCA that PPT refers to states "[t]he foregoing is without prejudice to each party's right to seek injunctions, exequatur and other relief in any appropriate court, **to the extent the same are not available in arbitration**." RCA, § 6.2 (emphasis added). However, PPT has not pointed to any relief it is seeking that is not available at ICC arbitration. Further, the ICC Arbitration Rules state "[u]nless the parties have otherwise agreed, as soon as the file has been transmitted to it, the arbitral tribunal

---

[1] Section C of the RCA states that it is governed by the law of the state of Delaware.

may, at the request of a party, order any interim or conservatory measure it deems appropriate." Rule 28(1). Clearly, this rule contemplates the issuance of injunctive relief by an arbitrator, so if that is the nature of the relief PPT says it cannot obtain at an arbitration, its argument is incorrect. The RCA does not contain a carve-out that makes the incorporation of the AAA rules insufficient so as to require additional proof of intent to delegate.

Next, PPT takes issue with the wording of the dispute resolution clause in the TLA, and the fact that section 11(a) says "any controversy, claim or dispute" **may** be submitted to arbitration, while section 11(b) says "all disputes **shall**" be settled by arbitration. By PPT's reading of the clause, 11(a) is a broad, permissive arbitration provision, while 11(b) is a narrow clause only applying to contract disputes. ECF No. 12, p. 23. PPT argues that the TLA does not refer all controversies to arbitration, only a "narrow subset of claims" described in 11(b) as disputes "arising in connection with this Agreement," and therefore does not refer statutory claims to arbitration. By PPT's reasoning, because the TLA doesn't refer statutory claims to arbitration, the parties could not possibly have clearly and unmistakably delegated arbitrability, and therefore the Court should decide arbitrability.

I find this argument to be unpersuasive. Courts have repeatedly rejected PPT's argument that the use of the word "may" automatically renders an arbitration clause permissive. *Brown v. City of Phila.*, 2010 WL 4484630 (E.D. Pa. Nov. 9, 2010). Rather, courts have interpreted arbitration clauses using the word "may" to be mandatory on the grounds that such language merely manifests

the parties' intent that arbitration be obligatory if either party so chooses. See e.g., *In re Winstar Commc'ns, Inc.*, 335 B.R. 556, 563 (Bkrtcy. D. Del. 2005) (citing *Chiarella v. Vetta Sports, Inc.*, 1994 WL 557114, at *3 (S.D.N.Y.1994) (". . . the proper interpretation is that the arbitration provision did not have to be invoked, but once raised by one party, it became mandatory with respect to the other party. A plain reading of the clause supports such an interpretation. If the clause were wholly optional . . . it would serve no purpose.")); *D & H Distrib. Co. v. Nat'l Union Fire Ins.*, 817 A.2d1645, 1169 (Pa. Super. 2003) (finding that such language evidences the parties' intent to arbitrate disputes at either party's choosing); *Block 175 Corp. v. Fairmont Hotel Mgmt. Co.*, 648 F.Supp. 450 (D.Colo.1986) (finding that such language does not render arbitration clause permissive instead of mandatory and [when] either party elects to arbitrate and serves the proper notice, arbitration must take place); *In re Winstar Commc'ns, Inc.*, 335 B.R. at 563 ("By using the word 'may,' both parties were given the power to enforce the arbitration clause.").

In this case, the word "may" in 11(a) does not make arbitration permissive. As discussed above in the noted caselaw, the word "may" gives either party the power to elect to proceed to arbitration. Once either party elects to proceed to arbitration, arbitration is mandatory. Accordingly, 11(a) requires any controversy, claim or dispute to be submitted to arbitration. Any other result would be absurd and render the clause found in 11(a) wholly optional and therefore, without a purpose. There is no disparity between 11(a) and 11(b) such that would indicate a failure to clearly and unmistakably delegate arbitrability.

Next, PPL dedicates numerous pages of its briefs to its argument that it should be excused from its contractual obligation to arbitrate based upon a rarely used doctrine called the "effective vindication" rule. First, because I have already determined that the arbitrator should determine arbitrability in this matter, effective vindication is an argument that should be presented to the arbitrator. However, PPT makes the argument that "the delegation clause itself would violate the effective vindication rule" and therefore, the Court must determine arbitrability. ECF No. 12, p. 4. Accordingly, I will address the effective vindication argument, but I find that it does not apply to the instant set of facts.

The effective vindication doctrine is an exception to the general presumption in favor of arbitrability under the Federal Arbitration Act; and serves to prevent "prospective waiver of a party's right to pursue statutory remedies." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013). The Supreme Court has noted that the doctrine "would perhaps cover filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable." *Id.*

The Third Circuit has found that an arbitration provision that "makes the arbitral forum prohibitively expensive for a weaker party" cannot be enforced under the doctrine. *Parilla v. IAP Worldwide Servs. VI, Inc.*, 368 F.3d 269, 284 (3d Cir. 2004) (remanding to the district court to permit the taking of limited discovery to determine whether enforcement of an arbitration provision would be prohibitively expensive). In order to invalidate an arbitration provision on the grounds of prohibitive expense, a party must: "(1) come forward with some

evidence to show the projected fees that would apply to their specific arbitration and (2) show the party's inability to pay those costs." *Hall v. Treasure Bay V.I. Corp.*, 371 Fed. Appx. 311, 313 (3d. Cir. 2010).

PPT presents evidence in the form of affidavits that it believes that arbitration costs could be as great as $500,000, of which it would have to pay half up front to arbitrate its claims against Defendants. PPT presents further evidence that it "only has approximately $50,000 cash on hand," and claims that it is "only able to finance this litigation through the use of a litigation funder, and the funding secured will not cover the costs of arbitration." ECF No. 12, p. 16, 2. Accordingly, PPT claims that it has met the test for the effective vindication rule, as it has presented evidence of the projected arbitration fees and has shown its inability to pay those fees.

In response, Defendants allege that PPT has exaggerated the size of its claim and therefore, the cost of the arbitration, and that PPT has failed to show that it could not afford arbitration. In analyzing this issue, it is first necessary to note that PPT is not an unsophisticated consumer; rather, it is a sophisticated corporate entity. PPT has both a board of directors and legal counsel, and it is undisputed that PPT's counsel participate in the drafting and review of both arbitration clauses in this matter. Further, the Court has been unable to locate nor has PPT cited to a single case where a sophisticated corporate entity advised by counsel before signing an arbitration clause has successfully used the effective vindication rule to avoid the effects of a bargained for arbitration clause. Rather, caselaw where high arbitration costs have been found to justify the use of the

effective vindication rule has involved extreme financial hardships to individuals,

circumstances that do not exist in this case. See *Spinetti v. Serv. Corp. Int'l*, 324

F.3d 212, 217 (3d Cir. 2003)(arbitration costs would be prohibitively expensive

for former employee who had been unemployed for 6 months, had monthly

expenses far greater than her income and who had taken multiple cash advances

on her credit cards); *Parilla v. IAP Worldwide Servs.*, 368 F.3d 269, 271 (3d. Cir.

2004)(Court permitted limited discovery as to whether an arbitration clause was

prohibitively expensive for an administrative assistant paid by the hour); *Ryan v.

Delbert Servs. Corp.*, 2016 WL 4702352 (E.D. Pa., Sept. 8, 2016)(finding

delegation clause to be unconscionable in contract between a consumer and

payday lender due to choice of law provisions).

I reject PPT's argument that the effective vindication rule applies to prevent this

matter from being sent to arbitration. First, I take issue with the "litigation funder" that

PPT claims is providing funding for it to pursue its claims. PPT alleges that this "funder"

is providing funds for federal court litigation only, not for arbitration, but provides no

factual support or reason for this assertion whatsoever. Even if this assertion is true, I

cannot give credence to this type of litigation funding arrangement that serves to exclude

resolution of claims via a contracted-for and agreed-upon arbitration provision. As stated

by Defendants, this type of arrangement would allow an "end-run" around both the

Federal Arbitration Act and the parties' contract rights. I find it disingenuous for PPT to

simultaneously claim it is in financial distress and therefore cannot afford to arbitrate this

matter and at the same time, want to proceed with costly federal court litigation.

Generally, arbitration is considered a quicker and less expensive alternative to federal

court litigation. See *Northwestern Nat. Life Ins. Co. v. U.S. Healthcare, Inc.*, 1998 WL 252353, *3 (E.D. Pa. May 11, 1998)(The intent of the Federal Arbitration Act is "to effectuate the avoidance of unnecessary expense and delay of litigation where the parties had provided for the more efficient process of arbitration"); see also *Gilling v. Eastern Airlines, Inc.,* 680 F.Supp. 169, 169 (D.N.J.1988) (finding that purpose of arbitration is "to provide parties with a quick and inexpensive means of resolving their dispute while ... reducing the court's caseload."). Accordingly, I find PPT's argument to be unpersuasive, as it would undermine the "liberal federal policy favoring arbitration agreements." *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 92 (2000).

### B. Statutory Claims

Next, PPT argues that even if it should be required to arbitrate, its statutory claims are not within the scope of the arbitration clauses contained in the RCA and the TLA. Specifically, PPT claims that the language in the RCA that the parties shall arbitrate "all disputes arising out of, or in connection with, the validity, interpretation, performance and/or termination of this Agreement," is not broad, all-encompassing language that would require arbitration of statutory claims.

I find this argument to be unpersuasive. A review of the complaint filed by PPT in this matter shows the extent to which its statutory and injunctive claims are intertwined with the contractual claims addressed by the RCA and TLA. See Compl. at ¶¶ 217–219, 232–234, 246, 251–254. Specifically, PPT claims that Solvay received and used PPT's trade secrets under the RCA and TLA, did so in a manner that violates these agreements, and that PPT needs injunctive relief to remedy Solvay's allegedly ongoing use and disclosure of said trade secrets that stem from these agreements. *Id.* The RCA contains

the quintessential broad arbitration provision, that directs to arbitration any controversy or claim "arising out of" or "related to" the agreement. *Renfrew Centers, Inc. v. UNI/CARE Sys. Inc.*, 920 F. Supp. 2d 572, 574 (E.D. Pa. 2013). The Third Circuit notes that arbitration provisions with the phrases "arising under" and "arising out of" "are normally given broad construction." *Battaglia v. McKendry,* 233 F.3d 720, 727 (3d Cir.2000).

With the assistance of counsel, PPT agreed to arbitration clauses that contained very broad language. It failed to include any limiting language in the RCA specifically excluding statutory claims or claims for injunctive relief from arbitration. Further, the entire premise of PPT's trade secrets claim is that Defendants used PPT's trade secrets beyond what was permitted by the RCA and the TLA. Clearly, this type of claim is related to the "validity," "performance," or "interpretation" of the RCA and the TLA based in no small part upon how PPT pled its claims in the complaint. As PPT's statutory claims will depend upon an interpretation of the RCA and the TLA, these claims clearly fall under the arbitration clauses contained in those contracts and are arbitrable.[2]

C. **Stay Pending Arbitration**

Section 3 of the FAA provides:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

---

[2] PPT also again argues that §11(a) of TLA does not require, but rather permits arbitration, and that § 11(b) is much narrower and limited to only breach of contract claims. As set forth above, this contention is incorrect. Section 11(a) of the TLA contains a broad, mandatory arbitration clause that applies to PPT's statutory and injunctive claims.

9 U.S.C. § 3 (emphasis added). Here, the plain language of § 3 affords a district court no discretion to dismiss a case where one of the parties applies for a stay pending arbitration. "The directive that the Court 'shall' enter a stay simply cannot be read to say that the Court shall enter a stay in all cases except those in which all claims are arbitrable and the Court finds dismissal to be the preferable approach." *Lloyd v. HOVENSA, LLC.*, 369 F.3d 263, 269 (3d Cir. 2004). In this case, PPT requested a stay of the proceeding, and I am obligated under 9 U.S.C. § 3 to grant the stay.

**VI.**     **CONCLUSION**

For all of the above reasons, Defendants' Motions to Compel Arbitration are granted, the stay of the ICC arbitration is lifted, and this matter is stayed.